Emily Craiger (Bar No. 021728)
emily@theburgesslawgroup.com
THE BURGESS LAW GROUP
3131 East Camelback Road, Suite 224
Phoenix, Arizona 85016
Telephone: (602) 806-2100

RACHEL H. MITCHELL
MARICOPA COUNTY ATTORNEY

By:    Thomas P. Liddy (Bar No. 019384)
       Joseph J. Branco (Bar No. 031474)
       Joseph E. LaRue (Bar No. 031348)
       Karen J. Hartman-Tellez (Bar No. 021121)
       Deputy County Attorneys
       MCAO Firm No. 0003200

CIVIL SERVICES DIVISION
225 West Madison St.
Phoenix, Arizona 85003
Telephone (602) 506-8541
Facsimile (602) 506-8567
liddyp@mcao.maricopa.gov
brancoj@mcao.maricopa.gov
laruej@mcao.maricopa.gov
hartmank@mcao.maricopa.gov
ca-civilmailbox@mcao.maricopa.gov

*Attorneys for Maricopa County Defendants*

## IN THE UNITED STATES DISTRICT COURT

## FOR THE DISTRICT OF ARIZONA

| | |
|---|---|
| Kari Lake and Mark Finchem,<br><br>        Plaintiffs,<br><br>vs.<br><br>Kathleen Hobbs, et al.,<br><br>        Defendants. | No. 2:22-cv-00677-JJT<br><br>**MARICOPA COUNTY DEFENDANTS' MOTION TO DISMISS PLAINTIFFS FIRST AMENDED COMPLAINT**<br><br>(Honorable John J. Tuchi) |

Pursuant to Fed. R. Civ. P. 12(b)(6), Defendants Bill Gates, Clint Hickman, Jack Sellers, Thomas Galvin, and Steve Gallardo in their official capacities as members of the

Maricopa County Board of Supervisors ("the County") move to dismiss Plaintiffs' First Amended Complaint ("FAC") for failure to state a claim upon which relief may be granted. The following Memorandum of Points and Authorities supports this Motion.

## MEMORANDUM OF POINTS AND AUTHORITIES

### STANDARD OF REVIEW

"Dismissal [under Rule 12(b)(6)] is proper when the complaint does not make out a cognizable legal theory or does not allege sufficient facts to support a cognizable legal theory." *Cervantes v. Countrywide Home Loans, Inc.*, 656 F.3d 1034, 1041 (9th Cir. 2011). A court generally "must accept as true all material allegations of the complaint, and must construe the complaint in favor of the complaining party." *Hong Kong Supermarket v. Kizer*, 830 F.2d 1078, 1080 (9th Cir. 1987). That general rule does not apply to plainly false allegations: "[t]he court need not, however, accept as true allegations that contradict matters properly subject to judicial notice or by exhibit." *Sprewell v. Golden State Warriors*, 266 F.3d 979, 988 (9th Cir. 2001). "Nor is the court required to accept as true allegations that are merely conclusory, unwarranted deductions of fact, or unreasonable inferences." *Id*. "The complaint is properly dismissed if it fails to plead enough facts to state a claim to relief that is plausible on its face." *In re Gilead Scis. Sec. Litig.*, 536 F.3d 1049, 1055 (9th Cir. 2008) (cleaned up).

Courts may take judicial notice of facts that cannot reasonably be disputed because "they can be accurately and readily determined from sources whose accuracy cannot reasonably be questioned." Fed. R. Evid. 201(b); *Tellabs, Inc. v. Makor Issues & Rts., Ltd.*, 551 U.S. 308, 322 (2007) (assessing Rule 12(b)(6) motion, courts may "consider . . . matters of which a court may take judicial notice"); *Shwarz v. United States*, 234 F.3d 428, 435 (9th Cir. 2000) (explaining courts "need not accept as true . . . allegations that contradict facts that may be judicially noticed by the court").

### STATEMENT OF FACTS

Plaintiffs' FAC is premised on three broad allegations that are demonstrably false

based on judicially-noticeable records.[1] <u>First</u>: that Arizona voters do not vote by hand on paper ballots. *They do*. <u>Second</u>: that Arizona's election equipment is not independently tested by experts. *It is*. <u>Third</u>: that Arizona's tabulation results are not subject to vote-verifying audits. *They are*.

## I.  Arizona's voters cast their ballots by hand, on paper ballots.

Plaintiffs allege that voters in Arizona do not vote by hand on paper ballots. (FAC, ¶¶ 7, 58-60, 153). But Arizona law requires paper ballots. *See* Ariz. Rev. Stat. ("A.R.S.") §§ 16-462 (primary election ballots "shall be printed"), 16-468(2) ("Ballots shall be printed in plain clear type in black ink, and for a general election, on clear white materials"), 16-502 (general election ballots "shall be printed with black ink on white paper"). The only exception is voters who are visually impaired may vote on accessible voting devices. § 16-442.01. But accessible voting devices must produce a paper ballot or voter verifiable paper audit trail, which the voter can review to confirm that the machine correctly marked the voter's choices and which can be used to audit the election. § 16-446(B)(7); (Elections Procedures Manual (2019) at 80 [hereinafter "EPM"]).[2]

## II.  Arizona's election equipment is tested by independent, neutral experts.

Plaintiffs' claim that the "electronic voting systems" used in Arizona have not been subjected to "neutral, expert analysis[,]" (FAC, ¶ 57), and that the Dominion equipment used by Maricopa County has not been subjected to neutral, expert evaluation, (FAC, ¶¶ 20, 69), is likewise demonstrably false. Electronic voting equipment must be tested by both the Secretary of State's Certification Committee and a testing laboratory accredited by the U.S.

---

[1]   The County submits a concurrently-filed Motion for Judicial Notice, asking the Court to take judicial notice of exhibits referenced in this Motion and separately provided for the Court's convenience. Additionally, the County requests that the Court take judicial notice of additional documents referenced in the Motion that are accessible on government websites. *See Daniels-Hall v. Nat'l Educ. Ass'n*, 629 F.3d 992, 998–99 (9th Cir. 2010). All references to exhibits herein are to the exhibits attached to Motion for Judicial Notice.

[2]   The Elections Procedures Manual has the force of law. A.R.S. § 16-452(A). The currently operative version is the 2019 edition, available at https://azsos.gov/sites/default/files/2019_ELECTIONS_PROCEDURES_MANUAL_APPROVED.pdf.

Election Assistance Commission ("EAC")[3] before it can be used in Arizona elections. A.R.S. § 16-442(A), (B).

### A. Testing by independent, neutral experts occurred in Maricopa County.

An EAC-accredited testing laboratory, Pro V&V, tested the Dominion Voting Systems Democracy Suite 5.5B, the equipment used in Maricopa County. (Exh. 2; Exh. 3; Exh. 4.) Maricopa County's equipment was then tested—in public—by the Arizona Secretary of State's Equipment Certification Committee; it also passed that testing. (Exh. 5.) Moreover, Pro V&V and another EAC-accredited testing laboratory, SLI Compliance, conducted forensic audits of the County's tabulation equipment in February, 2021. (*See* Maricopa Cnty., Auditing Elections Equipment in Maricopa County https://www.maricopa.gov/5681/Elections-Equipment-Audit; *see also* Exhs. 6, 7, 8.) As explained in the County's summary of these audits, there were four primary test objectives yielding the following results:

| TEST OBJECTIVE | PRO V&V FIELD AUDIT | SLI COMPIANCE FORENSIC AUDIT |
|---|---|---|
| Determine if installed software was U.S. EAC and AZ SOS certified | All tested software and equipment was inspected and verified to be using certified software | All tested systems and equipment were using certified software. |
| Determine if any malicious malware or hardware was installed on the system or equipment | No malicious hardware and software discrepancies were identified | No malicious malware or hardware was detected |
| Determine if tabulators were connected to the internet | The system was determined to be a "closed network" and does not have internet access | No evidence of an Internet Connection was identified |
| Perform a logic and accuracy test to determine if vote switching could occur | The logic and accuracy test resulted in accurate numbers | N/A – Test was not included in SLI's Scope of Work |

(Exh. 6 at 1.)

---

[3]   The Help America Vote Act, codified at 52 U.S.C. § 20901 *et seq*, established the EAC and charged it to "provide for the testing, certification, decertification, and recertification of voting system hardware and software by accredited laboratories." 52 U.S.C. § 20971(a)(1).

**B.  Testing by independent, neutral experts occurred in other counties.**

The other fourteen Arizona counties' election equipment has likewise been tested by EAC-accredited, expert voting system test laboratories and the Arizona Secretary of State's Equipment Certification Committee. (*See* Ariz. Sec'y of State, 2022 Election Cycle/Voting Equipment (Feb. 2022), *available at* https://azsos.gov/sites/default/files/2022_Election_-Cycle_Voting_Equipment-Feb-Final.pdf (identifying voting equipment and software used in each county); EAC, Certificate of Compliance: ES&S EVS 6.0.4.0 (May 3, 2019), *available at* https://www.eac.gov/sites/default/files/voting_system/files/EVS6040_Cert-_Scope%28FINAL%29.pdf; EAC, Certificate of Compliance: Unisyn OpenElect 2.1, *available at* https://www.eac.gov/sites/default/files/voting_system/files/OVS2.1Cert%26-Scope%28FINAL%29.pdf; Ariz. Sec'y of State, Ariz. Sec'y of State Certified Vote Tabulating Equipment Pursuant to A.R.S. § 16-442 (Jul. 22, 2020), *available at* https://azsos.gov/sites/default/files/2020.07.22_Official_List.pdf.)

In sum, the election equipment used by Arizona's fifteen counties was subjected to rigorous, independent expert testing before it was used in an Arizona election. Arizona law requires that, and that is what occurred. Plaintiffs' allegations throughout the FAC—that Arizona utilizes voting equipment that has not been subjected to testing—are false.

**III.   Arizona's tabulation results are subject to vote-verifying audits.**

Plaintiffs' third baseless allegation is that Arizona's vote tabulation results are not subject to a secure, independent audit. (FAC, ¶¶ 23, 72, 144-52.) Nonsense. For each election that includes candidates for federal or statewide office, four audits of tabulation equipment and ballots are required by Title 16. The first is a pre-election logic and accuracy test, or "L&A," performed by the Arizona Secretary of State on a sample of the tabulation equipment. A.R.S. § 16-449(A), (B). The Secretary of State performed the L&A on Maricopa County's tabulation equipment on October 6, 2020. The tabulators tabulated ballots with 100% accuracy. (Exh. 9; *see also* Maricopa Cnty., Maricopa County Election Facts | Voting Equipment & Accuracy, https://www.maricopa.gov/5539/Voting-Equipment-Facts [hereinafter "Maricopa Cnty. Election Facts"].)

The second required audit is a pre-election logic and accuracy test performed by the counties on *all* of their tabulation equipment. (EPM at 86.) This second audit also occurred on October 6, 2020, and also demonstrated that the tabulators tabulated ballots with 100% accuracy. (*See* Maricopa Cnty. Election Facts.)

The third required audit is the hand count audit of ballots following the election. A.R.S. § 16-602(B). Representatives of the political parties perform it under the oversight of the Elections Department. *See* A.R.S. § 16-602(B)(7); (EPM at 213-34.) The political party representatives randomly select two percent of the polling locations, along with one percent of the early ballots cast or five thousand early ballots, whichever is less, and count all the ballots by hand. A.R.S. §§ 16-602(B), (F); (EPM at 215). Maricopa County's hand count audit of the 2020 general election, conducted from November 4 to 9, 2020, showed that the tabulators counted the ballots with 100% accuracy. (Exh. 10.)

The fourth required audit is the post-election L&A conducted by the counties. (EPM at 235.) It uses the same test ballots as the counties' pre-election L&A and should generate the same results, verifying that nothing was changed in the tabulators' software between the pre-election and post-election L&As. (*Id.*) Maricopa County's post-election L&A was conducted on November 18, 2020, and was observed and certified by the county political party chairs. (Exhibit 11; *see also* Maricopa Cnty., Media Advisory: Post Election Logic and Accuracy Test on Nov. 18 (Nov. 17, 2020) https://content.govdelivery.com/accounts/AZMARIC/bulletins/2acffff; Maricopa Cnty., Board of Supervisors Certifies Maricopa County Election Results (Nov. 20, 2020) https://content.govdelivery.com/accounts/AZMARIC/bulletins/2ada05e.) Maricopa County's post-election L&A showed that the tabulators tabulated with 100% accuracy. (*Id.*)

Arizona's other counties similarly conduct these audits required by Arizona law.[4]

---

[4]   Every county performs all of the required logic and accuracy testing. The hand count audit, however, can only be performed if the county chairs of each political party designate and provide election board members to conduct the hand count. A.R.S. § 16-602(B)(7). In 2020, one or more of the political party chairs in Apache, Gila, Graham, La Paz, and Yuma did not designate election board members. As a result, hand count audits were not performed in those counties. Every other county, however, successfully completed its hand

Plaintiffs' contention that Arizona's vote tabulation results are not subject to a secure, independent audit is false.

<b>ARGUMENT</b>

**I. Plaintiffs' untimely claims and requests for relief are barred.**

    **A. Plaintiffs' claims are barred by the two-year statute of limitations.**

       Plaintiffs bring this suit under § 1983.[5] (FAC, ¶ 48.) Because § 1983 does not contain its own statute of limitations, "federal courts borrow the statute of limitations for § 1983 claims applicable to personal injury claims in the forum state." *TwoRivers v. Lewis*, 174 F.3d 987, 991 (9th Cir. 1999). As a result, a two-year statute of limitations applies to § 1983 claims in Arizona. *Id.* Federal law, however, governs claim accrual; typically, "a claim accrues when the plaintiff knows or has reason to know of the injury which is the basis of the action." *Id.*

       Here, Plaintiffs set out alleged harms from vote tabulation machines dating back to 2002. (*See, e.g.*, FAC, ¶¶ 71-82.) Plaintiffs also allege that on November 5, 2019 the Secretary "certified the Dominion Democracy Suite 5.5b voting system for use in elections held in Arizona." (*See id.*, ¶¶ 18, 137.) By that point, Plaintiffs knew or should have known about the alleged injury caused by Maricopa County's vote tabulation machines. Yet Plaintiffs waited until April 22, 2022—when both were running for statewide office—to file suit; apparently, raising these concerns was not politically expedient during the limitations period. (*See id.*, ¶¶ 35-41.) Regardless, because Plaintiffs brought this suit outside the two-year statute of limitations applicable to § 1983 claims, this Court should dismiss the claims against Maricopa County.

---

count audit. (*See* Ariz. Sec'y of State, Summary of Hand Count Audits - 2020 General Election (Nov. 17, 2020), https://azsos.gov/2020-general-election-hand-count-results.)

[5] Plaintiffs also purport to bring a "cause of action recognized in *Ex parte Young*, 209 U.S. 123 (1908)." (FAC, ¶ 48). Because that case addressed suits against a *state* official consistent with the Eleventh Amendment, it has no bearing on claims against Maricopa County. *See Pennhurst State Sch. & Hosp. v. Halderman*, 465 U.S. 89, 97-106 (1984).

**B. Laches bars Plaintiffs' untimely lawsuit.**

Assuming *arguendo* that Plaintiffs' claims accrued sometime within the last two years, their requests for relief are barred by laches. "Laches—unreasonable and prejudicial delay—requires denial of injunctive relief, including preliminary relief." *Ariz. Libertarian Party v. Reagan*, 189 F. Supp. 3d 920, 922 (D. Ariz. 2016) (quoting *Ariz. Pub. Integrity All. Inc. v. Bennett*, No. CV-14-01044-PHX-NVW, 2014 WL 3715130, at *2 (D. Ariz. June 23, 2014)). "Laches can bar untimely claims for relief in election cases, even when the claims are framed as constitutional challenges." *Bowyer v. Ducey*, No. CV-20-02321-PHX-DJH, 2020 WL 7238261 (D. Ariz. Dec. 9, 2020). "Laches applies when there is both unreasonable delay and prejudice." *Ariz. Libertarian Party*, 189 F. Supp. 3d at 922. "In the context of election matters, the laches doctrine seeks to prevent dilatory conduct and will bar a claim if a party's unreasonable delay prejudices the opposing party or the administration of justice." *Ariz. Pub. Integrity All.*, 2014 WL 3715130, at *2 (citations omitted). In particular, "[u]nreasonable delay can prejudice the administration of justice by compelling the court to steamroll through . . . delicate legal issues in order to meet election deadlines." *See Ariz. Libertarian Party*, 189 F. Supp. 3d at 923 (quotation marks omitted).

Here, Plaintiffs challenge a statutory scheme that has authorized counties to use vote tabulation machines to "automatically" count votes since at least 1966. (*See* Exh. 14). Plaintiffs allege problems with vote tabulation machines known since 2002. (*See, e.g.*, FAC, ¶¶ 71-82.) Plaintiffs seek to invalidate a voting system certified by the Secretary on November 5, 2019. (*See id.*, ¶¶ 18, 137.) And Plaintiffs' voter files indicate they have voted in elections in which vote tabulation machines were used for more than a decade. (*See* Exh. 15.)

Given this timeline, Plaintiffs do not explain their unreasonable delay in bringing suit. Instead, Plaintiffs' dilatory conduct persists: after filing the original complaint on April 22, 2022, Plaintiffs filed the FAC on May 4, 2022—adding immaterial allegations and making cosmetic changes. (*See* Docs. 3, 4.)

Plaintiffs' unreasonable delay prejudices Maricopa County. Maricopa County has

7

already administered local jurisdictional elections this year. (Exh. 16 at 7.) Maricopa County's 2022 election plans for the primary and general elections are complete. (*See* Exh. 1.) And while Plaintiffs were busy correcting typographical errors in their original complaint, Maricopa County was presenting these plans to the public. (*See* Exh. 17.)

Plaintiffs' inexplicable delay also prejudices the administration of justice. Without any sense of urgency, Plaintiffs ask this Court to consider a 51-page FAC that manages to mangle § 1983 law, Arizona election law, and basic facts about election administration—with the upshot of requesting that this Court enmesh itself in an on-going election with sweeping changes to well-established procedures implicating ballot printing, handling, and counting. (*See* FAC, ¶ 153.) A straightforward application of laches thus bars this suit.

**C. *Purcell* bars Plaintiffs' request for injunctive relief.**

The timing and scope of Plaintiffs' requested injunctive relief also guarantees that even if this Court ordered an injunction, a federal appellate court would be required to stay it under the *Purcell* principle. *See Purcell v. Gonzalez*, 549 U.S. 1, 4-5 (2006) (requiring court to "weigh . . . considerations specific to election cases and its own institutional procedures"). The Supreme Court "has repeatedly emphasized that lower federal courts should ordinarily not alter the election rules on the eve of an election." *Republican Nat'l Comm. v. Democratic Nat'l Comm.*, 140 S. Ct. 1205, 1207 (2020) (collecting cases); *Short v. Brown*, 893 F.3d 671, 676 (9th Cir. 2018) ("[T]he Supreme Court has warned us many times to tread carefully where preliminary relief would disrupt a state voting system on the eve of an election."); *see also New Georgia Project v. Raffensperger*, 976 F.3d 1278, 1283 (11th Cir. 2020) ("And we are not on the eve of the election—we are in the middle of it, with absentee ballots already printed and mailed.").

Here, Plaintiffs' requested relief requires a complete overhaul of Arizona's elections procedures, from ballot printing to tabulation. (FAC, ¶ 153.) Plaintiffs ask this Court to run roughshod over Arizona statutory law. And Plaintiffs demand that their bullet-pointed wish list be implemented in the middle of the "Midterm" election. (FAC at 49-50.)

Plaintiffs' request for relief thus ignores a "bedrock tenet of election law." *See*

8

*Merrill v. Milligan*, 142 S. Ct. 879, 880 (2022) (Kavanaugh, J., concurring). During this election cycle, federal courts hearing election litigation have already invoked *Purcell* to deny requests for injunctive relief. *See League of Women Voters of Fla., Inc. v. Fla. Sec'y of State*, 32 F.4th 1363, 2022 WL 1435597, \*2–4 (11th Cir. 2022); *Gonidakis v. LaRose*, No. 2:22-CV-0773, 2022 WL 1503406, at \*1 (S.D. Ohio May 12, 2022) (*per curiam*); *League of United Latin Am. Citizens v. Abbott*, No. 121CV991LYJESJVB, 2022 WL 1410729, at \*30 (W.D. Tex. May 4, 2022) (*per curiam*); *Am. Council of the Blind of Ind. v. Ind. Election Comm'n*, No. 120CV03118JMSMJD, 2022 WL 702257, at \*6 (S.D. Ind. Mar. 9, 2022); *see also Mi Familia Vota v. Hobbs*, No. CV-21-01423-PHX-DWL, 2022 WL 475986, at \*1 (D. Ariz. Feb. 16, 2022) (addressing implications of *Purcell* in action initiated in August 2021).

Federal courts applying *Purcell* routinely acknowledge the strain on elections officials prompted by late changes to elections procedures. *See, e.g.*, *Ariz. Democratic Party v. Hobbs*, 976 F.3d 1081, 1086 (9th Cir. 2020) ("And, as we rapidly approach the election, the public interest is well served by preserving Arizona's existing election laws, rather than by sending the State scrambling to implement and to administer a new procedure for curing unsigned ballots at the eleventh hour."); *League of United Latin Am. Citizens*, 2022 WL 1410729, at \*30 (agreeing with election official defendants and applying *Purcell* because "the primary elections were already underway as this Court heard the preliminary-injunction motion" and "[a] delay . . . would require election administrators to duplicate their efforts [and] would increase costs (particularly for small counties)"); *see also Merrill*, 142 S. Ct. at 880 (Kavanaugh, J., concurring) ("The District Court's order would require heroic efforts by those state and local authorities in the next few weeks—and even heroic efforts likely would not be enough to avoid chaos and confusion."). As the judicially noticeable records filed alongside this Motion illustrate—"state and local election officials need substantial time to plan for elections. Running elections state-wide is extraordinarily complicated and difficult. Those elections require enormous advance preparations by state and local officials, and pose significant logistical challenges." *Id.*; (*see also* Exh. 1).

This case presents an object lesson in the *Purcell* principle. Accordingly, this Court should dismiss Plaintiffs' suit because the requested relief is unavailable.

**II.     As a matter of law, Plaintiffs fail to allege sufficient factual allegations.**

Dismissal is proper because Plaintiffs' FAC "does not allege sufficient facts to support a cognizable legal theory." *See Cervantes*, 656 F.3d at 1041. A pleading must contain "enough facts to state a claim to relief that is plausible on its face." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged. The plausibility standard is not akin to a 'probability requirement,' but it asks for more than a sheer possibility that a defendant has acted unlawfully." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (internal citations omitted).

Establishing the plausibility of a complaint's factual allegations is a two-step process that is "context-specific" and "requires the reviewing court to draw on its judicial experience and common sense." *Id.* at 679. First, a court must "identif[y] pleadings that, because they are no more than conclusions, are not entitled to the assumption of truth." *Id.* Then, assuming the truth only of well-pleaded factual allegations, a court must "determine whether they plausibly give rise to an entitlement to relief." *Id.*; *see also Eclectic Props. E., L.L.C. v. Marcus & Millichap Co*., 751 F.3d 990, 996 (9th Cir. 2014) (identifying the two-step process for evaluating pleadings).

Here, one of Plaintiffs' two requests for injunctive relief already exists in Arizona: requiring the use of paper ballots. The FAC spends a great deal of time discussing the need for and merits of the use of paper ballots. (*See, e.g*., FAC, ¶ 7 (requesting injunction requiring votes to be "cast by hand on verifiable paper ballots that maintains (sic) voter anonymity"), ¶ 59 (asserting after 2002 Arizona moved from a "paper-voting system(s) to electronic, computer-based system(s)"), ¶ 153 (requesting "an election conducted by paper ballots, as an alternative to the current framework").)

All votes tabulated in Maricopa County and every other county in Arizona are cast on paper ballots. Arizona has always used paper ballots; Arizona law requires it. The most

10

basic factual inquiry would have revealed this fact to Plaintiffs' counsel, including talking to their own clients who have voted on paper ballots in Arizona for nearly 20 years. (*See* Exh. 15.) In fact, both Mr. Finchem and Ms. Lake have received a paper ballot in the mail and voted early by mail in numerous elections since 2004. (*Id*.) Moreover, Mr. Finchem has been elected to office by voters using paper ballots that were tabulated by machines four times since 2014. (*Id*.)

As to Plaintiffs' remaining request for injunctive relief (that all votes be counted by hand and not machine) and the underlying causes of action, the FAC is devoid of factual allegations sufficient to support their claims. First, the majority of the allegations in the FAC have nothing to do with Arizona elections, the machines used to conduct Arizona elections, or the relief requested. For instance, FAC ¶¶ 73-89, 125-131, 133 and 134 contain allegations concerning elections in Alabama, North Carolina, Nebraska, Texas, Georgia, Wisconsin, Michigan, and Colorado—but not Arizona or Maricopa County. Plaintiffs' blanket allegations concerning alleged foreign manufacturing of components by hostile nations is similarly inapposite; the allegations do not identify specific machines or parts. (FAC, ¶¶ 90-92.) Likewise, the Court need not consider Plaintiffs' discussion of their beliefs regarding the merits of "open source" technology because it has nothing to do with the claims asserted or relief requested. (*Id.*, ¶¶ 108-24.)

To the extent the FAC's allegations address Arizona, most are conclusory, and the Court need not "assume the truth of legal conclusions merely because they are cast in the form of factual allegations." *Fayer v. Vaughn*, 649 F.3d 1061, 1064 (9th Cir. 2011) (per curiam). Mere "conclusory allegations of law and unwarranted inferences are insufficient to defeat a motion to dismiss." *Adams v. Johnson*, 355 F.3d 1179, 1183 (9th Cir. 2004); *accord Iqbal*, 556 U.S. at 678. For instance, § G of the FAC asserting "Arizona's Voting Systems Do Not Comply with State or Federal Standards" is simply a list of statutory requirements and the allegation that they have not been met. (FAC, ¶¶ 135-43.) The same is true with respect to Plaintiffs' alleged "Past and Threatened Conduct" of County Defendants. (*Id.*, ¶¶ 162-65.)

Finally, those few allegations that remain concerning Maricopa County are demonstrably false. The Court need not accept as true allegations contradicted by judicially noticeable facts, *Shwarz*, 234 F.3d at 435, and "may look beyond the plaintiff's complaint to matters of public record" without converting the Rule 12(b)(6) motion into one for summary judgment. *See Shaw v. Hahn*, 56 F.3d 1128, 1129 n.1 (9th Cir. 1995). For example, the allegation that, "[t]he recent hand count in Maricopa County, the second largest voting jurisdiction in the United States, offers Defendant Hobbs a proof-of-concept and a superior alternative to relying on corruptible electronic voting systems," is untrue. (FAC, ¶ 155.) The Cyber Ninjas counted only two contests (of more than 60 on each ballot), it took them more than three months, it cost millions of dollars, they claim that they went bankrupt as a result, and the hand count results were so problematic, the Arizona Senate was forced to purchase paper-counting machines in an attempt to reconcile the hand counts' botched numbers.[6] Moreover, the baseless "findings" of the Cyber Ninja's "reports," including those in paragraphs 70, 132, and 164 of the FAC, have been debunked. For instance, Plaintiffs' assertion that the Final Voted file (VM55) contained significant discrepancies is blatantly false, (*see* FAC, ¶ 70); among other things, the Cyber Ninjas did not understand that there are protected votes who are prohibited by state law from being included in any public voter file. (Exh. 13 at 65.) In addition, Plaintiffs repeatedly assert that election files were "missing," "cleared," or "deleted." (FAC, ¶¶ 70, 132, 164.) However, all the hard drives and corresponding data files from the November 2020 General

---

[6] (*See* Cyber Ninjas' Report, Vol. II (Sept. 24, 2021) at 4, *available at* https://www.azsenaterepublicans.com/cyber-ninjas-report; Cyber Ninjas' Report, Vol. III (Sept. 24, 2021) at 2–3, *available at* https://www.azsenaterepublicans.com/cyber-ninjas-report; Randy Pullen Report (Aug. 13, 2021), *available at* https://www.azsenaterepublicans.com/pullen-report (explaining that Arizona Senate acquired tabulation machines to count paper ballots in an attempt to "check" results of hand-count performed by Cyber Ninjas); Jerod MacDonald-Evoy, "'Audit' records show Cyber Ninjas went deep into debt, despite pro-Trump donations," *AZMirror* (May 11, 2022) https://www.azmirror.com/blog/audit-records-show-cyber-ninjas-went-deep-into-debt-despite-pro-trump-donations/; Erin Brady, "Cyber Ninjas to File for Bankruptcy, CEO Plans to Start New Firm with Same Employees," *Newsweek* (Jan. 7, 2022) https://www.newsweek.com/cyber-ninjas-file-bankruptcy-ceo-plans-start-new-firm-same-employees-1667113.)

Election were maintained and safely secured by Maricopa County; the files the Cyber Ninjas claimed were missing were either not subpoenaed and so not provided, or were not located because of the Cyber Ninjas' ineptitude. (Exh. 13 at 5.)

Similarly specious is Plaintiffs' assertion that "untested and unverified electronic voting machines" are used in Maricopa County and Arizona. (FAC, ¶ 2.) The tabulation machines used in Arizona elections were subjected to testing and verification prior to being certified for use, as required by federal and state law. (*See* Statement of Facts, § II.) Both the independent, bipartisan EAC and the Arizona Secretary of State's Equipment Certification Committee certified them. (*Id.*) These machines are tested again, both before and after elections, to verify that they accurately read paper ballots. (*Id.*) Further, the accuracy of the tabulation machines is verified via the required 2% hand-count audit conducted by representatives of the political parties after elections. (*Id.*, § III.) The allegation that the tabulation machines used in Arizona elections are untested and unverified is blatantly contradicted by the public record.

Finally, the entire FAC is premised on the erroneous theory that machine counting of ballots is unreliable because the machines used are "potentially susceptible to malicious manipulation that can cause incorrect counting of votes" and these alleged vulnerabilities stem from the possibility that the machines "can be connected to the internet." (FAC, ¶¶ 26, 33.) Maricopa County's vote tabulation system is not, never has been, and cannot be connected to the Internet. The Arizona Senate's Special Master confirmed that Maricopa County uses an air-gapped system that "provides the necessary isolation from the public Internet, and in fact is in a self-contained environment" with "no wired or wireless connections in or out of the Ballot Tabulation Center" so that "the election network and election devices cannot connect to the public Internet." (Exh. 12 at 8, 10–11.) The Special Master's report discredits all of the Cyber Ninjas' speculative findings—relied on by the FAC—concerning alleged "unauthorized access, malware present or internet access to these systems" that "basic cyber security best practices and guidelines were not followed" or that in the past Maricopa County failed to ensure that "election management servers were not

connected to the internet." (FAC, ¶¶ 70, 132, 164.)

Because Plaintiffs fail to assert sufficient facts to state a plausible claim for relief, their claims fail as a matter of law and this action must be dismissed.

**III.    As a matter of law, Plaintiffs fail to allege a cognizable legal theory.**

As a preliminary matter, Plaintiffs sue the five individual Maricopa County defendants "in their capacity [*sic*] as members of the Maricopa County Board of Supervisors." (FAC at 1.) Plaintiffs apparently sue the individual supervisors in their "official capacities." (*Id.*, ¶ 45.) But Plaintiffs' legal theory of liability is unstated. *See Horton v. City of Santa Maria*, 915 F.3d 592, 602–03 (9th Cir. 2019) (listing legal theories against local government entity available under § 1983). As a result, responding to Plaintiffs' 51-page FAC is unnecessarily complicated.

Regardless, Plaintiffs allege that using vote tabulation equipment is unconstitutional. But the federal Constitution delegates to state legislatures the authority to determine how elections are administered when congressional candidates are on the ballot, absent legislation by Congress. U.S. Const. art. 1, § 4, cl.1. Congress has not legislated how ballots must be counted, so Arizona's legislature is authorized to make that policy decision. Arizona law provides that ballots in Arizona are counted by electronic tabulation machines, followed by a 2% hand count audit. A.R.S. §§ 16-441 to -450 (providing statutory framework and authorization for the use of tabulation machines for Arizona's elections), 16-602(B) (mandating 2% hand count audit following every primary, special, or general election). Plaintiffs' assertion that tabulating ballots with electronic equipment is unconstitutional necessarily fails as a matter of law.

**A.    Plaintiffs' "fundamental right to vote" claims [Counts I and III] fail.**

Plaintiffs' "due process" (Count I) and "fundamental right to vote" (Count III) claims are nearly identical. (*Compare* FAC, ¶¶ 178–83 *with* FAC, ¶¶ 191–95.) Indeed, the heart of both claims is Plaintiffs' allegation that "Defendants have violated Plaintiffs' fundamental right to vote by deploying an electronic voting equipment system that has failed . . . to provide a reasonable and adequate method for voting by which Arizona electors' votes

14

would be accurately counted." (*Id*. ¶¶ 180, 193.) Regardless of whether this is a due process claim or a fundamental right to vote claim, the legal analysis is the same. Such claims are subject to review under the "*Anderson/Burdick* framework, which [the Ninth Circuit has] referred to as the 'single analytical framework' that applies to most constitutional challenges to voting restrictions." *Ariz. Democratic Party v. Hobbs*, 18 F.4th 1179, 1194 (9th Cir. 2021) [hereinafter "ADP"]. And that legal analysis leads to only one conclusion: Plaintiffs' due process and fundamental right to vote claims must be dismissed.

The *Anderson/Burdick* framework is a "'flexible standard' for assessing laws that regulate elections, and most laws need not meet strict scrutiny to pass constitutional muster." *Burdick v. Takushi*, 504 U.S. 428, 434 (1992); *see also Anderson v. Celebrezze*, 460 U.S. 780 (1983). A court "must weigh 'the character and magnitude of the asserted injury to the rights protected by the First and Fourteenth Amendments that the plaintiff seeks to vindicate' against 'the precise interests put forward by the State as justifications for the burden imposed by its rule,' taking into consideration 'the extent to which those interests make it necessary to burden the plaintiff's rights.'" *Id.* (quoting *Anderson*, 460 U.S. at 789). "A law that imposes a 'severe' burden on voting rights must meet strict scrutiny. . . . Lesser burdens, however, trigger less exacting review, and a State's 'important regulatory interests' will usually be enough to justify 'reasonable, nondiscriminatory restrictions.'" *ADP*, 18 F.4th at 1187 (quoting *Timmons v. Twin Cities Area New Party*, 520 U.S. 351, 358 (1997), and *Burdick*, 504 U.S. at 434).[7]

Here, in assessing Plaintiffs' assertion that Maricopa County's use of electronic vote tabulation equipment violates their fundamental right to vote, this Court should engage in a three-step process: (1) "consider the character and magnitude of the asserted injury to the rights protected by the First and Fourteenth Amendments that [Plaintiffs] seek[] to

---

[7]    Arizona state courts consider "state and federal due process claims together because the respective due process clauses 'contain nearly identical language and protect the same interests.'" *Vong v. Aune,* 328 P.3d 1057, 1061, ¶ 21 (Ariz. App. 2014) (quoting *State v. Casey*, 71 P.3d 351, 354, ¶ 11 (Ariz. 2003)). As such, analysis under Ariz. Const. art. II, § 4 does not differ from the *Anderson/Burdick* framework.

15

vindicate"; (2) "identify and evaluate the precise interests put forward by the State as justifications for the burden imposed by its rule"; and (3) "weigh 'the legitimacy and strength of each of those interests,' and . . . 'consider the extent to which those interests make it necessary to burden the plaintiff's rights.'" *ADP*, 18 F.4th at 1187 (quoting *Anderson*, 460 U.S. at 789). When as here, "a state election law provision imposes only 'reasonable, nondiscriminatory restrictions' upon the First and Fourteenth Amendment rights of voters, 'the State's important regulatory interests are generally sufficient to justify' the restrictions." *Id.* (quoting *Burdick*, 504 U.S. at 434; *Anderson*, 460 U.S. at 788).

In this case, the burden on Plaintiffs' rights is not severe but is entirely illusory. As set forth above, Plaintiffs' assertion of harm rests almost entirely on conclusory allegations about electronic voting systems in other states and systems that are not used in Arizona. (FAC, ¶¶ 73-89, 125-31, 133-34); *see Weber v. Shelley,* 347 F.3d 1101, 1103 (9th Cir. 2003) (concluding that voter's hypothetical concern about voting machines without an auditable paper trail imposed only a minimal burden on her right to vote). Moreover, their alleged harm—inaccurate vote counting—is belied by judicially-noticeable records, including the various L&A tests and vote-confirming hand count audits. (*See* Statement of Facts, § III, *supra*.) There is simply no way that Plaintiffs can establish that the electronic tabulation system used in Maricopa County has harmed them or will harm them in the future. Consequently, their "fundamental right to vote" claims are subject to dismissal outright.

Given the complete lack of harm to Plaintiffs, there is no need to conduct the rest of the *Anderson/Burdick* analysis. But if the Court proceeds to that analysis, "the State's important regulatory interests" are compelling and fully justify continuing to conduct elections using electronic tabulation. In the FAC, Plaintiffs offer "[t]he recent hand count in Maricopa County" as "proof-of-concept and a superior alternative." (FAC, ¶ 155.) In fact, the Arizona Senate's hand count of nearly 2.1 million Maricopa County ballots demonstrates clearly that hand-counting ballots in the time provided by Arizona law would not be a "superior alternative," but instead would be impossible for several reasons:

    **1.**    The Senate's hand count took more than three months. (*See* Argument, § II.)

Arizona law requires counties to complete counting and canvass results within 20 days of an election. A.R.S. §16-642(A). This is particularly important for the primary election, which is only 98 days before the general election, and where federal law requires that ballots for overseas voters be mailed no later than 43 days after the primary election. §§ 16-204(E), 16-543(A); 52 U.S.C. § 20302(a)(8)(A).

**2.**     Critically, the Senate audit counted only two races on each ballot in three months. But ballots in Maricopa County seldom have fewer than ten races in a primary; a general election, which includes judicial retention races, can have 60 or 70 races to count.

**3.**     Plaintiffs have not asked this Court to change the laws regarding early voting, which more than 80 percent of Arizona voters have used in recent elections. (*See, e.g.,* 2020 General Election County Canvasses, https://azsos.gov/2020-general-election-county-canvass-returns.) That means that the vast majority of ballots to be counted will not be separated by precinct or ballot style. For the upcoming August 2, 2022 primary election, Maricopa County has more than 15,000 ballot styles. (Exh. 1 at 5). Simply sorting those ballots to conduct a hand count would be an arduous and time-consuming task.

**4.**     A full hand count of more than two million ballots would require a massive increase in staff and space to conduct the count. In addition, Arizona law requires that ballot tabulation occur under 24/7 video surveillance in secure locations. A.R.S. § 16-621(D). The cost of increasing staff and securing locations would require a huge increase in the budget to conduct elections. (*See* Exh. 1 at 66-67 (listing budgets for temporary staff and rented vote center locations)).

The foregoing are by no means all of the administrative burdens that would arise if Plaintiffs' desired relief were granted—particularly on the accelerated timeline caused by Plaintiffs' dilatory conduct—but they clearly demonstrate that the State's important regulatory interests in accurately, securely, timely, and cost-effectively tabulating ballots outweigh any burden imposed by Plaintiffs' unfounded fear that their ballots will not be counted accurately.

1        **B.      Plaintiffs' equal protection claim [Count II] fails.**

2        Plaintiffs' equal protection claim is mystifying. They assert that "using electronic

3   voting systems . . . there will be an unequal voting tabulation of votes treating Plaintiffs

4   who vote in Arizona differently than other, similarly situated voters who cast ballots in the

5   same election." (FAC, ¶ 185.) Yet they also assert that "[e]very county in Arizona intends

6   to tabulate votes cast in the Midterm Elections through optical scanners." (*Id.*, ¶ 14.)

7   Because Arizona law requires all counties to conduct the Midterm Elections using paper

8   ballots tabulated by electronic tabulators, it is wholly unclear which Arizona voters

9   Plaintiffs allege will be treated differently from others. Regardless of how one frames the

10  equal protection claim, however, it fails.

11       If Plaintiffs mean that Arizona voters will be treated differently from voters in other

12  states, the claim fails as a matter of law because the Elections Clause, U.S. Const. art. 1, §

13  4, cl. 1, expressly authorizes each state legislature to prescribe the times, places, and manner

14  of congressional elections. The Equal Protection Clause does not require each state to

15  conduct its elections in exactly the same way. Moreover, Plaintiffs do not identify any state

16  that will be hand-counting ballots for the Midterm Elections.

17       If Plaintiffs mean that some Arizona voters will be treated differently from others

18  because Maricopa County uses Dominion tabulation equipment, Yavapai County uses

19  Unisyn tabulation equipment, and all other Arizona counties use ES&S tabulation

20  equipment, they have not alleged that the fictional risks of inaccurate tabulation differ for

21  any of the three systems used in the state. More importantly, even if they had made such an

22  allegation, it would not support an equal protection claim. *See S.W. Voter Registration*

23  *Educ. Project v. Shelly*, 344 F.3d 914, 918 (9th Cir. 2003) (en banc) (concluding that

24  plaintiffs did not have a likelihood of success on the merits of their equal protection claim

25  arising from counties using different voting technologies). This Court has recognized that

26  different counties may use different systems to implement election procedures. *Ron Barber*

27  *for Congress v. Bennett*, No. CV-14-02489-TUC-CKJ, 2014 WL 6694451, *5 (D. Ariz.

28  Nov. 27, 2014) (citing *Bush v. Gore*, 531 U.S. 98, 109 (2000)). Accordingly, Plaintiffs have

failed to state a claim for relief based on equal protection.

**C.      Plaintiffs' § 1983 and § 2201 claims [Counts IV and VI] fail.**

Finally, this Court should dismiss Counts IV and VI because they are redundant. Plaintiffs erroneously raise § 1983 as a distinct claim. (*See* FAC, ¶¶ 196–99.) But "one cannot go into court and claim a 'violation of § 1983'—for § 1983 by itself does not protect anyone against anything." *Chapman v. Houston Welfare Rights Organization*, 441 U.S. 600, 617 (1979). Plaintiffs similarly raise 28 U.S.C. § 2201 as a distinct claim. (*See* FAC, ¶¶ 207–211.) But, as its title makes clear, § 2201 merely provides a "remedy"—it does not constitute a separate basis for relief apart from the constitutional claims already present in other counts. *Cf. California v. Texas*, 141 S. Ct. 2104, 2115 (2021) ("The Declaratory Judgment Act, 28 U.S.C. § 2201, alone does not provide a court with jurisdiction. . . . Instead, just like suits for every other type of remedy, declaratory-judgment actions must satisfy Article III's case-or-controversy requirement."). This Court should dismiss these redundant claims.

**D.      Plaintiffs Are Not Pursuing Their A.R.S. § 11-251 Claim.**

During a "meet and confer" phone conference on June 6, 2022, Plaintiffs stated they would not pursue what they have called their A.R.S. § 11-251 claim.

**NOTICE CONCERNING FEES**

The County gives notice that it will ask this Court to award it its attorney's fees and costs pursuant to 42 U.S.C. §§ 1983 and 1988 and any other applicable statute or rule.

**CONCLUSION**

For the foregoing reasons, this Court should grant the County's Motion to Dismiss. RESPECTFULLY SUBMITTED this 7th day of June, 2022.

THE BURGESS LAW GROUP

BY: */s/ Emily Craiger*
Emily Craiger

RACHEL H. MITCHELL
MARICOPA COUNTY ATTORNEY

BY:  Thomas P. Liddy
     Joseph J. Branco
     Joseph E. La Rue
     Karen Hartman-Tellez
     Deputy County Attorneys

*Attorneys for Maricopa County Defendants*

## CERTIFICATE OF SERVICE

I hereby certify that on June 7, 2022, I electronically transmitted the foregoing document to the Clerk's Office using the CM/ECF System for filing and transmittal of a Notice of Electronic Filing to the CM/ECF registrants on record.

*/s/ Dana N. Troy*