Roopali H. Desai (024295)
D. Andrew Gaona (028414)
Kristen Yost (034052)
**COPPERSMITH BROCKELMAN PLC**
2800 North Central Avenue, Suite 1900
Phoenix, Arizona 85004
T: (602) 381-5478
rdesai@cblawyers.com
agaona@cblawyers.com
kyost@cblawyers.com

Sambo (Bo) Dul (030313)
**STATES UNITED DEMOCRACY CENTER**
8205 South Priest Drive, #10312
Tempe, Arizona 85284
T:  (480) 253-9651
bo@statesuniteddemocracy.org

Christine Bass *
**STATES UNITED DEMOCRACY CENTER**
3749 Buchanan Street, Unit 475165
San Francisco, California 94147-3103
T:  (309) 242-8511
christinebass@statesuniteddemocracy.org
* *Application for Pro Hac Vice Pending*

*Attorneys for Defendant*
*Arizona Secretary of State Katie Hobbs*

**UNITED STATES DISTRICT COURT**

**DISTRICT OF ARIZONA**

| | |
|---|---|
| Kari Lake and Mark Finchem, | ) No. 2:22-cv-00677-JJT |
| | ) |
| Plaintiffs, | ) |
| | ) |
| v. | ) **ARIZONA SECRETARY OF** |
| | ) **STATE'S MOTION TO DISMISS** |
| | ) **FIRST AMENDED COMPLAINT** |
| Katie Hobbs, in her official capacity as | ) |
| Arizona Secretary of State, et al., | ) |
| | ) |
| Defendants. | ) |
| | ) |

1087112.8

**Introduction**

Plaintiffs Kari Lake and Mark Finchem seek a mandatory injunction compelling Arizona election administrators to follow Plaintiffs' preferred procedures for preparing, distributing, collecting, and tabulating ballots, including forcing them to hand-count every ballot cast in Arizona elections. [Doc. 3 ¶ 153].

Plaintiffs' request for this unprecedented relief hinges on their conjectural allegations of potential "vulnerabilities" in electronic voting equipment. For starters, the allegations in the First Amended Complaint ("FAC") are inaccurate and misleading, and many are provably false. For example, contrary to Plaintiffs' repeated allegations that Arizona uses "untested and unverified electronic voting machines" and that some ballots are cast electronically [*e.g.*, Doc. 3 ¶¶ 2, 153, 173], every ballot cast in Arizona is a paper ballot, and every piece of electronic voting equipment is tested and verified before being certified for use in Arizona elections and is again tested before and after every election. For these reasons and others, Plaintiffs' claims are frivolous and violate Rule 11(b), Fed. R. Civ. P, and the Arizona Secretary of State Katie Hobbs ("Secretary") seeks an award of her attorneys' fees and costs incurred in filing this Motion under 42 U.S.C. § 1988(b).

But even accepting Plaintiffs' allegations as true for purposes of this Motion only, the Court should dismiss the FAC with prejudice. Despite claiming throughout the FAC that they seek relief "in the upcoming 2022 Midterm Election," [Doc. 3 ¶ 1], Plaintiffs inexplicably waited until the eve of the election to file their complaint, then waited several weeks to even serve the complaint, and still haven't filed a motion for preliminary injunction. As the County Defendants explain in their Motion to Dismiss [Doc. 27], Plaintiffs brought their claims far too late to get the relief they seek in this election. The Secretary will not repeat the County Defendants' arguments, but she joins in their motion and incorporates it here. The Secretary also moves to dismiss the FAC under Rule 12(b)(1) and (b)(6) for three other reasons.

First, Plaintiffs lack standing. Their claims rest on contingency after contingency: that

Arizona's voting equipment is vulnerable to hacking or manipulations, that third-parties will in fact hack that equipment, that election officials won't be able to detect or stop it, and that the hacking will affect Plaintiffs' votes or the outcome of the election. This "speculative chain of possibilities" cannot establish a concrete injury-in-fact. *Clapper v. Amnesty Int'l USA*, 568 U.S. 398, 414 (2013). And Plaintiffs' vague allegations of broad harm to "all Arizona voters" is a generalized grievance, not a particularized injury personal to Plaintiffs.

Second, the Eleventh Amendment bars Plaintiffs' claims. Plaintiffs try to mask their claims as violations of their right to vote under the U.S. Constitution, but their claims depend on allegations that Arizona's election equipment does not comply with state law. [*E.g.*, Doc. 3 ¶¶ 156-64, 181, 194]. The Eleventh Amendment and principles of federalism don't allow federal courts to "instruct[] state officials on how to conform their conduct to state law." *Pennhurst State Sch. & Hosp. v. Halderman*, 465 U.S. 89, 106 (1984).

Last, Plaintiffs fail to state a cognizable constitutional claim. They allege no facts sufficient to give rise to an inference that their right to vote has been or will be violated. The FAC contains only sheer conjecture about possible hacking of electronic voting equipment and irrelevant allegations about other jurisdictions. That is not "enough to raise a right to relief above the speculative level." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007). Instead, Plaintiffs' claims are mere policy preferences about election administration. But "it is the job of democratically-elected representatives to weigh the pros and cons of various balloting systems"—Plaintiffs don't have a constitutional right to their preferred method of counting votes. *Weber v. Shelley*, 347 F.3d 1101, 1107 (9th Cir. 2003).

The Court should dismiss the FAC with prejudice.

## Factual Background

### I.     The Use of Electronic Voting Equipment in Arizona.

Arizona authorized the use of electronic voting systems as early as 1966. H.B. 204, 27th Leg., 2d. Reg. Sess. (Ariz. 1966) https://azmemory.azlibrary.gov/digital/collection/azsession

/id/22/rec/4. All electronic voting systems undergo federal and state testing and certification before being used in Arizona elections, counties perform logic and accuracy testing on all equipment before and after every election, and the Secretary separately performs logic and accuracy testing on a sample of each county's equipment before each election with a federal, statewide, or legislative race. *See, e.g.*, A.R.S. §§ 16-442, 16-449, 16-602; 2019 Elections Procedures Manual ("2019 EPM") at 76-82, 86-100, 235, https://azsos.gov/sites/default/files/2019_ELECTIONS_PROCEDURES_MANUAL_APPROVED.pdf.

Though Arizona uses electronic equipment to tabulate votes (and has done so for many decades), every vote cast in Arizona is on a paper ballot. *E.g.*, A.R.S. §§ 16-462, 16-468(2), 16-502. Voters with disabilities may use accessible electronic voting devices to select their choices on a ballot, but Arizona law requires that every accessible voting device produce a paper ballot or voter verifiable paper audit trail. 2019 EPM at 80. The Secretary has certified each electronic voting system that will be used in each county in the 2022 elections. Ariz. Sec'y of State, *2022 Election Cycle / Voting Equipment*, https://azsos.gov/sites/default/files/2022_Election_Cycle_Voting_Equipment-Feb-Final.pdf.

## II.    The 2020 Election Results.

In the face of a once-in-a-century pandemic and unprecedented levels of misinformation, Arizona election officials successfully administered free, fair, and secure elections in 2020. Over 3.4 million Arizonans exercised their right to vote in the general election, and counties completed and passed post-election audits and logic and accuracy testing confirming the results.

The Secretary and other dedicated election officials defended nearly a dozen post-election lawsuits in Arizona, including several suits seeking to overturn the results of the presidential election. Every lawsuit failed. *E.g.*, *Bowyer v. Ducey*, 506 F.Supp.3d 699, 716, 724 (D. Ariz. 2020) ("Plaintiffs failed to provide the Court with factual support for their extraordinary claims" challenging accuracy of election results in Maricopa County, including

implausible allegations of fraud and "irregularities" relating to Dominion voting systems).

After these legal challenges failed, the Arizona Senate hired a private company called the "Cyber Ninjas" to conduct an "audit" of the election results in Maricopa County. The Cyber Ninjas failed to meet industry standards for any credible audit (much less for an election audit), showed a lack of understanding of election processes, and tried to perform (and botched) a hand-count of the top two races. *E.g.*, Ariz. Sec'y of State, *Report on the Partisan Review of the 2020 Election in Maricopa County*, https://azsos.gov/sites/default/files/2020_Ballot_Review_Report_ver20210819-03_Review.pdf. The Cyber Ninjas' final "audit report" included various misleading and inaccurate findings, all of which were debunked by Maricopa County elections officials. *See* Maricopa Cnty., *Correcting the Record: Maricopa County's In-Depth Analysis of the Senate Inquiry* (Jan. 2022), https://recorder.maricopa.gov/justthefacts/pdf/Correcting%20The%20Record%20-%20January%202022%20Report.pdf. Even so, the Cyber Ninjas' "audit" report didn't contradict the certified election results.

## III.    Plaintiffs' Claims Challenging All Electronic Voting Systems.

Undeterred, Plaintiffs now challenge the use of electronic voting systems in Arizona, raising many of the same inaccurate theories about electronic voting systems. Plaintiffs vaguely allege that electronic voting systems—in general—have certain security risks, complain about a lack of "transparency" from manufacturers, and allude to various election equipment issues in other jurisdictions. Based on these allegations, they ask [¶ 23] the Court to infer that all voting systems certified for use in Arizona are "potentially unsecure, lack adequate audit capacity, fail to meet minimum statutory requirements, and deprive voters of the right to have their votes counted and reported in an accurate, auditable, legal, and transparent process." Plaintiffs then ask the Court [¶ 153] to order Arizona's election officials to conduct elections following a 9-step list of Plaintiffs' preferred election procedures.

1                                  **Argument**

2   **I.    Plaintiffs Lack Standing.**

3          The standing doctrine "is a core component of the Article III case or controversy

4   requirement." *Barnum Timber Co. v. U.S. E.P.A.*, 633 F.3d 894, 897 (9th Cir. 2011). It "asks

5   whether a litigant is entitled to have a federal court resolve his grievance. This inquiry involves

6   'both constitutional limitations on federal-court jurisdiction and prudential limitations on its

7   exercise.'" *Kowalski v. Tesmer*, 543 U.S. 125, 128-29 (2004) (quoting *Warth v. Seldin*, 422

8   U.S. 490, 498 (1975)). To establish Article III standing, Plaintiffs must show: (1) that they

9   suffered an injury in fact; (2) that the challenged conduct caused their alleged injury; and (3)

10  that a favorable decision would likely redress the claimed injury. *Barnum Timber Co.*, 633

11  F.3d at 897. Plaintiffs fail at step one.

12         To establish an injury in fact, "a plaintiff must show that he or she suffered 'an invasion

13  of a legally protected interest' that is 'concrete and particularized' and 'actual or imminent, not

14  conjectural or hypothetical.'" *Spokeo, Inc. v. Robins*, 578 U.S. 330, 339 (2016) (*quoting Lujan

15  v. Defs. of Wildlife*, 504 U.S. 555, 560 (1992)). A "concrete" and "particularized" injury must

16  be "real," not "abstract," *id.*, and "must affect the plaintiff in a personal and individual way."

17  *Raines v. Byrd*, 521 U.S. 811, 819 (1997) (quotation omitted). And to be "actual or imminent,"

18  a threatened injury must be "certainly impending"—"allegations of possible future injury are

19  not sufficient." *Clapper*, 568 U.S. at 409 (cleaned up).

20         Plaintiffs offer nothing but innuendo and conjecture about "potential" vulnerabilities in

21  election equipment generally, but they do not (and cannot) allege that any election equipment

22  in Arizona has caused or will cause them harm. Further, Plaintiffs cannot pursue their

23  "generalized grievance" over the use of electronic voting equipment in Arizona's elections.

24         **A.    Plaintiffs' claimed injuries are too conjectural and speculative.**

25         First, Plaintiffs' asserted injury "is far too speculative and conjectural" to establish

26  standing. *Drake v. Obama*, 664 F.3d 774, 781 (9th Cir. 2011).

                                          5

According to Plaintiffs, the use of electronic voting equipment could impair their right to vote because the equipment cannot "reliably provide trustworthy and verifiable election results." [Doc. 3 ¶ 172]. They make vague allegations that electronic voting equipment—in general—has potential security vulnerabilities. [*E.g.*, Doc. 3 ¶ 4 (alleging issues with "electronic voting systems" generally); ¶ 23 (alleging voting equipment is "potentially" unsecure); ¶ 29 (claiming electronic voting equipment has "common shortcomings" that "leave the systems vulnerable to generalized, widespread-effect attacks"); ¶ 61 (alleging that any voting machine "can be hacked or compromised"); ¶ 107 (alleging without elaboration that voting equipment manufactured by ES&S and Dominion are "opaque, easily hacked, and vulnerable to incorporation of compromised components"); ¶ 181 (claiming voting systems "must be presumed to be compromised and incapable of producing verifiable results"); ¶ 199 (alleging voting equipment "may miscount" voters' votes)].

And every example Plaintiffs offer of alleged "issues" with election equipment involves other jurisdictions, not Arizona. [Doc. 3 ¶ 32 (alleging "other countries" have "largely banned or limited the use of electronic voting machines due to the security risks they present"); ¶¶ 73-80 (alleging issues with voting equipment in other states up to twenty years ago); ¶¶ 81-89 (various allegations about issues with security and equipment in other states over several years); ¶¶ 90-92 (alleging equipment used in "many jurisdictions" is "vulnerable" to attack from other countries); ¶¶ 93-102 (vague allegations about election security issues generally in the United States); ¶¶ 103-106 (alleging a voting machine not used in Arizona once failed a certification test in Texas); ¶¶ 108-116 (vague allegations of issues with equipment in other jurisdictions); ¶¶ 125-31, 133-34 (allegations of potential security issues in the 2020 election in other jurisdictions); *see also* Section III.A below].[1]

_____

[1]       The few times Plaintiffs try to tie their allegations to Arizona, they again raise only vague, speculative allegations of potential security risks. [Doc. 3 ¶ 4 (alleging an unnamed expert in an undisclosed "secret" report found "catastrophic failures" in an unidentified voting machine allegedly used in Arizona); ¶ 132 (vaguely alleging—based on a debunked report of

1      All these allegations depend on a chain of contingencies to get to Plaintiffs' alleged

2  harm: that Arizona's specific electronic voting systems are in fact vulnerable to security

3  breaches; that third parties will in fact exploit those vulnerabilities and interfere in a future

4  election; that Arizona's election officials will not detect or stop this interference; and that this

5  interference will affect Plaintiffs' votes or enough votes to impact the outcome of the election

6  in a way that harms Plaintiffs. This "speculative chain of possibilities" cannot establish Article

7  III standing. *Clapper*, 568 U.S. at 414.

8      *Shelby Cnty. Advocs. for Valid Elections v. Hargett* is instructive. There, the plaintiffs

9  made similar allegations that their county's electronic voting equipment was "vulnerable to

10  undetectable hacking and malicious manipulation." 2019 WL 4394754, at *2 (W.D. Tenn.

11  Sept. 13, 2019), *aff'd Shelby Advocs. for Valid Elections v. Hargett*, 947 F.3d 977 (6th Cir.

12  2020). The district court found these allegations were "based only on speculation, conjecture

13  and [the plaintiffs'] seemingly sincere desire for their 'own value preferences' in having voting

14  machines with a paper trail," *id.* *7, but the plaintiffs failed to allege facts to show "that Shelby

15  County's voting system is any more likely to miscount votes than any other system used in

16  Tennessee." *Id.* at *10. The court held that this "conjectural and hypothetical injury cannot

17  survive as the foundation for [the plaintiffs'] claims." *Id.* The Sixth Circuit affirmed. *Shelby*,

18  947 F.3d at 981, 983 (plaintiffs' allegations of "prior system vulnerabilities, previous

19  equipment malfunctions, and past election mistakes" do not support a claim of alleged future

20  harm, and arguments about election equipment used in <u>other states</u> "does not translate into an

21  imminent risk that individuals will hack the voting machines in Shelby County, Tennessee").

22
23  a company with no election experience—that certain "cyber security best practices and
   guidelines were not followed" in the 2020 general election in Maricopa County); ¶ 139
24  (alleging one "expert" has stated that an accessible voting device used by voters with
   disabilities in Arizona has "flaws" and "security vulnerabilities"). That these allegations are
25  pure conjecture is obvious from the first paragraph of the FAC: Plaintiffs claim that Arizona's
   voting equipment must be "subjected to scientific analysis by objective experts <u>to determine</u>
26  <u>whether it is secure</u> from manipulation or intrusion." [Doc. 3 ¶ 1 (emphasis added)]

1    Other courts around the country have held the same. *See, e.g.*, *Stein v. Cortes*, 223 F.

2  Supp. 3d 423, 432 (E.D. Pa. 2016) (voter's "allegation that voting machines may be

3  'hackable,' and the seemingly rhetorical question they pose respecting the accuracy of the vote

4  count, simply do not constitute injury-in-fact"); *Samuel v. Virgin Islands Joint Bd. of Elections*,

5  2013 WL 842946, at *5 (D.V.I. Mar. 7, 2013) (plaintiffs' "conjectural" allegations "that the

6  election process 'may have been' left open to compromise" by using certain voting machines

7  were "amorphous due process claims, without requisite concreteness"); *Schulz v. Kellner*, 2011

8  WL 2669456, at *7 (N.D.N.Y. July 7, 2011) (allegations that "votes will allegedly not be

9  counted accurately" because of "machine error and human fraud resulting from Defendants'

10  voting procedures" were "merely conjectural and hypothetical and do not demonstrate a

11  concrete or particularized injury to Plaintiffs"); *Landes v. Tartaglione*, 2004 WL 2415074, at

12  *3 (E.D. Pa. Oct. 28, 2004), *aff'd,* 153 F. App'x 131 (3d Cir. 2005) (plaintiffs' claimed injury

13  was only "conjectural or hypothetical" where she claimed "that voting machines are

14  vulnerable to manipulation or technical failure"). So too here.

15    **B.    Plaintiffs raise only generalized grievances, not a particularized injury.**

16    Second, Plaintiffs' generalized complaints about the use of electronic voting equipment

17  in elections is not a particularized injury.

18    Like the plaintiffs in *Shelby Cnty. Advocs. for Valid Elections*, Plaintiffs' claims are no

19  more than "general dissatisfaction with the voting system and processes used in" Arizona. 2019

20  WL 4394754, at *9; [*see* Doc. 3 ¶ 2 (asserting rights of "Plaintiffs and their fellow voters and

21  office seekers" to have "all ballots . . . counted accurately and transparently"); ¶ 23 (alleging

22  the use of voting machines "violates the voting rights of every Arizonan"); ¶ 143 (alleging

23  security vulnerabilities "affecting Arizona voters"); ¶ 172 (claiming "[a]ll persons who vote in

24  the Midterm Election, if required to vote using an electronic voting system or have their vote

25  counted using an electronic voting system, will be irreparably harmed"); ¶¶ 199, 211 (alleging

26  use of voting equipment will "violate the rights of the citizens of the State")].

These allegations fail to establish "concrete and particularized" harm personal to Plaintiffs. *See, e.g.*, *Pierce v. Ducey*, 965 F.3d 1085, 1089 (9th Cir. 2020) (generalized "interest in seeing that the law is obeyed" is neither concrete nor particularized); *Stein*, 223 F. Supp. 3d at 433 (allegations about harm to all "Pennsylvania voters" was an improper "generalized grievance"); *Samuel*, 2013 WL 842946, at *4 ("Plaintiffs' allegations do not distinguish their concerns—about the use of certain voting machines in the election or the election results in general—from concerns of other voters or even other candidates. . . . At best, Plaintiffs allege 'a type of institutional injury'—use of improper voting machines—'which necessarily damages' all Virgin Islands voters 'equally.'") (cleaned up) (citing *Raines*, 521 U.S. at 821).

Plaintiffs' failure to allege an injury-in-fact dooms their claims.

## II.    The Eleventh Amendment Bars Plaintiffs' Claims.

Next, Plaintiffs ask the Court to order state officials to follow state law according to Plaintiffs' specific (incorrect) interpretation of it. The Eleventh Amendment doesn't allow this.

The Eleventh Amendment prevents a state from being sued in federal court without its consent. *Seven Up Pete Venture v. Schweitzer*, 523 F.3d 948, 952 (9th Cir. 2008). This immunity extends to "suit[s] against state officials when the state is," as it is here, "the real, substantial party in interest." *Pennhurst*, 465 U.S. at 101 (quotations omitted). The *Ex parte Young* exception to this immunity applies only to "claims seeking prospective injunctive relief against state officials to remedy a state's ongoing violation of <u>federal</u> law." *Ariz. Students' Ass'n v. Ariz. Bd. of Regents*, 824 F.3d 858, 865 (9th Cir. 2016) (citing *Ex parte Young*, 209 U.S. 123 (1908) (emphasis added)).

*Ex parte Young* doesn't apply here. The relief Plaintiffs seek is not in fact to remedy a violation of federal law because they don't plausibly allege such a violation.[2] *See, e.g.*, *Weber*,

---

[2]    *Ex parte Young* also doesn't apply when the plaintiff seeks damages. *Ulaleo v. Paty*, 902 F.2d 1395, 1398 (9th Cir. 1990). Eleventh Amendment immunity thus bars Plaintiffs' purported claim for "damages" against the Secretary in her official capacity. [Doc. 3 ¶¶ 42, 199]; *Mitchell v. Washington*, 818 F.3d 436, 442 (9th Cir. 2016) ("The Eleventh Amendment bars claims for damages against a state official acting in his or her official capacity.").

9

347 F.3d at 1107 ("Nothing in the Constitution forbids" the use of touchscreen voting systems; "it is the job of democratically-elected representatives to weigh the pros and cons of various balloting systems. So long as their choice is reasonable and neutral, it is free from judicial second-guessing"); *Pettengill v. Putnam Cnty. R–1 Sch. Dist.,* 472 F.2d 121, 122 (8th Cir. 1973) ("[The] complaint asks the federal court to oversee the administrative details of a local election. We find no constitutional basis for doing so[.]"); *N.Y. State Democratic Party v. Lomenzo,* 460 F.2d 250, 251 (2d Cir. 1972) (given "the wide latitude which the state has in deciding the manner of conducting elections" there was no "substantial constitutional question" raised); *Green Party of N.Y. v. Weiner,* 216 F.Supp.2d 176, 190-91 (S.D.N.Y. 2002) (use of voting machines "is for the elected representatives of the people to decide[.] There is no constitutional right to any particular method of registering and counting votes.").

Instead, Plaintiffs' claims can only stem from an argument that Defendants are violating <u>Arizona</u> law by using insecure or inaccurate electronic voting systems. Arizona statutes set out a comprehensive set of requirements for the conduct of elections in the state, including the casting and counting of ballots. *See* A.R.S. § 16-400 *et seq*. There are requirements on voting equipment, *see* A.R.S. § 16-441 *et seq.*, including that electronic voting systems are "used safely, efficiently and accurately in the conduct of elections and counting ballots," "record correctly and count accurately every vote cast," and "[p]rovide for voting in secrecy." A.R.S. § 16-446(B)(1), (4), (6). Plaintiffs cannot plausibly claim these laws themselves violate the federal Constitution. Their claims, therefore, boil down to allegations that Defendants are violating these and other state law requirements. [*E.g.*, Doc. 3 ¶¶ 156-61 (claiming the Secretary "has failed to meet the duties" in Arizona statutes, including: voting equipment requirements in A.R.S. § 16-446(B); the requirement to "prescribe rules to achieve and maintain the maximum degree of correctness, impartiality, uniformity and efficiency on the procedures" for voting in A.R.S. § 16-452; and the requirement that computer election programs "shall be used by the Secretary of State or Attorney General to preclude fraud or any

unlawful act" under A.R.S. § 16-445(D)); ¶¶ 162-64 (describing statutory requirements that the County Defendants allegedly violated); ¶¶ 181, 194 (claiming Defendants "abrogated their statutory duties")].

Even if Plaintiffs are correct in their interpretation of state law (they're not), they cannot raise these claims in federal court. The Eleventh Amendment's protections are at their apex where, as here, a plaintiff asks a federal court to "order state actors to comply with state law." *Hale v. Arizona*, 967 F.2d 1356, 1369 (9th Cir. 1992). Indeed, the Supreme Court has said that "it is difficult to think of a greater intrusion on state sovereignty than when a federal court instructs state officials on how to conform their conduct to state law." *Pennhurst*, 465 U.S. at 106; *see also Doe v. Regents of the Univ. of Cal.*, 891 F.3d 1147, 1153 (9th Cir. 2018); *Democracy N. Carolina v. N. Carolina State Bd. of Elections*, 2020 WL 6383222, at *6 (M.D.N.C. Oct. 30, 2020) (rejecting challenge to election board's actions in curing ballots and holding that "[f]ederal courts are prohibited from directing state actors to implement state law in a particular fashion").

Plaintiffs try to disguise their claims as alleged violations of the federal Constitution. But because their claims turn on application of state law, they are barred. Courts have repeatedly rejected similar state law claims cloaked as federal law violations. *See, e.g., S&M Brands, Inc. v. Georgia ex rel. Carr*, 925 F.3d 1198, 1204-05 (11th Cir. 2019) (Eleventh Amendment barred alleged federal constitutional claim that "relied on a determination that state officials had not complied with state law"); *DeKalb Cty. Sch. Dist. v. Schrenko*, 109 F.3d 680, 682 (11th Cir. 1997) (rejecting attempt to cloak claims in federal constitutional law because the "gravamen" and "substance" of the complaint was that the state improperly interpreted and applied a state statute); *Bowyer*, 506 F.Supp.3d at 716 ("where the claims are state law claims, masked as federal law claims" Eleventh Amendment immunity applies) (citing *Massey v. Coon*, 865 F.2d 264 (9th Cir. 1989)); *Balsam v. Sec'y of New Jersey*, 607 F. App'x 177, 183-84 (3d Cir. 2015) (rejecting plaintiff's "attempt to tie their state law claims

1   into their federal claims").[3]

2       Plaintiffs ask this Court to become impermissibly "entangled, as [an] overseer[] and

3   micromanager[], in the minutiae of state election processes," *Ohio Democratic Party v. Husted*,

4   834 F.3d 620, 622 (6th Cir. 2016), by not only enjoining Defendants from using electronic

5   voting systems and retaining jurisdiction to ensure compliance, but also requiring Defendants

6   to conduct elections according to Plaintiffs' detailed demands about how ballots must be cast,

7   conveyed, counted, and recounted, and how the whole process must be recorded, streamed,

8   and archived. [Doc. 3 ¶ 153]. "Such a result conflicts directly with the principles of federalism

9   that underlie the Eleventh Amendment," *Pennhurst*, 465 U.S. at 106, and the Court should

10  reject it. *See Ulaleo*, 902 F.2d at 1400 ("For a federal court to decide such state issues would

11  offend federalism and does not further the interests of federal law, the justification for the *Ex*

12  *parte Young* exception to the eleventh amendment.").[4]

13  **III.   Plaintiffs Fail to State Cognizable Constitutional Claims.**

14      Even if Plaintiffs had standing (they don't) and the Eleventh Amendment didn't bar

15  their claims (it does), the Court should dismiss the FAC for failure to state a claim upon which

16  ───────────────

17  [3]   Alternatively, the Court should abstain from determining Plaintiffs' claims under the *Pullman* abstention doctrine. "By allowing 'federal courts to refrain from deciding sensitive

18  federal constitutional questions when state law issues may moot or narrow the constitutional questions,'" *Pullman* abstention is "intended both to avoid 'a collision between the federal

19  courts and state . . . legislatures' and to prevent 'the premature determination of constitutional questions.'" *Porter v. Jones*, 319 F.3d 483, 492 (9th Cir. 2003) (citation omitted). Plaintiffs'

20  claims about how votes are cast and counted in Arizona turn on disputed questions of state law. This sets up precisely the type of collision that *Pullman* aims to avoid. *See Wolfson v. Brammer*,

21  616 F.3d 1045, 1066 (9th Cir. 2010).

22  [4]   Plaintiffs' allegations are replete with baseless speculation, but if they could muster real

23  evidence that serious irregularities have occurred in an Arizona election, state law provides an explicit mechanism for contesting a state election. A.R.S. § 16-671 *et seq.* Because of the

24  "strong public policy favoring stability and finality of election results," the Arizona Supreme Court requires that election contests be made in "strict compliance" with the statutory

25  requirements. *Donaghey v. Ariz. Att'y Gen.*, 584 P.2d 557, 559 (Ariz. 1978). Those requirements include A.R.S. § 16-672(B)'s mandate that election contests be brought in state

26  court, thus underscoring the federalism concerns at play here.

relief can be granted. To state a claim that survives a Rule 12(b)(6) motion, "a complaint must contain sufficient factual matter, accepted as true to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Twombly*, 550 U.S. at 570). That is, factual allegations "must be enough to raise a right to relief above the speculative level." *Twombly*, 550 U.S. at 555. A claim that is merely "conceivable" or "a sheer possibility" is insufficient. *Iqbal*, 556 U.S. at 678, 680.

The FAC contains no well-pled facts sufficient to show a violation of Plaintiffs' "right to vote [and] to have that vote counted." [Doc. 3 ¶ 192] Instead, the FAC relies on innuendo, speculation, and immaterial claims about other jurisdictions to allege a mere <u>possibility</u> that Arizona election systems could be susceptible to intrusion. But without plausible allegations that Arizona's systems have been or will be compromised, Plaintiffs' claims are no more than a demand that Defendants adopt Plaintiffs' policy preferences for election administration. That is not a cognizable claim—Plaintiffs don't have a constitutional right to their preferred method of counting votes.

### A.     Plaintiffs do not plausibly allege any deficiencies in Arizona's election systems or any burden on Plaintiffs' right to vote.

Plaintiffs allege various issues with voting systems in other jurisdictions (up to 20 years ago). [Doc. 3 ¶¶ 71-89].[5] These allegations are immaterial to Plaintiffs' claims that Arizona's voting systems are "unsecure and vulnerable to manipulation and intrusion and incapable of producing verifiable results" today. [Doc. 3 ¶¶ 185, 194]. Equally irrelevant are Plaintiffs' allegations that manufacturers source and assemble components in foreign nations. [Doc. 3 ¶¶ 90-92]. These allegations suggest the vague possibility that a foreign attack "could happen" during the manufacturing process of some unidentified election equipment. [Doc. 3 ¶ 90]. Plaintiffs also raise generalized concerns about election cybersecurity, [¶¶ 93-102], but fail to

---

[5]     The lone reference to Arizona in this section has nothing to do with a voting system; it describes a reported breach of Arizona's <u>voter registration</u> system in 2016. [Doc. 3 ¶ 79].

1    connect their allegations to Arizona's voting systems. Rattling off incomplete and out-of-

2    context quotes that don't refer to Arizona does not plausibly support a conclusion that

3    Arizona's systems are somehow deficient.

4         Even when Plaintiffs try to tie their allegations to Arizona, their allegations are

5    insufficient. For example, Plaintiffs note that Texas declined to certify Dominion's Democracy

6    Suite 5.5A voting system in a past election, then declare, without explanation, that this system

7    is "substantially similar" to Democracy Suite 5.5B used in Maricopa County this year. [Doc 3

8    ¶¶ 103-106]. Even if Plaintiffs alleged that Democracy Suite 5.5B has the same "risks" alleged

9    for Democracy Suite 5.5A (they don't), one state choosing not to certify an electronic voting

10   system doesn't mean that the use of a "similar" system is unconstitutional. *See, e.g.*, *Weber*,

11   347 F.3d at 1107 (a state's choice to certify election equipment is "free from judicial second-

12   guessing"). And even if Plaintiffs had alleged specific security "risks," that wouldn't translate

13   to a deprivation of due process, equal protection, or the right to vote. This is all the more true

14   given that election officials implement policies to mitigate risks. *See, e.g.*, 2019 EPM at 95-98

15   (establishing physical and data security measures for electronic voting systems).[6]

16         Plaintiffs' allegations [¶¶ 135-43] that Dominion's Democracy Suite 5.5B is

17   noncompliant with state and federal requirements are also implausible (and irrelevant) given

18   that they misstate the law and allege noncompliance with voting system guidelines that are (1)

19   voluntary, and (2) outdated. A.R.S. § 16-442(B) requires that equipment comply with the Help

20   America Vote Act of 2002 (HAVA) and be approved by an accredited laboratory. HAVA

21   establishes standards for electronic voting equipment under 52 U.S.C. § 21081. It does not, as

22   Plaintiffs allege, require voting equipment to conform to the Federal Election Commission's

23   2002 Voting System Standards (VSS). The VSS were never mandated under federal law, and

---

24

25        [6]      The Court may take judicial notice of this public record without converting this motion to dismiss into a motion for summary judgment. *E.g.*, *Intri-Plex Techs., Inc. v. Crest Grp., Inc.*,

26   499 F.3d 1048, 1052 (9th Cir. 2007); *see also Gonzalez v. Arizona*, 677 F.3d 383, 397 (9th Cir. 2012) (the EPM "has the force and effect of law").

were superseded by the Election Assistance Commission's 2005 Voluntary Voting System Guidelines (VVSG), promulgated under 52 U.S.C. § 21101. *See* Karen L. Shanton, Cong. Rrsch. Serv., IN11592, *Voluntary Voting System Guidelines (VVSG): An Overview* 1 (2021) https://crsreports.congress.gov/product/pdf/IN/IN11592. Because the federal guidelines are voluntary, Plaintiffs' allegations of noncompliance (even if true) would not violate HAVA. Even more, Plaintiffs' reliance on the defunct 2002 VSS renders their allegations irrelevant. Had Plaintiffs bothered to look at the EAC website, they would have easily discovered that Democracy Suite 5.5B was tested and certified under the VVSG in 2019. U.S. Election Assistance Comm'n, *Democracy Suite 5.5B (Modification)*, https://www.eac.gov/voting-equipment/democracy-suite-55b-modification.

Beyond that, Plaintiffs ignore that 14 of Arizona's 15 counties don't even use Dominion machines. Ariz. Sec'y of State, *2022 Election Voting Equipment List* (updated Feb. 2022), https://azsos.gov/elections/voting-election/voting-equipment. Despite 13 counties using ES&S equipment, Plaintiffs offer only a few vague allegations that ES&S's equipment is "vulnerable" to hacking [¶¶ 28, 61, 107], and a conclusory statement that Arizona's certification of certain ES&S equipment was "improper." [Doc. 3 ¶ 21].[7] Plaintiffs never even mention Unisyn, the manufacturer of Yavapai County's equipment. Given that Plaintiffs couldn't be bothered to identify all the voting equipment used in Arizona, much less allege any facts showing its purported deficiencies, Plaintiffs' claims that electronic voting systems unconstitutionally burden due process, equal protection, and the right to vote are implausible on their face.

Plaintiffs' innuendo about "irregularities" and "vote manipulation" in the 2020 elections also does not plausibly support their claims. [Doc. 3 ¶ 125-34]. In fact, Plaintiffs allege no vote manipulation in Arizona, and rely mostly on allegations about Dominion systems in other

---

[7]     They also reference ES&S advertising, public statements, and usage in other states, but fail to allege Arizona-specific facts. [Doc. 3 ¶¶ 73, 87, 88, 113, 150].

jurisdictions. [Doc. 3 ¶¶ 126-29, 134].[8] Plaintiffs do not allege that Arizona uses the same equipment and procedures that caused the alleged issues they point to. Even so, allegations that certain cybersecurity practices were not followed in another election [*e.g.*, ¶ 127], that a state's election results "could have been modified" [¶ 128], and that some machines may have been connected to the internet [¶ 129, 133] do not give rise to a plausible inference that Arizona's voting systems are at risk of being compromised.

Plaintiffs next make broad allegations [¶¶ 108-16] about a lack of "transparency" by certain voting system manufacturers, and claim [¶¶ 117-18] that Defendants "refused" to adopt open-source voting technologies. But nothing in the Constitution requires this; Plaintiffs merely argue that voting "should be open to the public." [Doc. 3 ¶ 123]. In all events, Plaintiffs ignore Arizona's many opportunities for public observation throughout the election process, including open meetings of the Election Equipment Certification Committee and logic and accuracy testing of voting equipment before each election. *See, e.g.*, A.R.S. §§ 16-442, 16-449.

Finally, Plaintiffs allege deficiencies in Arizona's election "audit regime." [Doc. 3 ¶¶ 144-52]. Yet Plaintiffs fail to even describe Arizona's auditing procedures, much less make a plausible claim that they violate any constitutional rights. *Compare with, e.g.*, A.R.S. §§ 16-449 (pre-election logic and accuracy testing), 16-602 (post-election hand count audits); 2019 EPM at 86-100 (pre-election logic and accuracy testing; security measures for electronic voting systems), 213-34 (hand count audit), 235 (post-election logic and accuracy testing). They instead raise second-hand allegations [¶ 146] that malware could defeat Georgia's procedural protections. And even if Plaintiffs had alleged facts suggesting Arizona's "audit regime" is somehow inadequate, they cannot allege any burden on their right to vote. *See Shipley v. Chicago Bd. of Election Comm'ns.*, 947 F.3d 1056, 1061-62 (7th Cir. 2020) (plaintiffs "cannot

---

[8]     Plaintiffs' only allegation about Arizona relies on the "audit" of Maricopa County's 2020 election results. [Doc. 3 ¶ 132]. This fails to show that Plaintiffs' right to vote has been or will be infringed. [*See supra* at 4].

1   state a claim for a violation of the right to vote" based on post-election audit procedures that
2   "cannot alter or discard any vote cast").

3       Plaintiffs vague allegations of <u>possible</u> "vulnerabilities" in voting equipment cannot
4   "nudge[] their claims across the line from conceivable to plausible." *Twombly*, 550 U.S. at 570.

5       **B.     Plaintiffs' claims are not cognizable because they merely reflect a general
            policy preference for the manner of casting and counting ballots.**

6
7       Because Plaintiffs fail to plausibly allege deficiencies with Arizona's voting systems—
    to say nothing of any burden on their right to vote—their FAC amounts to a mere desire for
8
    the Court to impose Plaintiffs' preferred methods of election administration. Indeed, Plaintiffs'
9
    proposed remedy makes clear that their FAC is rooted not in any constitutional requirements,
10
    but in Plaintiffs' dislike for electronic voting systems in general. [*See* Doc. 3 ¶¶ 153-55].
11
12      Simply put, nothing in the Constitution requires that ballots be cast or counted the way
    Plaintiffs prefer. "[T]he framers of the Constitution intended the States to keep for themselves,
13
    as provided by the Tenth Amendment, the power to regulate elections." *Gregory v. Ashcroft*,
14
    501 U.S. 452, 461-62 (1991) (quoting *Sugarman v. Dougall*, 413 U.S. 634, 647 (1973)); s*ee*
15
    *also* U.S. Const. art. I, § 4, cl. 1 (broadly delegating power to the states over the "times, places,
16
    and manner" of elections even for congressional offices). It is thus "the job of democratically-
17
    elected representatives to weigh the pros and cons of various balloting systems." *Weber*, 347
18
    F.3d at 1107. The Arizona Legislature did just that when it authorized electronic voting systems
19
    over five decades ago. *See* H.B. 204, 27th Leg., 2d. Reg. Sess. (Ariz. 1966). Plaintiffs have
20
    therefore failed to state a cognizable constitutional claim.
21
                                    **Conclusion**
22
23      For all these reasons, the Court should dismiss the FAC with prejudice. The Court
    should also award the Secretary her attorneys' fees under 42 U.S.C. § 1988(b).
24

25

26

Respectfully submitted this 8th day of June, 2022.

COPPERSMITH BROCKELMAN PLC

By /s/ Roopali H. Desai
       Roopali H. Desai
       D. Andrew Gaona
       Kristen Yost

STATES UNITED DEMOCRACY CENTER

Sambo (Bo) Dul
Christine Bass *

*Application for Pro Hac Vice Pending

   Attorney for Defendant Arizona Secretary of
   State Katie Hobbs