Emily Craiger (Bar No. 021728)
emily@theburgesslawgroup.com
THE BURGESS LAW GROUP
3131 East Camelback Road, Suite 224
Phoenix, Arizona 85016
Telephone: (602) 806-2100

RACHEL H. MITCHELL
MARICOPA COUNTY ATTORNEY

By:   Thomas P. Liddy (Bar No. 019384)
      Joseph J. Branco (Bar No. 031474)
      Joseph E. LaRue (Bar No. 031348)
      Karen J. Hartman-Tellez (Bar No. 021121)
      Deputy County Attorneys
      MCAO Firm No. 0003200

CIVIL SERVICES DIVISION
225 West Madison St.
Phoenix, Arizona 85003
Telephone (602) 506-8541
Facsimile (602) 506-8567
liddyt@mcao.maricopa.gov
brancoj@mcao.maricopa.gov
laruej@mcao.maricopa.gov
hartmank@mcao.maricopa.gov
ca-civilmailbox@mcao.maricopa.gov

*Attorneys for Maricopa County Defendants*

**IN THE UNITED STATES DISTRICT COURT**

**FOR THE DISTRICT OF ARIZONA**

| | |
|---|---|
| Kari Lake and Mark Finchem, | No. 2:22-cv-00677-JJT |
| Plaintiffs, | **MARICOPA COUNTY DEFENDANTS' RESPONSE IN OPPOSITION TO PLAINTIFFS' MOTION FOR PRELIMINARY INJUNCTION (DOC. 50)** |
| vs. | |
| Kathleen Hobbs, et al., | |
| Defendants. | (Honorable John J. Tuchi) |

Defendants Bill Gates, Clint Hickman, Jack Sellers, Thomas Galvin, and Steve

Gallardo in their official capacities as members of the Maricopa County Board of Supervisors ("the County") respond to Plaintiffs' Motion for Preliminary Injunction ("MPI") (Doc. 50) by requesting that this Court deny it for the reasons set forth below.

## MEMORANDUM OF POINTS AND AUTHORITIES

As set forth in the County's previously filed Motion to Dismiss ("Cnty. MTD") (Doc. 27), Plaintiffs' claims fail as a matter of law: (1) their claims are untimely, and so time-barred on several bases; (2) they allege insufficient facts; and (3) there is no legal or factual basis for their constitutional claims. Because Defendants have moved for dismissal pursuant to Rule 12(b)(6), the Court need not consider Plaintiffs' untimely preliminary injunction request and instead should dismiss this case in its entirety.

Even if the Court considers Plaintiffs' MPI, a cursory review reveals it is barred by the *Purcell* principle. *Purcell v. Gonzalez*, 549 U.S. 1 (2006) (per curiam). Contrary to Plaintiffs' assertions, their requested relief requires a complete overhaul of Arizona's elections procedures, from ballot printing to tabulation, and these changes, in the middle of the election cycle, will confuse voters and would be impossible for election officials to implement at this late date. (*See* Ex. 1, Declaration of Maricopa County Elections Director Scott Jarrett, ¶¶ 31-57.)

Further, there is no legal or factual basis to support the requested injunctive relief. *See Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 20 (2008) (discussing elements for preliminary equitable relief); *All. for the Wild Rockies v. Cottrell*, 632 F.3d 1127, 1134–35 (9th Cir. 2011). Plaintiffs have no likelihood of success on the merits as set forth in the County's MTD. Likewise, Plaintiffs' alleged irreparable harm does not exist because there are adequate post-election remedies they may pursue if actual evidence demonstrates that illegal or fraudulent conduct impacted tabulation of the paper ballots cast in Arizona's 2022 General Election. Finally, the balance of equities and public interest tip in the government Defendants' favor. Requiring the ballots cast in the 2022 General Election to be entirely hand counted, after using tabulation machines to count ballots in the 2022 Primary Election, would change the rules during the middle of an election cycle, inevitably confusing voters

and causing them to wonder whether their votes will be counted accurately. (Ex. 1, ¶¶ 31-40.) It will also require, among other things, vastly larger facilities for tabulation, exponentially more poll workers, substantial additional training, and massive public outreach, with little to no time to implement such changes. (*Id*.) All would come at great, unnecessary expense to taxpayers and directly contravene Arizona law that specifically authorizes machine counting of ballots. (*Id*., ¶ 56.) Further, all of these problems are compounded by Plaintiffs' woefully dilatory conduct in requesting an injunction.

For these reasons, the County requests, to the extent this Court considers Plaintiffs' MPI, that it be denied.

## ARGUMENT

### I.     Arizonans Vote on Paper Ballots.

The lengthy MPI and its remarkably voluminous attachments are riddled with the same fatal infirmities as Plaintiffs' First Amended Complaint ("FAC"). Most of the assertions are speculative, and those that are not are based on outdated, incorrect, or irrelevant information. Most inexcusable is Plaintiffs continued false assertions that voters in Arizona do not vote on paper ballots. By written correspondence and twice telephonically during meet and confer, Defendants notified Plaintiffs' counsel of this fact, universally known by every voter in Arizona, including Plaintiffs. Yet this false assertion appears again, taxing finite judicial resources. In addition to the repeated statements to that effect in the FAC, the MPI asserts, "[e]xperience has now shown the move to computerized voting in Arizona was a mistake." (MPI at 2). This is false: there has been no move to computerized voting in Arizona." Rather, Arizonans vote on hand-marked paper ballots, not computers.[1] The MPI similarly claims, "[a] return to the tried-and-true paper ballots of

---

[1] The only exception is accessible voting devices made available for in-person voters who are blind or visually impaired. A.R.S. § 16-442.01. But accessible voting devices must produce a paper ballot or voter verifiable paper audit trail, which the voter can review to confirm that the machine correctly marked the voter's choices and which can be used to audit the election. A.R.S. § 16-446(B)(7); Elections Procedures Manual (2019) at 93. In the 2020 General Election, 453 Maricopa County voters—out of 2,089,563 total Maricopa County Voters—marked their ballots using accessible voting devices. (Ex. 1, ¶¶ 24-26.) Thus, the total number of voters using accessible voting devices in Maricopa County

2

the past – and of the present, in countries like France, Taiwan, and Israel – is necessary." (MPI, at 2). Again, false—Arizona voters have always voted and continue to vote on paper ballots; Arizona law requires it, and the state cannot "return to" what it has always done and is currently doing.

Even more problematic is that the testimony and evidence Plaintiffs cite in the FAC and MPI, to support their contention that computer ballot tabulation is unreliable, is primarily from a case addressing voting systems that do not use paper ballots or lack appropriate paper back up, unlike Arizona. This "evidence" taken out of context is misleading, at best. Specifically, Plaintiffs heavily rely on the ruling and testimony from *Curling v. Raffensperger,* 493 F. Supp. 3d 1264 (N.D. Ga. 2020), but hand counting ballots was never requested, addressed or at issue in that case. Rather, the *Curling* plaintiffs sought an injunction requiring the use of paper ballots for in-person voting in Georgia after the state moved *exclusively* to voting on Dominion Voting Systems' Democracy Suite electronic ballot marking devices ("BMDs") for all in-person voting. *Id*. at 1268–69. The concerns raised and the alleged vulnerabilities referenced in that case do not exist in Arizona, because (1) the vast majority of voters cast their votes on paper ballots without use of BMDs, *i.e.*, accessible voting devices (see footnote 1, *supra*); (2) Maricopa County is the *only* Arizona county to use Dominion Voting Systems' Democracy Suite tabulation machines, but it uses a *different* version than that addressed in *Curling*; and (3) Maricopa County has enacted security protocols that address and counteract the vulnerabilities and concerns identified in *Curling*. (Ex. 1, ¶¶ 19, 24-30)

In fact, Professor J. Alex Halderman's expert report in *Curling* states,

> the scientific evidence about voter verification shows that attackers who compromise the BMDs could likely change individual votes and even the winner of a close race without detection. Georgia **can eliminate or greatly mitigate these risks by adopting the same approach to voting that is practiced in most of the country: using hand-marked paper ballots and reserving BMDs for voters who**

---

represented a mere 0.02% of voters—the remainder hand marked their paper ballots. (*Id.*) The same format is followed in Arizona's other counties, because of the requirements of Arizona law. (*Id.*, ¶ 23.)

3

> **need or request them**. Absent security improvements such as this, it is my opinion that Georgia's voting system does not satisfy accepted security standards.

(Halderman Decl. 33, ECF # 1304-3, *Curling v. Raffensperger,* No. 1:17-CV-2989-AT (N.D. Ga. Feb. 3. 2022) (emphasis added)).

This is exactly what already occurs in Arizona. BMDs, *i.e.*, accessible voting devices, are available for voters who are blind or visually impaired, as required by both state and federal law. A.R.S. § 16-442.01; 52 U.S.C. § 21081(A)(3). Every other Arizona voter, whether they vote in-person or by mail, hand marks a paper ballot. Plaintiffs' selective use of quotes and expert testimony from *Curling* is misleading and inapposite - the issues addressed and relief requested in that case are not relevant to Arizona.

The same is true with respect to Plaintiffs' selective quoting from Professor Halderman's testimony to the Senate Select Committee on Intelligence - it blatantly misleads the court and public. In response to being asked what the "most important" things a secretary of state should do to protect their state's elections from attack, Halderman responded, "[t]he most important things are to make sure we have votes recorded on paper, paper ballots, which just cannot be changed in a cyber attack . . . ." *Russian Interference in the 2016 U.S. Elections* at 91, S.Hrg. 115-92 (June 21, 2017) (MPI, Parker Decl., Exh. H). Halderman's testimony, again, addressed the lack of paper ballots, not a requirement that electronic tabulation be permanently banned.

Plaintiff's reliance on *Seeking the Source: Criminal Defendants' Constitutional Right to Source Code,* 17 Ohio St. Tech. L.J. 1, 35 (Dec. 2020*)*, is similarly specious. (MPI at 8). The premise of that piece is entirely unrelated to election administration, yet Plaintiffs cite to partial anecdotal quotes. Worse, what they do not include is the following excerpt from the article's brief section discussing elections,

> At first blush, a requirement for software independence might appear to preclude the use of any software (or computers) in elections altogether. But that is not necessarily the case. Software independence simply requires that any software-based system be designed in a way that allows for recovery of correct results even if the software has failed in some way. For example, a voting system that employs paper ballots (marked by a

4

> voter) might perform an initial tally by computerized scanners, but still retain the ability to use the original paper ballots (which reflect the true intent of the voters) for recounts and audits . . . .

(*See* MPI, Ex. G, "Parker Decl." (Doc. 42-1), at 37). Again, this describes exactly what already occurs in Arizona.

Finally, Plaintiffs' reliance on the recently-released statement from the U.S. Cybersecurity and Infrastructure Agency ("CISA") report is equally misleading. Although that report identified vulnerabilities related to the use of Dominion Voting Systems' Democracy Suite 5.5-A BMDs, it very clearly stated, "CISA has no evidence that these vulnerabilities have been exploited in any elections." More importantly, it acknowledged that the available mitigation measures to address these vulnerabilities are "typically standard practice in jurisdictions where these devices are in use and can be enhanced to further guard against exploitation of these vulnerabilities." CISA, ICS Advisory (ICSA-22-154-01), https://www.cisa.gov/uscert/ics/advisories/icsa-22-154-01. Plaintiffs conveniently fail to state this because, in fact, Maricopa County is the only Arizona county to use Dominion Voting Systems' equipment; it uses a *different*, updated version of the Dominion Voting Systems' BMDs (not the 5.5-A version); and the County has already implemented all of the recommendations that are necessary to provide security for the tabulation equipment. (Ex. 1, ¶¶ 27-30.)

The County agrees, as Plaintiffs assert, that "public confidence in the integrity of the electoral process has independent significance because it encourages participation in the democratic process." (MPI at 33 (quoting *Crawford v. Marion Cnty. Election Bd*., 553 U.S. 181, 197 (2008))). Indeed, Maricopa County, its elected officials, and dedicated election workers have spent the last nearly two years correcting the barrage of disinformation, like that asserted above by Plaintiffs, that has irresponsibly and without any factual basis sowed doubts about the reliability and trustworthiness of elections. Plaintiffs' efforts to use the courts as a vehicle to further this false narrative is repugnant. As the court aptly stated in *Bowyer v. Ducey,* which alleged without basis, among other things, that software "DNA" used to "rig" elections in Venezuela is now used in U.S.

voting machines, "[a]llegations that find favor in the public sphere of gossip and innuendo cannot be a substitute for earnest pleadings and procedure in federal court." 506 F. Supp. 3d 699, 724 (D. Ariz. 2020).

## II. There is no basis for granting preliminary injunctive relief.

### A. The *Purcell* Principle prohibits the grant of an injunction.

As set forth in detail in the County's MTD, the Supreme Court "has repeatedly emphasized that lower federal courts should ordinarily not alter the election rules on the eve of an election." *Republican Nat'l Comm. v. Democratic Nat'l Comm.*, 140 S. Ct. 1205, 1207 (2020) (collecting cases); *Short v. Brown*, 893 F.3d 671, 676 (9th Cir. 2018) ("[T]he Supreme Court has warned us many times to tread carefully where preliminary relief would disrupt a state voting system on the eve of an election."); *see also New Georgia Project v. Raffensperger*, 976 F.3d 1278, 1283 (11th Cir. 2020) ("And we are not on the eve of the election—we are in the middle of it, with absentee ballots already printed and mailed."); *Purcell*, 549 U.S. 11 (staying a lower court order that changed election laws shortly before the election).

Here, Plaintiffs' requested relief, including the bullet-pointed wish list contained in the FAC, would dramatically change all aspects of the election process. (FAC, ¶¶ 49-50, 153.) Contrary to Plaintiffs' assertions, *Purcell* and its progeny address both minimizing confusion to the voters **and** lessening the strain on election officials prompted by late changes to elections procedures. *See, e.g.*, *Ariz. Democratic Party v. Hobbs*, 976 F.3d 1081, 1086 (9th Cir. 2020) ("And, as we rapidly approach the election, the public interest is well served by preserving Arizona's existing election laws, rather than by sending the State scrambling to implement and to administer a new procedure for curing unsigned ballots at the eleventh hour.").

Even if Plaintiffs were correct that preventing voter confusion is the only concern addressed by the *Purcell* principle, which it is not, Plaintiffs wrongly represent that banning electronic tabulation will not confuse voters because it only "affects the counting of the ballots." (MPI, at 34). Indeed, as just one example, if the Court required hand counting of

6

ballots, all in-person voters in Maricopa County would place their ballots into ballot boxes instead of inserting them into onsite tabulators at polling locations as they are accustomed to doing. (Ex. 1, ¶¶ 31-34.) This noticeable change will be particularly troubling to in-person voters because the only ballots ordinarily placed in ballot boxes instead of onsite tabulators are provisional ballots and ballots that the tabulation machines cannot read, but which the voters decline to recast. (*Id.*, ¶ 34.) Voters consistently express doubt and concern about whether their ballots will be counted if they are treated as provisional. (*Id.*, ¶¶ 35-36.) This confusion will be further compounded by the fact that Plaintiffs' injunction would impact only the November General Election. So in-person voters would vote differently in the Primary and General Elections—elections that are within months of each other, within the same election cycle and with little to no time for communication and public outreach to explain the change. (*Id.*, ¶¶ 37-38.) Such a change and the confusion it would create would inevitably bring very long wait-times which would, in turn, lead to the disenfranchisement of Arizona voters whose jobs or personal circumstances do not allow them to wait for hours in line to vote. (*Id.*, ¶¶ 39-40.)

Likewise, the administration of the election would be profoundly negatively impacted if Arizona's counties were required to hand count the millions of ballots expected to be cast in the November 2022 General Election. First, hand counts are notoriously unreliable when compared to machine counts. (*See, e.g.*, Ex. 2, Stephen Ansolabehere et al., *Learning from Recounts*, 17 Election L.J. 2, 100, 115 (2018) (stating, after conducting extensive analysis of computerized counts and hand counts of ballots in Wisconsin, "[w]e find . . . that vote counts originally conducted by computerized scanners were, on average, more accurate than votes that were originally tallied by hand"); Ex. 3, Stephen Goggin, *et al.*, *Post-Election Auditing: Effects of Procedure and Ballot Type on Manual Counting Accuracy, Efficiency, and Auditor Satisfaction and Confidence*, 11 Election L.J. 36, 42 (2012) (noting that "hand-counted ballots generally have higher rates of adjustment upon recount" than do machine-counted ballots); *id.* at 50 (explaining that "even the most basic tasks performed by humans can and do introduce error into the process")). This is not

surprising; "[c]omputers tend to be more accurate than humans in performing long, tedious, repetitive tasks." (Ex. 2, *Learning from Recounts*, at 115.) And it is well-established that "[c]ounting paper ballots can be tedious, leading to vote-count errors." (Ex. 4, National Academies of Sciences, Engineering, and Medicine, *Securing the Vote: Protecting American Democracy*, at 43 (2018).)

Second, beyond the innocent-type mistakes that can occur with hand counting ballots, there is the possibility of nefarious, intentional miscounts by bad actors who want to secure victory for their chosen candidates. (*Id.* at 94.)

Third, training workers to conduct hand counts takes significant time and resources. (Ex. 1, ¶¶ 41-42) More importantly, for Maricopa County to count all of its ballots by hand, some of which will contain up to 70 contests, would take a massive number of additional workers and physical space that would be impossible for the County to hire and procure in such a short period of time. (*Id.*, ¶¶ 43-57.) It is well-established that hand counting ballots takes significantly longer than machine counting does; thus, to count all the ballots by the deadlines set by Arizona law, a huge amount of poll workers will have to be hired. (*Id.*)  As already explained by the County, the Cyber Ninjas counted only two contests (of 70 on each ballot) and spent millions of dollars doing so, yet it took them five months to accomplish even that limited task. (Cnty. MTD at 12; Ex. 1, ¶ 52.) Contrast that with the actual requirements of Arizona law, pursuant to which the County must canvass the election [*i.e.*, announce the final vote totals] "not more than twenty days following the election." A.R.S. § 16-642(A). To accomplish the complete count within twenty days, *by hand*, would be a herculean task necessitating an extremely large number of persons to count the ballots. (Ex. 1, ¶¶ 43-57.)

The County has struggled to hire sufficient poll workers to staff polling locations; it is extremely unlikely that it could secure the necessary poll workers to hand count all its ballots at the 2022 General Election. (*Id.*, ¶¶ 54-56.) Additionally, poll worker training has already started in Maricopa County, but this change would require different, additional training for the November General Election than the training workers receive for the August

Primary Election, further increasing the likelihood of confusion and error on the part of those workers. (Ex. 1, ¶ 43.)

For all these reasons, Plaintiffs' request for preliminary injunction must be denied.

### B. Plaintiffs cannot meet their burden for preliminary injunctive relief.

A preliminary injunction is "an extraordinary and drastic remedy, one that should not be granted unless the movant, *by a clear showing*, carries the burden of persuasion." *Lopez v. Brewer*, 680 F.3d 1068, 1072 (9th Cir. 2012) (quoting *Mazurek v. Armstrong*, 520 U.S. 968, 972 (1997) (per curiam) (emphasis in original)); *see also Winter*, 555 U.S. at 24 (2008) ("A preliminary injunction is an extraordinary remedy never awarded as of right.") (citation omitted). A plaintiff seeking a preliminary injunction must show that (1) plaintiff is likely to succeed on the merits, (2) is likely to suffer irreparable harm without an injunction, (3) the balance of equities tips in plaintiff's favor, and (4) an injunction is in the public interest. *Winter*, 555 U.S. at 20. When the government is the opposing party, the third and fourth factors merge. *Nken v. Holder*, 556 U.S. 418, 435 (2009).

Further, a mandatory injunction, such as the one Plaintiffs seek, is one that "orders a responsible party to 'take action.'" *Meghrig v. KFC W., Inc.*, 516 U.S. 479, 484 (1996). Such an injunction "'goes well beyond simply maintaining the status quo [p]endente lite [and] is particularly disfavored.'" *Marlyn Nutraceuticals, Inc. v. Mucos Pharma GmbH & Co.*, 571 F.3d 873, 879 (9th Cir. 2009) (alterations in original) (quoting *Anderson v. United States*, 612 F.2d 1112, 1114 (9th Cir. 1979)). Generally, mandatory injunctions "are not granted unless extreme or very serious damage will result and are not issued in doubtful cases." *Id.* at 879 (quoting *Anderson*, 612 F.2d at 1115).

As set forth below, Plaintiffs fail to meet any of the *Winter* elements to justify the grant of their requested mandatory injunctive relief.

#### 1. Success on the Merits.

The County's MTD sets forth numerous reasons why Plaintiffs claims fail as a matter of law: (1) their claims are untimely on several bases; (2) they allege insufficient facts to state a plausible claim for relief; and (3) there is no legal or factual basis for their

constitutional claims. Because Plaintiffs' FAC should be dismissed in its entirety, Plaintiffs' request for preliminary injunction should, likewise, be denied.

### 2. Irreparable Harm

Plaintiffs' MPI also fails because they have not established that they are likely to suffer irreparable harm in the absence of an injunction. That failure bars any preliminary injunction. *Winter*, 555 U.S. at 20 ("A plaintiff seeking a preliminary injunction *must* establish . . . that he is likely to suffer irreparable harm in the absence of preliminary relief") (emphasis added); *Am. Trucking Ass'ns, Inc. v. City of L.A.*, 559 F.3d 1046, 1052 (9th Cir. 2009)' *see also Winter*, 555 U.S. at 21–22 (rejecting the "possibility" of harm standard, and holding that the Court's "frequently reiterated standard *requires* plaintiffs seeking preliminary relief to demonstrate that irreparable injury is *likely* in the absence of an injunction") (first emphasis added). Here, Plaintiffs' harm is entirely speculative. (*See* Cnty. MTD at 10–14 (discussing the conclusory nature of Plaintiffs' allegations, most of which have nothing to do with Arizona, and the few of which that concern Arizona are entirely speculative).) Such conjectural harm does not satisfy *Winter*'s mandate that irreparable harm is *likely*.

As the *Winter* court explained, "[i]ssuing a preliminary injunction based only on a possibility of irreparable harm is inconsistent with our characterization of injunctive relief as an extraordinary remedy that may only be awarded upon a clear showing that the plaintiff is entitled to such relief." 555 U.S. at 22. "Speculative injury does not constitute irreparable harm sufficient to warrant granting a preliminary injunction." *Caribbean Marine Servs. Co. v. Baldrige*, 844 F.2d 668, 674 (9th Cir. 1988); *see also Stormans, Inc. v. Selecky*, 586 F.3d 1109, 1139 (9th Cir. 2009) ("the district court need not consider public consequences that are highly speculative" (internal quotation marks and citation omitted)). "A plaintiff must do more than merely allege imminent harm sufficient to establish standing; a plaintiff must demonstrate immediate threatened injury as a prerequisite to preliminary injunctive relief." *Caribbean Marine Servs.*, 844 F.2d at 674 When plaintiffs cannot demonstrate "imminent or likely" harms, an injunction should not issue. *Id*. at 675;

10

*see also Nat'l Wildlife Fed'n v. Burlington N. R.R.*, 23 F.3d 1508, 1512 n.8 (9th Cir. 1994) (explaining that preliminary injunctions issue when there is evidence "of *certain* future harm . . . not just *speculative* harm") (emphasis added).

Here, Plaintiffs have alleged nothing but speculative harm. They worry about such things as "phantom votes," "large invisible risks," and "manipulation of vote totals [that] 'may' occur." (MPI at 33–34). Yet, these allegations are purely speculative and Plaintiffs put forth absolutely no evidence that any improper vote manipulation, hacking or other improper conduct has occurred in past Arizona elections or will occur in Arizona's administration of its 2022 General Election. Indeed, of the MPI's 35 pages, only six lines are actually dedicated to addressing the showing of the required, irreparable harm element. Further, and as addressed in detail above, because Arizona uses paper ballots, to the extent improper conduct occurs with respect to the tabulation of ballots, adequate post-election remedies already exist. In particular, A.R.S. § 16-672 specifies five grounds on which an election may be contested, three of which would allow for redress of the *potential* harms alleged by Plaintiffs. Specifically, A.R.S. § 16-672 states:

> **A.** Any elector of the state may contest the election of any person declared elected to a state office, or declared nominated to a state office at a primary election, or the declared result of an initiated or referred measure, or a proposal to amend the Constitution of Arizona, or other question or proposal submitted to vote of the people, upon any of the following grounds:
>
> 1. For misconduct on the part of election boards or any members thereof in any of the counties of the state, or on the part of any officer making or participating in a canvass for a state election.
>
> . . .
>
> 4. On account of illegal votes.
>
> 5. That by reason of erroneous count of votes the person declared elected or the initiative or referred measure, or proposal to amend the constitution, or other question or proposal submitted, which has been declared carried, did not in fact receive the highest number of votes for the office or a sufficient number of votes to carry the measure, amendment, question or proposal.

11

Accordingly, if actual evidence exists that would support an allegation that votes were manipulated or improperly counted by a vote tabulation system, Plaintiffs may bring that claim and produce that evidence after the election. And, because paper ballots are used and then securely stored after tabulation in Arizona, the alleged problematic results can be recounted, if necessary. *See* A.R.S. § 16-624(D) (providing that "[i]f a recount is ordered or a contest begun within six months [following an election], the county treasurer may be ordered by the court to deliver to it the packages or envelopes containing the ballots" so that the recount can occur). As the Court is no doubt aware, Maricopa County successfully defended numerous challenges to its 2020 election results, including those containing allegations of improper manipulation of tabulation equipment, like those Plaintiffs speculate about in this action. No credible evidence existed, in any of those cases, to prove that the type of nefarious conduct Plaintiffs allege occurred.[2] Plaintiffs certainly offer no

---

[2] The challenges brought in Maricopa County Superior Court included: *Aguilera v. Fontes*, No. CV2020-014083 (voluntarily dismissed, Nov. 7, 2020); *Donald J. Trump for President, Inc. v. Hobbs*, No. CV2020-014248 (Min. Entry Order, November 13, 2020 (after conducting evidentiary hearing, dismissing complaint with prejudice)); *Arizona Republican Party v. Fontes*, No. CV2020-014553 (Min. Entry Order, Nov. 18, 2020 (dismissing complaint with prejudice and ordering that Secretary of State, who had requested her fees, could file motion pursuant to A.R.S. § 12-349 (frivolous litigation statute)); *Aguilera v. Fontes II*, No. CV2020-014562 (Min. Entry, Nov. 29, 2020 (after conducting evidentiary hearing, "dismiss[ing] with prejudice for failing to state a claim upon which relief can be granted"; or alternatively, denying the relief sought by Plaintiffs given their failure to produce evidence demonstrating entitlement to same)); *Ward v. Jackson*, No. CV2020-015285 (Min. Entry Ruling, Dec. 4, 2020 (after conducting evidentiary hearing, denying requested relief and "confirming the election," because court found that evidence did not show fraud, misconduct, illegal votes, or erroneous vote count), *affirmed* No. CV-20-0343-AP/EL (Ariz. S. Ct. Dec. 9, 2020) ("conclud[ing], unanimously, that . . . . the challenge fails to present any evidence of 'misconduct,' 'illegal votes' or that the Biden Electors 'did not in fact receive the highest number of votes for office,' let alone establish any degree of fraud or a sufficient error rate that would undermine the certainty of the election results")). Additionally, an action was filed in this court. *Bowyer, v. Ducey*, No. CV-20-02321-PHX-DJH. It alleged fraud resulting from foreign interference in the election via offshore algorithms that somehow infiltrated Maricopa County's vote tabulation equipment, leading to "injections" of votes for President-elect Biden, and ballot fraud. After reviewing the "evidence" submitted by the plaintiffs, Judge Humetewa dismissed the case. She ruled that the "Plaintiffs failed to provide the Court with factual support for their extraordinary claims[.]" 506 F. Supp. at 724. An additional challenge was filed in Pinal County Superior Court; the plaintiff raised the same claims as alleged by the plaintiffs in the federal court case, and it, too, was dismissed. *Burk v. Ducey*, No. S1100CV202001869 (Pinal Cnty. Sup. Ct. Dec. 15, 2020).

evidence to suggest that it will occur in the 2022 General Election.

Finally, in the instant action, the County will suffer irreparable harm if the Court grants Plaintiffs' proposed relief—not only because it will be forced to attempt to conduct a near-impossible (and perhaps actually impossible) hand count of all of its ballots, without sufficient time to prepare for doing so, but also because a state "suffers a form of irreparable injury" whenever it "is enjoined by a court from effectuating statutes enacted by representatives of its people." *Maryland v. King*, 567 U.S. 1301, 1303 (2012) (citations omitted). Here, Plaintiffs' proposed injunction would invalidate Arizona law that allows electronic tabulation of ballots. In asking the Court to effectively enjoin a law that has been policy in the State of Arizona since at least 1966, Plaintiffs would impose a significant, irreparable harm on Defendants, who are required to conduct elections consistent with Arizona law. *Democratic Nat'l Comm. v. Reagan*, No. CV-16-01065-PHX-DLR, 2018 WL 2191664, at *8 (D. Ariz. May 10, 2018), *aff'd*, No. 18-15845, 2018 WL 4344291 (9th Cir. Sept. 12, 2018); *League of Women Voters of Ariz. v. Reagan*, 2018 WL 4467891, at *4 (D. Ariz. Sept. 18, 2018).

### 3. Balance of Equities and the Public Interest

To qualify for injunctive relief, Plaintiffs must establish that "the balance of equities tips in [their] favor." *Stormans*, 586 F.3d at 1138 (quoting *Winter*, 555 U.S. at 20). In determining whether a movant has met this burden, courts have a "duty . . . to balance the interests of all parties and weigh the damages to each." *Id.* (quoting *L.A. Mem'l Coliseum Comm'n v. Nat'l Football League*, 634 F.2d 1197, 1203 (9th Cir. 1980)). Moreover, in cases involving elections, "[t]he public interest is significantly affected." *Sw. Voter Registration Educ. Project v. Shelley*, 344 F.3d 914, 919 (9th Cir. 2003).

As an initial matter, Plaintiffs' request for injunctive relief should be denied because of their inexplicable delay. While the doctrine of laches warrants dismissal of the FAC, Plaintiffs' dilatory conduct is even more consequential in the context of their request for preliminary injunction. Indeed, "a party requesting a preliminary injunction must generally show reasonable diligence." *Benisek v. Lamone,* 585 U.S. ——, 138 S. Ct. 1942, 1944

13

(2018); *see also Holmberg v. Armbrecht,* 327 U.S. 392, 396 (1946). That is as true in election law cases as elsewhere. *See Lucas v. Townsend,* 486 U.S. 1301, 1305 (1988) (Kennedy, J., in chambers); *Fishman v. Schaffer,* 429 U.S. 1325, 1330 (1976) (Marshall, J., in chambers). In *Benisek* the Supreme Court determined, in considering the balance of equities among the parties, "plaintiffs' unnecessary, years-long delay in asking for preliminary injunctive relief weighed against their request." 138 S. Ct. at 1944. There, plaintiffs waited six years, and three general elections, before pursuing their claims. *Id*. Here, Plaintiffs challenge a statutory scheme that has authorized counties to use vote tabulation machines to "automatically" count votes since at least 1966. (*See* Cnty. MTD, Ex. 14 (Doc. 29-15).) Plaintiffs allege problems with vote tabulation machines known since 2002. (*See, e.g.*, FAC, ¶¶ 71–82.) Plaintiffs seek to invalidate a voting system certified by the Secretary on November 5, 2019. (*See id.*, ¶¶ 18, 137.) And Plaintiffs' voter files indicate they each have voted in elections in which vote tabulation machines were used for more than a decade. (*See* Cnty. MTD, Ex. 15 (Doc. 29-16).)

Inexplicably, Plaintiffs' dilatory conduct has persisted since filing the original complaint on April 22, 2022. First, they waited until May 4, 2022 to file their FAC—adding immaterial allegations and making cosmetic changes. (*See* Docs. 3, 4.) Worse yet, Plaintiffs then waited an additional five weeks after filing their FAC, and *after* Defendant Maricopa County moved to dismiss their Complaint, to file for their preliminary injunction. For these reasons, in addition to those addressed above with respect to the *Purcell* Principle, the balance of equities and the public interest will not be served by forcing all of the counties in Arizona to hand-count ballots in the 2022 General election.

For the foregoing reasons, this Court should deny Plaintiffs' request for preliminary injunction.

//
//
//
//

RESPECTFULLY SUBMITTED this 22nd day of June, 2022.

            THE BURGESS LAW GROUP

            BY: */s/ Emily Craiger*
                  Emily Craiger

            RACHEL H. MITCHELL
            MARICOPA COUNTY ATTORNEY

            BY: Thomas P. Liddy
                  Joseph J. Branco
                  Joseph E. La Rue
                  Karen Hartman-Tellez
                  Deputy County Attorneys

            *Attorneys for Maricopa County Defendants*

## CERTIFICATE OF SERVICE

I hereby certify that on June 22, 2022, I electronically transmitted the foregoing document to the Clerk's Office using the CM/ECF System for filing and transmittal of a Notice of Electronic Filing to the CM/ECF registrants on record.

*/s/ Dana N. Troy*