**PARKER DANIELS KIBORT**
Andrew Parker (028314)
888 Colwell Building
123 Third Street North
Minneapolis, Minnesota 55401
parker@parkerdk.com
Telephone: (612) 355-4100
Facsimile: (612) 355-4101

**OLSEN LAW, P.C.**
Kurt Olsen (D.C. Bar No. 445279)*
1250 Connecticut Ave., NW, Suite 700
Washington, DC 20036
Telephone: (202) 408-7025
ko@olsenlawpc.com

Alan M. Dershowitz (MA Bar No. 121200)*
1575 Massachusetts Avenue
Cambridge, MA 02138
* Admitted *Pro Hac Vice*

*Attorneys for Plaintiffs*

## UNITED STATES DISTRICT COURT
## DISTRICT OF ARIZONA

| | |
|---|---|
| Kari Lake; Mark Finchem,<br><br>Plaintiffs,<br><br>v.<br><br>Kathleen Hobbs, as Arizona Secretary of State; Bill Gates; Clint Hickman; Jack Sellers; Thomas Galvin; and Steve Gallardo, in their capacity as members of the Maricopa County Board of Supervisors; Rex Scott; Matt Heinz; Sharon Bronson; Steve Christy; Adelita Grijalva, in their capacity as members of the Pima County Board of Supervisors,<br><br>Defendants. | No. 22-cv-00677-JJT<br>(Honorable John J. Tuchi)<br><br>**PLAINTIFFS' OPPOSITION TO ARIZONA SECRETARY OF STATE'S MOTION TO DISMISS FIRST AMENDED COMPLAINT**<br><br>Oral Argument Requested |

Plaintiffs respectfully submit this Opposition to the Motion to Dismiss the First Amended Complaint ("Hobbs Mot.") (ECF no. 45) filed by the Arizona Secretary of State ("Hobbs"). Plaintiffs' claims are conventional, proper, and follow in the path of similar claims currently pending in another federal district court. *See Curling v. Raffensperger*, 493 F. Supp. 3d 1264 (N.D. Ga. 2020) (challenging constitutionality of electronic voting system). Notably, in *Curling*, plaintiffs' allegations of critical security failures in Dominion Voting Systems Inc.'s ("Dominion") software and voting equipment proved correct, and on June 3, 2022, the federal government announced that the ImageCast X device, which is approved for use in Arizona, has nine security failures "that should be mitigated as soon as possible."[1]

For Hobbs's motion, Plaintiffs' well-pled allegations must be accepted as true. The allegations show that electronic voting systems used in Arizona are unsecure and nontransparent. Am. Compl. ¶¶ 73, 124 (ECF no. 3) ("Complaint"). Moreover, compromises of the security of these voting machines can be undetectable by any current safety protocols or certification. *Id*. ¶¶ 31, 75, 116, 136(i), 146. Such security failures nullify the fundamental right to vote by permitting elections to be decided by computer manipulation rather than vote totals – a constitutionally unacceptable system. "The right to vote freely for the candidate of one's choice is of the essence of a democratic society, and any restrictions on that right strike at the heart of representative government." *Reynolds v. Sims*, 377 U.S. 533, 555 (1964). "Other rights, even the most basic, are illusory if the right to vote is undermined." *Id*. at 560 (quoting *Wesberry v. Sanders*, 376 U.S. 1, 17 (1964)). The right to vote includes the right to have one's ballot counted, and the Constitution prohibits destroying the right to vote by alteration of ballots or ballot box stuffing. *United States v. Classic*, 313 U.S. 299, 315 (1941); *Reynolds*, 377 U.S. at

---

[1] Cybersecurity & Infrastructure Security Agency, *ICS Advisory (ICSA-22-154-01): Vulnerabilities Affecting Dominion Voting Systems ImageCast X* (June 3, 2022), *available at* https://www.cisa.gov/uscert/ics/advisories/icsa-22-154-01. Per Hobbs Mot. at 14 n.6, the "public record" of CISA's action concerning this undisputed fact may be judicially noticed by the Court.

554-55. Plaintiffs' Complaint pleads a state of affairs in Arizona's election process that nullifies Plaintiffs' constitutional right to vote. Hobbs's arguments seeking dismissal are without merit.[2]

## I.   PLAINTIFFS' ALLEGATIONS

The Amended Complaint ("Complaint") alleges that Hobbs, as the chief election officer in Arizona, intends to cause Arizona to use electronic voting machines to administer future elections, including the 2022 Election scheduled for November 8, 2022. Compl. ¶¶ 1, 9-11, 177-183 (ECF no. 3). It is well established that electronic voting systems are open to hacking, tampering, and fraud to wrongfully alter vote totals. *Id*. ¶¶ 71-92. Protective measures are inadequate to remediate these security failures. *Id*. ¶¶ 144-152. Wrongful manipulation of votes through electronic voting machines can be done so as to remove the evidence that such manipulation occurred—despite all current safety procedures and certifications—leaving no trace of the stolen votes. *Id*. ¶¶ 4, 31, 75, 116, 146. Conducting an election by a means that allows vote totals to be undetectably manipulated violates Plaintiffs' fundamental constitutional right to vote. *Id*. ¶¶ 178-81.

These allegations state an obvious, redressable wrong. If the result of an election can be determined by an electronic intruder secretly altering votes or vote totals in Arizona's computerized voting equipment, then the votes cast by voters are meaningless and their right to vote has been nullified.

## II.   HOBBS'S FACTUAL ASSERTIONS
## PROVIDE NO BASIS FOR DISMISSAL.

"[O]n a Rule 12(b)(6) motion, 'The facts alleged in a complaint are to be taken as true.'" *Hoffman v. Preston*, 26 F.4th 1059, 1061 (9th Cir. 2022). The facts alleged must be "construed in the light most favorable to the nonmoving party." *Hamm v. Equifax Info.*

---

[2] Hobbs incorporates by reference the arguments for dismissal made by the other defendants. Hobbs Mot. 1. Those arguments, too, are without merit for the reasons stated in Plaintiffs' Opposition to Maricopa County Defendants' Motion to Dismiss First Amended Complaint (ECF no. 56), which are incorporated herein by reference.

*Servs. LLC*, No. CV-17-03821-PHX-JJT, 2018 U.S. Dist. LEXIS 123505, at *3-4 (D. Ariz. July 24, 2018). Hobbs's motion begins by improperly advancing factual allegations taken from outside the Complaint. Hobbs Mot. 1, 2-4. Facts outside the complaint may not be considered to support a Fed. R. Civ. P. 12(b)(6) motion to dismiss. *WBS, Inc. v. Croucier*, 762 Fed. Appx. 424, 428 (9th Cir. 2019); *Ree v. Zappos.com, Inc.*, 888 F.3d 1020, 1028 (9th Cir. 2018). The Court must "disregard[]" evidence outside the Complaint, such as "portions of the Federal Communications Commission's website." *Enos v. Arizona*, No. CV-16-00384-PHX-JJT, 2017 U.S. Dist. LEXIS 19268, at *10 (D. Ariz. Feb. 10, 2017). The "simple question before the Court" on a motion to dismiss is "whether Plaintiffs have alleged sufficient facts in the Amended Complaint to allow the Court to plausibly infer" that the Defendants' conduct will deny Plaintiffs their rights. *See id*. The Complaint easily surpasses that threshold.

### III.    PLAINTIFFS HAVE STANDING.

Hobbs' argument that Plaintiffs lack standing to bring their claims is incorrect. Hobbs Mot. 5-9. The only element of Plaintiffs' standing challenged by Hobbs is the "injury in fact" element. *Id*. An injury in fact is "an invasion of a legally protected interest which is (a) concrete and particularized and (b) actual or imminent, not conjectural or hypothetical." *Meland v. Weber*, 2 F.4th 838, 844 (9th Cir. 2021). The Complaint alleges a concrete and particularized injury – nullification of Plaintiffs' fundamental rights as candidates and as voters to vote and have their votes properly counted without being diluted or debased by other fictitious or manipulated votes. "[O]ne thing is clear: total and complete disenfranchisement of the electorate as a whole is patently and fundamentally unfair (and, hence, amenable to rectification in a federal court)." *Bonas v. Town of N. Smithfield*, 265 F.3d 69, 75 (1st Cir. 2001). The injury is also actual and imminent, as it will occur during the 2022 Elections through use of electronic election equipment that Hobbs acknowledges Arizona will use.

**"Conjectural and speculative."** Hobbs first argues that Plaintiffs' injuries are too speculative and conjectural to establish standing. Hobbs Mot. 5. Not so. A plausible threat

of misconduct that would jeopardize the accurate counting of votes in an election constitutes adequate injury to establish standing. "An allegation of future injury may suffice if . . . there is a substantial risk that the harm will occur." *Susan B. Anthony List v. Driehaus*, 573 U.S. 149, 158 (2014) (quotation omitted). "An inaccurate vote tally is a concrete and particularized injury to candidates" sufficient to meet the injury-in-fact requirement. *Carson v. Simon*, 978 F.3d 1051, 1058 (8th Cir. 2020). An "increased probability of injury" as a result of the challenged act by the defendant can provide standing. *Sierra Club v. United States EPA*, 774 F.3d 383, 392 (7th Cir. 2014). Accordingly, the U.S. District Court for the Northern District of Georgia properly held that standing was established where the plaintiffs "plausibly allege a threat of a future hacking event that would jeopardize their votes and the voting system at large." *Curling v. Kemp*, 334 F. Supp. 3d 1303, 1316 (N.D. Ga. 2018).

The Complaint alleges that the electronic equipment Hobbs intends to use in the 2022 Election has existing security failures that allow unauthorized persons to manipulate votes, and that such manipulation has repeatedly occurred in the past. Compl. ¶¶ 23-30, 61, 69-89. In addition, these security failures are *ongoing* – CISA announced on June 3, 2022, that nine security failures can be used "to steal votes" in Arizona, *see supra* at 1 & n.1. – and remain unaddressed. *Id.* ¶¶ 4, 139-40. The Complaint pleads detailed allegations showing that existing safety procedures and certifications can be defeated and that manipulation of votes can be performed without leaving any record of the changes. *Id.* ¶¶ 31, 75, 98, 128, 138-40, 145-46. Further, future hacking of elections is expected by former federal officials; and at least one person has hacked Arizona's state voter registration records. *Id.* ¶¶ 79, 80, 94, 99, 101, 130. Still further, the Complaint alleges that electronic election equipment used in Arizona in 2020 was found after the election to have vote total discrepancies, missing data, and security failures. *Id.* ¶¶ 70, 132. The threat is real and imminent. *See Curling*, 493 F. Supp. 3d at 1342 ("The Plaintiffs' national cybersecurity experts convincingly present evidence that this is not a question of 'might this actually ever happen?' — but 'when it will happen.'").

Taken as true, and drawing all inferences in Plaintiffs' favor, these allegations plead an injury that is neither conjectural nor speculative: Plaintiffs' rights as candidates and voters to vote and have an accurate count of the vote are nullified because the outcome of the election can be determined without regard to the actual votes cast, *and no one will ever know that this happened.* Under such a system, the casting of a vote is a sham. Voting is meaningless unless the vote is fairly counted and the winner of the election is determined by the majority of the legally-cast votes – not the undetectable interference of an unscrupulous computer expert. *See Marks v. Stinson*, 19 F.3d 873, 887 (3d Cir. 1994) (affirming injunction against candidate taking office after election in which fraud may have changed the outcome, based on violation of the right to vote when the "possibility is left open that some other candidate actually received more votes than the declared winner, which would mean that each of the votes cast for this other candidate was ignored"); *Griffin v. Burns*, 570 F.2d 1065, 1078-79 (1st Cir. 1978) (affirming injunction requiring new election, where the "integrity" of the initial election "was severely impugned" by voters using ballots quashed by the state supreme court, in part because "due process involves the appearance of fairness as well as actual fairness"); *Bonas*, 265 F.3d at 74 (where "organic failures in a state or local election process threaten to work patent and fundamental unfairness, a colorable claim lies for a violation of substantive due process (and, hence, federal jurisdiction attaches)").

Hobbs attempts to minimize the threat posed by Arizona's fatally flawed election equipment by arguing that the injury depends on a "chain of contingencies." Hobbs Mot. 7. All lawsuits seeking injunctive relief rely on the occurrence of a contingency, so that consideration is not itself sufficient to defeat standing. The possibility of illegal conduct changing an election outcome has been held by this Court to establish standing. *Ariz. Democratic Party v. Ariz. Republican Party*, No. CV-16-03752-PHX-JJT, 2016 U.S. Dist. LEXIS 154086, at *4 (D. Ariz. Nov. 4, 2016) (allegation that plaintiff "will suffer immediate and irreparable injury if Defendants' alleged conspiracy to intimidate voters 'succeeds in disrupting or changing the results of the election'" sufficient to

establish standing). If illegal conduct changing the result of an election is plausible, a plaintiff has shown injury to establish standing. That is the case here.

Two of the cases cited by Hobbs, Hobbs Mot. 8, to support her "conjectural" argument were cases challenging *past* elections and did not allege the election result would change if they were granted relief. *E.g. Stein v. Cortés*, 223 F.3d 423, 426 (E.D. Pa. 2016) (candidate who received less than 1% of votes demanded recount of votes "during last month's election"); *Samuel v. V.I. Joint Bd. of Elections*, No. 2012-0094, 2013 U.S. Dist. LEXIS 31538, at *1 (D.V.I. Mar. 7, 2013) (plaintiffs sought "to decertify the November 6, 2012 general election in the Virgin Islands" but "do not claim that they have been deprived of something to which they personally are entitled – such as election to the various positions they sought.") (internal quotation marks and citation omitted). For obvious reasons, federal courts are loath to invalidate elections that have already been completed, without strong evidence of fraud. Moreover, the consideration that courts will not touch a completed election without strong evidence of fraud weighs in *favor* of Plaintiffs' standing here, for the Complaint alleges Arizona's electronic election equipment can be hacked undetectably. Taken as true, these allegations mean that Plaintiffs could *never* obtain relief when their votes were stolen or overruled by manipulation of the computerized election system, because they will not be able to show the fraud that occurred. They must seek relief now based on the high risk of manipulation, and prevent the irreparable harm before it occurs. The other cases relied on by Hobbs to support her argument on this issue, Hobbs Mot. 7-8, are not applicable here or are inconsistent with *Carson* and *Curling*.[3]

**"Generalized grievances."** Hobbs also argues that Plaintiffs' injuries are insufficiently "concrete and particularized." Hobbs Mot. 8-9. Contrary to Hobbs's assertion, though, Plaintiffs do not claim a generalized interest in "seeing that the law is

---

[3] In *Shelby Cnty. Advocs. for Valid Elections v. Hargett,* 2019 WL 4394754, at *2 (W.D. Tenn. Sept. 13, 2019), *aff'd Shelby Advocs. for Valid Elections v. Hargett*, 947 F.3d 977 (6th Cir. 2020), unlike this case, none of the plaintiffs were current candidates for office.

obeyed." *See id*. at 9. Plaintiffs are both candidates for office in the 2022 Election. Compl. ¶¶ 35-41. "[A]s candidates" they "have a cognizable interest in ensuring that the final vote tally accurately reflects the legally valid votes cast. An inaccurate vote tally is a concrete and particularized injury to candidates." *Carson*, 978 F.3d at 1058 (footnote omitted); *Trump v. Wis. Elections Comm'n*, 983 F.3d 919, 924 (7th Cir. 2020). As voters, Plaintiffs possess a fundamental right to vote. *Burdick v. Takushi*, 504 U.S. 428, 433 (1992). They have a particular and individual interest in casting ballots that they can be assured will be counted as votes for the candidates they prefer, rather than scanned by a black-box piece of equipment that counts the votes in an unknown and unknowable way and can easily manipulate votes whether through hacking, malware implanted in the source code, or illicit components manufactured or assembled in adversarial countries like China.

Plaintiffs may seek judicial intervention to prevent this injury, and a state may not, by arbitrary action or other unreasonable impairment, burden it. *Baker v. Carr*, 369 U.S. 186, 208 (1962). "[S]ince the right to exercise the franchise in a free and unimpaired manner is preservative of other basic civil and political rights, any alleged infringement of the right of citizens to vote must be carefully and meticulously scrutinized." *Reynolds*, 377 U.S. at 562. The right to vote includes the right to have the citizen's vote counted, *Classic*, 313 U.S. at 315, "correctly counted and reported," *Gray v. Sanders*, 372 U.S. 368, 380 (1963), and not debased or diluted by the introduction of fraudulent votes, *Reynolds*, 377 U.S. at 556. "'[T]he free exercise and enjoyment of the rights and privileges guaranteed to the citizens by the Constitution and laws of the United States'" entails "the right and privilege . . .  to have their expressions of choice given full value and effect by not having their votes impaired, lessened, diminished, diluted and destroyed by fictitious ballots fraudulently cast and counted, recorded, returned, and certified." *United States v. Saylor*, 322 U.S. 385, 386 (1944). Plaintiffs have pleaded that Arizona's electronic election equipment is so unsecure that there is actual and imminent risk that their votes and votes for them as candidates will be rendered meaningless. This is a concrete and particularized injury. *Carson*, 978 F.3d at 1058; *Curling*, 334 F. Supp. 3d at 1316.

The fact that Defendants' wrongful conduct also inflicts the same concrete and particularized injury on other Arizona voters does not prevent Plaintiffs from having standing to pursue relief concerning their own injuries. "[W]here a harm is concrete, though widely shared, the [Supreme] Court has found 'injury in fact.'" *FEC v. Akins*, 524 U.S. 11, 24 (1998). "This conclusion seems particularly obvious . . . where large numbers of voters suffer interference with voting rights conferred by law." *Id*. In *FEC*, the Supreme Court held that a claim "directly related to voting, the most basic of political rights" was "sufficiently concrete" to establish standing. *Id*. at 24-25. In *Brakebill v. Jaeger*, the Eighth Circuit held that the plaintiff had standing to challenge a voter identification law notwithstanding that the burden of the law would fall on any person who had a residential street address. 932 F.3d 671, 677 (8th Cir. 2019). In *Common Cause/Georgia v. Billups*, the Eleventh Circuit held that the plaintiffs had standing to challenge a voter ID statute, and that the statute could be challenged even by persons who possessed an acceptable form of ID. 554 F.3d 1340, 1351-52 (11th Cir. 2009). That court noted that the "inability of a voter to pay a poll tax" would not be required to challenge a statute imposing a tax on voting. *Id*. at 1352. A suit challenging a poll tax would assert an injury applicable to all voters, but the requirement of standing would nevertheless be met. The same is true here.

In *Ariz. Democratic Party*, this Court held that standing existed for the plaintiff to bring election-related claims based on the possibility that the defendants' alleged conduct might "succeed[] in disrupting or changing the results of the election." No. CV-16-03752-PHX-JJT, 2016 U.S. Dist. LEXIS 154086, at *4. That outcome is the outcome Plaintiffs here also seek to prevent. *See also Donald J. Trump for President, Inc. v. Bullock*, 491 F. Supp. 3d 814, 828 (D. Mont. 2020) ("Because the alleged injuries to the members' voting rights at issue in this case could conceivably be asserted by any Montanan does not eradicate the standing necessary to assert these claims. On the contrary, the Supreme Court has repeatedly enumerated the principle that claims alleging a violation of the right to vote can constitute an injury in fact despite the widespread reach of the conduct at issue.").

The nullification of Plaintiffs' right to vote, and to receive accurate votes as

candidates, is an injury concrete and particularized enough to give Plaintiffs standing to seek a remedy from this Court. Hobbs's arguments to the contrary are without merit.

## IV.   NO ELEVENTH AMENDMENT BAR APPLIES.

Hobbs argues that Eleventh Amendment immunity bars Plaintiffs' claims. Hobbs Mot. 9-12. The Eleventh Amendment does not prevent "actions for prospective declaratory or injunctive relief against state officers in their official capacities for alleged violations of federal law" if the state officer has "some connection with enforcement of the act." *Mecinas v. Hobbs*, 30 F.4th 890, 903 (9th Cir. 2022) (citations omitted). Here, Plaintiffs' claims seek prospective declaratory and injunctive relief against Hobbs, a state officer in her official capacity, for violations of federal constitutional law. Compl. ¶¶ 183, 189, 195, 197, 211. Hobbs, as Secretary of State, is Arizona's "chief state election officer" and responsible for the approval of election equipment. A.R.S. §§ 16-142(A)(1), 16-441; Compl. ¶¶ 156-58. The Complaint cannot be dismissed on the basis of the Eleventh Amendment.

Though Hobbs uses the label "Eleventh Amendment," this section of her Motion actually argues, incorrectly, that Plaintiffs' claims fail on the merits – that Plaintiffs "don't plausibly allege" a violation of federal law. Hobbs Mot. 9. Hobbs asserts the Constitution does not forbid the use of touchscreen voting systems and gives states wide latitude to decide the manner of conducting elections. *Id*. at 10. Federal courts have recognized since at least the 1960s that the Constitution both grants power to states to regulate elections *and* forbids states, when regulating elections, from infringing their citizens' constitutional rights. *E.g. Gomillion v. Lightfoot*, 364 U.S. 339, 347 (1960) ("When a State exercises power wholly within the domain of state interest, it is insulated from federal judicial review. But such insulation is not carried over when state power is used as an instrument for circumventing a federally protected right."). Plaintiffs allege that the use of electronic equipment is an election regulation that falls outside the zone of Arizona's permissible constitutional discretion, because it allows elections to be decided without regard to the votes actually cast, thereby nullifying the right to vote and have one's vote counted without being debased, diluted, or destroyed. To be constitutional, election regulations must

1    produce a reliable count of the legal votes. Plaintiffs' claims plausibly allege that Arizona's

2    equipment and system do not. Plaintiffs allege a violation of federal law.

3          Nor do Plaintiffs' claims depend on any application of Arizona state law. Without

4    regard to whether Arizona's use of electronic election equipment satisfies Arizona state

5    law requirements, use of the equipment violates Plaintiffs' federal constitutional rights.

6    This Court need make no pronouncement concerning whether Arizona's procedures

7    comply with state law, in order to grant Plaintiffs relief. Allegations that Arizona's

8    equipment fails to meet state law standards provide evidentiary support for Plaintiffs'

9    allegations that the equipment is not sufficiently secure and reliable, but the Court can, and

10   should, grant Plaintiffs the relief they seek irrespective of any Arizona state law standards.

11         Hobbs repeatedly cites *Weber v. Shelley*, 347 F.3d 1101 (9th Cir. 2003). Hobbs Mot.

12   at 2, 9, 14, 17. *Weber* mandates denial of Hobbs's motion to dismiss, for the court in *Weber*

13   reviewed a grant of *summary judgment*. That is, in *Weber* the plaintiff's complaint alleging

14   that an electronic voting system was unconstitutional was *not* dismissed at the pleadings

15   stage, but proceeded through discovery to summary judgment, where the plaintiff failed to

16   prove her claims. *Weber*, 347 F.3d at 1105. Much has happened since 2003 to show that

17   electronic election equipment is inherently less accurate and less verifiable than other

18   systems. Plaintiffs in this case are entitled to an opportunity to gather and present that

19   evidence, just as the plaintiff in *Weber* was afforded that opportunity.

20         Hobbs argues in a footnote that *Pullman* abstention should stay the Court from

21   hearing Plaintiffs' claims. Hobbs Mot. 12 n.3. "*Pullman* abstention is an extraordinary and

22   narrow exception to the duty of a District Court to adjudicate a controversy" that applies

23   when "state law issues may moot or narrow the constitutional questions." *Porter v. Jones*,

24   319 F.3d 483, 492 (9th Cir. 2003) (quotation omitted). Hobbs does not identify any pending

25   "state law issues" in controversy that might "moot or narrow" Plaintiffs' constitutional

26   claims, and does not even attempt to show how this case meets the three elements required

27   for *Pullman* abstention. *Id.* Hobbs does not deny that Arizona intends to the use electronic

28   election equipment alleged in the Complaint. There is no reason to believe that any

unidentified state law issue might moot or narrow Plaintiffs' claim. Hobbs is merely citing *Pullman* as a means to try to avoid addressing Plaintiffs' claims on the merits. *Pullman* abstention "should rarely be applied." *Id*. This is not a case for *Pullman*.

## V.   PLAINTIFFS PLEAD VIABLE CLAIMS.

Hobbs lastly, and repetitively, argues that the Complaint fails to state a cognizable constitutional claim because it purportedly "contains no well-pled facts sufficient to show a violation of Plaintiffs' 'right to vote [and] to have that vote counted." Hobbs Mot. 12-13. To support this conclusion, Hobbs argues that the Complaint doesn't address Arizona's specific voting equipment and practices, and that the Complaint does not "give rise to a plausible inference that Arizona's voting systems are at risk of being compromised." *Id*. 15-16. Hobbs is wrong. The Complaint is replete with detailed allegations demonstrating that (1) *all* electronic voting equipment *can be* compromised through a variety methods of including hacking, source code manipulation, and compromise of components assembled or manufactured in adversarial countries like China, (2) *Arizona's* electronic voting equipment *can be* compromised through the same paths; (3) multiple attempts have been made in the past to hack U.S. election equipment; (4) Arizona's voter registration database *has been* hacked; (5) a federal judge, after hearing evidence related to the *same* electronic election system used in part of Arizona, concluded it was not a matter of "if" but of "when" an election would be hacked; and (6) votes could be changed in an electronic election system without leaving any evidence of the change. These allegations are well-pled, specific, and give rise to plausible inferences that Arizona's voting systems can be compromised to change the results of future elections and that it is reasonably likely this will occur. *See* Compl. ¶¶ 80, 84, 94. As a result, the Complaint states a claim that Plaintiffs' fundamental right to vote will be infringed if Arizona uses the electronic equipment to administer future elections.

### A.   <u>The Complaint Alleges Specific Facts Showing Arizona's Use of Electronic Election Equipment Is Unsecure.</u>

The Complaint alleges the following:

1. Plaintiffs have a constitutional right to vote and have their votes counted accurately so that only legal votes determine the winners of offices. *Id*. ¶ 2.

- Hobbs does not dispute this, and she acknowledges Plaintiffs are asserting the right to vote and have their votes counted. *See* Hobbs Mot. at 13.

2. "Every county in Arizona intends to tabulate votes cast in the Midterm Elections through optical scanners" and upload vote tallies "over the internet to an election reporting system." Compl. ¶¶ 14-15. "All optical scanners and ballot marking devices certified by Arizona, as well as the software on which they rely . . . . deprive voters of the right to have their votes counted and reported in an accurate" way. *Id*. ¶ 23. "All electronic voting machines and election management systems, including those slated to be used in Arizona in the Midterm Election, can be manipulated through internal or external intrusion to alter votes and vote tallies." *Id*. ¶ 24. A vast body of real-world evidence shows that electronic voting machines and election management systems can be hacked to manipulate votes. *Id*. ¶¶ 73-89. Dominion and ES&S electronic voting machines "can be hacked or compromised with malware, as has been demonstrated by recognized computer science experts, including experts from the University of Michigan, Princeton University, Georgetown University, and other institutions." *Id*. ¶ 61. Dominion and ES&S electronic election equipment is intended to be used in Arizona. *Id*. ¶¶ 14, 16, 19. "Electronic voting machines and software manufactured by . . . Dominion and ES&S, are vulnerable to cyberattacks before, during, and after an election in a manner that could alter election outcomes." *Id*. ¶ 28. The equipment used in Maricopa County, Arizona during the 2020 election exhibited data inconsistencies, missing information, and basic cyber security deficiencies. *Id*. ¶ 132.

- Hobbs is plainly incorrect in asserting that the Complaint "fail[s] to connect [its] allegations to Arizona's voting system" and "ignore[s] that 14 of Arizona's 15 counties don't even use Dominion machines." Hobbs Mot. 13-14, 15.[4] The

---

[4] Some of Hobbs's assertions appear intended to be taken not at face value. For example, she declares (wrongly) that "every example" in the Complaint of "issues" with election

Complaint speaks specifically to Arizona. Hobbs's argument that security incidents in other jurisdictions are "immaterial," *id.* at 13, is also incorrect. Incidents elsewhere show the threat in Arizona is real, not speculative.

- Hobbs attacks the Complaint for making "vague allegations of <u>possible</u> 'vulnerabilities'" or "potential security vulnerabilities," Hobbs Mot. 17, 6; but the Complaint alleges Arizona's equipment **is** flawed and **can be** used to manipulate votes. The security failures are not "possible." They are actual.

3. Litigation in Georgia concerning Dominion Democracy Suite 5.5b election equipment resulted in expert testimony that the Dominion system is flawed due to inadequate "hardening" against a security attack. Compl. ¶ 83. The Georgia federal court found substantial evidence that the system "was plagued by security risks and the potential for votes to be improperly rejected or misallocated," and wrote, "national cybersecurity experts convincingly present evidence that this is not a question of 'might this actually ever happen?' – but 'when it will happen.'" *Id.* ¶ 84. The voting system used in Georgia is the same system used in Arizona. *Id.* ¶¶ 139-40.

- Hobbs argues the Complaint does not allege "that Arizona uses the same equipment and procedures that caused the alleged issues they point to." Hobbs Mot. 16. This is simply incorrect; the Complaint alleges that Arizona uses the same equipment used in Georgia. Moreover, even if Arizona's equipment was unique among states this would not matter, because the Complaint plausibly alleges *all* electronic equipment – including Arizona's – is unconstitutionally unsecure for use in voting and counting votes.

4. "Expert testimony demonstrates that all safety measures intended to secure electronic voting machines against manipulation of votes, such as risk limiting audits and logic and accuracy tests, can be defeated." Compl. ¶ 31; *id.* ¶ 4. "All post-election audit procedures can be defeated by sophisticated manipulation of electronic voting machines."

---

equipment "involves other jurisdictions, not Arizona." Hobbs Mot. 6. Yet on the same page, she admits "Plaintiffs try to tie their allegations to Arizona." *Id.* n.1.

*Id*. ¶ 145. A professor of computer science has testified that malware can defeat acceptance testing, logic and accuracy testing, external firmware validation, and risk-limiting audits as protections for election equipment in Georgia, which is also used in Arizona. *Id*. ¶ 146.

- Hobbs argues, citing evidence outside the Complaint and without providing any reason to believe these efforts are successful (which would, in any event, only create a dispute of material fact that cannot support dismissal of Plaintiffs' claims), that Arizona "election officials implement policies to mitigate risks," and that Arizona has election "auditing procedures." Hobbs Mot. 14, 15-16. But the Complaint pleads that all such security policies and audits can be defeated, and it provides expert testimony to substantiate this allegation. A manual review of the votes at 2% of the precincts in a county, the hand count procedure from A.R.S. § 16-602 and EPM 213-34 cited by Hobbs, Mot. at 16, does not protect against hacking of election equipment in 98% of the county.

- Contrary to Hobbs's assertion, Hobbs Mem. 14-15, Plaintiffs are well aware that the election equipment Arizona intends to use has been "certified." The Complaint plausibly pleads that the review and certification process for election equipment is meaningless, because it does not catch security failures and approves equipment with serious security problems. Experts for years have demonstrated the ability to hack election machines certified for use in elections. Compl. ¶¶ 74-78, 89. The Complaint plausibly[5] pleads that the equipment

---

[5] Allegations that certification does not assure security are plausible in part because they are consistent with published conclusions of relevant experts. *E.g.* Steven M. Bellovin et al., *Seeking the Source: Criminal Defendants' Constitutional Right to Source Code*, 17 Ohio St. Tech. L. J. 1, 35 (Dec. 2020) (Decl. of Andrew Parker Ex. G (ECF no. 42-1)) (Voting machines are the "best-documented example" of "adversarial testing" finding "flaws in software that had been certified by outside parties," and "outside auditors . . . have *always* found flaws" in voting machine software, so that "There is broad consensus among elections experts that modern software systems are, by virtue of their design, too complex and unreliable to be relied upon for determining the outcomes of civil elections."); *Russian Interference in the 2016 U.S. Elections* at 76, Hearing of S. Sel. Comm. on

14

Arizona intends to use, and the software on which it relies, was "wrongly certified" because it "deprives voters of the right to have their votes counted and reported in an accurate, auditable, legal, and transparent process." *Id*. ¶ 23. For example, Dominion tabulators approved by the EAC were found to contain "erroneous code" that caused the equipment to exclude ballots from reported election results. *Id*. ¶ 116. The Dominion system used in Georgia, the same Dominion system certified to be used in Arizona, was found by a federal court to be plagued by security risks and the potential for votes to be improperly rejected or misallocated. *Id*. ¶¶ 84-85. In response to expert analysis in the Georgia case, *id*. ¶ 4, CISA, the federal agency responsible for certifying election equipment, announced that a Dominion device, which is approved for use in Arizona,[6] has nine different security vulnerabilities, *see supra* at 1 & n.1 Certification of voting equipment for use by federal and state authorities clearly does not mean the equipment is secure against unauthorized manipulation.

5. Malware that causes the changing of votes on electronic election equipment can delete itself after the election, "leaving no evidence that the voting machine was ever hijacked or any votes stolen." Compl. ¶ 75.

- This means Arizona's election audit procedures are not likely to discover whether an election's result has been changed by computerized manipulation.

6. Foreign states have attempted to use electronic intrusion to interfere in U.S. elections in the past, and a former Obama administration official predicted that "the 2020 election will be hacked no matter what we do." *Id*. ¶¶ 79-80, 94. The Biden administration

---

Intelligence, S. Hrg. 115-92 (June 21, 2017) (Decl. of Andrew Parker Ex. H (ECF no. 43)) ("Cybersecurity experts have studied a wide range of U.S. voting machines—including both DREs and optical scanners—and in *every single case*, they've found severe vulnerabilities that would allow attackers to sabotage machines and to alter votes.").

[6] *See* Arizona Secretary of State, 2022 Election Cycle/Voting Equipment, *available at* https://azsos.gov/sites/default/files/2022_Election_Cycle_Voting_Equipment-Feb-Final.pdf.

in 2021 announced sanctions against Russia for election interference in the 2020 election. *Id.* ¶ 130. The Arizona state voter registration database was breached in 2016. *Id.* ¶¶ 79, 94. U.S. Senators and Representatives have publicly warned about the risks of electronic voting machines being hacked since at least 2018. *Id.* ¶¶ 95-100. A federal court found that it was not a matter of "if" but "when" an election would be hacked, after hearing evidence related to the same Dominion system used in Arizona. *Id.* ¶ 84.

- Hobbs repeatedly asserts that future hacking of Arizona's electronic election equipment is not "plausible." Hobbs Mot. 13, 16, 17. The Complaint alleges specific facts showing that it is plausible.

7. Election equipment can be opened to malicious manipulation "through illicit software installed on their component parts during the manufacturing process." Compl. ¶ 90. Similar such attacks were discovered by the U.S. Department of Defense in 2010, Intel Corp. in 2014, an FBI investigation in 2015, and a government contractor providing intelligence services in 2018. *Id.* ¶ 91.

- Hobbs argues that a foreign attack during the manufacturing process is a "vague possibility." Hobbs Mot. at 13. To the contrary, the Complaint specifically pleads that such attacks have repeatedly occurred already. They are not a "vague possibility"; they are a historical fact that can easily recur.

Taken as true, the Complaint alleges specific, plausible facts showing that Arizona's electronic election equipment can be manipulated to change votes and decide the results of elections without regard to votes actually cast; that such manipulation can occur without leaving evidence to show it happened; that any efforts by Arizona to prevent this from happening are ineffective; that there exist actors with the desire to manipulate U.S. elections. Means, motive, opportunity, and impunity to manipulate Arizona's elections all exist. Arizona's use of electronic voting equipment nullifies Plaintiffs' right to vote.

## B. **Plaintiffs Allege Viable Legal Theories, Not a Mere Policy Preference.**

Hobbs finally argues that Complaint "amounts to a mere desire for the Court to impose Plaintiffs' preferred methods of election administration." Hobbs Mot. 17. As

discussed above, the Constitution denies states the power to administer elections in such a fashion as to infringe rights guaranteed by the Constitution, including the right to vote. *Gomillion*, 364 U.S. at 347; *Tashjian v. Republican Party of Conn.*, 479 U.S. 208, 217 (1986) (state's "power to regulate the time, place, and manner of elections does not justify, without more, the abridgment of fundamental rights, such as the right to vote"). The Complaint is not about Plaintiffs' preferences; it is about Hobbs's intention to nullify Plaintiffs' constitutional rights by permitting computer manipulations to overrule Plaintiffs' ballots and determine the election outcomes. That is a cognizable legal claim.

## VI.   CONCLUSION

For the foregoing reasons, Hobbs's Motion should be denied. If the Court grants the motion in whole or in part, Plaintiffs should be given leave to amend the Complaint to add additional factual allegations, including among other things information from the declarations filed in support of Plaintiffs' motion for a preliminary injunction. *See* ECF nos. 35-41.

DATED: June 22, 2022.          **PARKER DANIELS KIBORT LLC**

By */s/ Andrew D. Parker*
    Andrew D. Parker (AZ Bar No. 028314)
    888 Colwell Building
    123 N. Third Street
    Minneapolis, MN 55401
    Telephone: (612) 355-4100
    Facsimile: (612) 355-4101
    parker@parkerdk.com

**OLSEN LAW, P.C.**
By */s/ Kurt Olsen*
    Kurt Olsen (D.C. Bar No. 445279)*
    1250 Connecticut Ave., NW, Suite 700
    Washington, DC 20036
    Telephone: (202) 408-7025
    ko@olsenlawpc.com

By */s/ Alan M. Dershowitz*
    Alan M. Dershowitz (MA Bar No. 121200)*
    1575 Massachusetts Avenue
    Cambridge, MA 02138

* Admitted *Pro Hac Vice*

*Counsel for Plaintiffs Kari Lake
and Mark Finchem*

18

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on June 22, 2022, I electronically transmitted the foregoing document to the Clerk's Office using the CM/ECF System for filing and transmittal of a Notice of Electronic Filing to the CM/ECF registrants on record.

*/s/ Andrew D. Parker*