Roopali H. Desai (024295)
D. Andrew Gaona (028414)
Kristen Yost (034052)
**COPPERSMITH BROCKELMAN PLC**
2800 North Central Avenue, Suite 1900
Phoenix, Arizona 85004
T: (602) 381-5478
rdesai@cblawyers.com
agaona@cblawyers.com
kyost@cblawyers.com

Sambo (Bo) Dul (030313)
**STATES UNITED DEMOCRACY CENTER**
8205 South Priest Drive, #10312
Tempe, Arizona 85284
T: (480) 253-9651
bo@statesuniteddemocracy.org

Christine Bass*
**STATES UNITED DEMOCRACY CENTER**
3749 Buchanan Street, Unit 475165
San Francisco, California 94147-3103
T: (309) 242-8511
christinebass@statesuniteddemocracy.org

*Admitted Pro Hac Vice*

*Attorneys for Defendant*
*Arizona Secretary of State Katie Hobbs*

**UNITED STATES DISTRICT COURT**

**DISTRICT OF ARIZONA**

| | |
|---|---|
| Kari Lake and Mark Finchem, | No. 2:22-cv-00677-JJT |
| Plaintiffs, | |
| v. | **SECRETARY OF STATE KATIE HOBBS' RESPONSE IN OPPOSITION TO PLAINTIFFS' MOTION FOR PRELIMINARY INJUNCTION** |
| Katie Hobbs, in her official capacity as Arizona Secretary of State, et al., | |
| Defendants. | |

1090752.3

**Introduction**

Plaintiffs sued in April 2022 to enjoin the use of electronic voting systems in all Arizona elections. That claim was already too late to get relief this election year. Yet Plaintiffs waited another two months to file a Motion for Preliminary Injunction [Doc. 50] repeating the same allegations. Plaintiffs' lack of diligence is reason enough to deny relief, but the Court can take its pick of many reasons to deny the Motion.

To begin, Plaintiffs cannot succeed on the merits. Plaintiffs lack standing because their claims rest on a speculative chain of contingencies that cannot establish an injury-in-fact. Their claims are also barred by the Eleventh Amendment because the alleged federal constitutional violations are actually claims that election equipment violates state law, and it's plainly not the role of federal courts to compel state officials to comply with state law. And Plaintiffs fail to state a cognizable constitutional claim. Their hypothetical claims about "vulnerabilities" in election equipment doesn't translate to a burden on Plaintiffs' right to vote, and they don't have a constitutional right to a hand-count of all ballots.

Next, Plaintiffs fall far short of establishing any other injunction factor. Plaintiffs just assume they prevail on the merits, and include two conclusory sentences in their 35-page motion claiming they will face irreparable harm without an injunction. But granting an injunction would cause irreparable harm by upending longstanding election procedures in the middle of an election year.

Plaintiffs' eleventh-hour request for an injunction is also barred by the laches and *Purcell* doctrines. Counties have already planned, budgeted, and prepared to administer the 2022 Primary and General elections using existing electronic voting equipment. Forcing them to hand-count dozens of races on millions of ballots would be impossible to implement this year and would have disastrous cascading effects. It could also disenfranchise voters with disabilities who have relied on accessible voting equipment for decades (and violate state and federal law). All told, Plaintiffs' requested relief would create severe hardship and damage the

1

public interest.

The Court should deny Plaintiffs' Motion for any of these reasons. It also can and should deny the Motion for reasons in the Maricopa County Defendants' response [Doc. 57], which the Secretary joins.

**Factual Background**

**I.     The Use of Electronic Voting Equipment in Arizona.**

Arizona authorized the use of electronic voting systems as early as 1966. H.B. 204, 27th Leg., 2d. Reg. Sess. (Ariz. 1966) https://azmemory.azlibrary.gov/digital/collection/azsession/id/22/rec/4. All electronic voting systems undergo federal and state testing and certification before being used in Arizona elections, all counties perform logic and accuracy testing on all equipment before and after every election, and the Secretary performs logic and accuracy testing on a sample of each county's equipment before every election with a federal, statewide, or legislative race. *See, e.g.*, A.R.S. §§ 16-442, 16-449, 16-602; 2019 Elections Procedures Manual ("2019 EPM") at 76-82, 86-100, 235 https://azsos.gov/sites/default/files/2019_ELECTIONS_PROCEDURES_MANUAL_APPROVED.pdf.[1]

Though Arizona uses electronic equipment to <u>tabulate</u> votes (and has done so for many decades), every vote cast in Arizona is on a paper ballot. *E.g.*, A.R.S. §§ 16-462, 16-468(2), 16-502. Voters with disabilities may use accessible electronic voting devices to select their choices on a ballot, but every accessible voting device must produce a paper ballot or voter verifiable paper audit trail. 2019 EPM at 80. The federal Election Assistance Commission and the Secretary have certified each electronic voting system to be used in each county in 2022. Ariz. Sec'y of State, *2022 Election Cycle / Voting Equipment*, https://azsos.gov/sites/default/files/2022_Election_Cycle_Voting_Equipment-Feb-Final.pdf.

---

[1] The 2019 EPM is the last EPM promulgated under A.R.S. § 16-452 and has "the force and effect of law." *E.g.*, *Gonzalez v. Arizona*, 677 F.3d 383, 397 (9th Cir. 2012) (en banc).

## II. The 2020 Election Results.

In the face of a once-in-a-century pandemic and unprecedented levels of misinformation, Arizona election officials successfully administered free, fair, and secure elections in 2020. Over 3.4 million Arizonans exercised their right to vote in the general election, and counties completed and passed post-election audits and logic and accuracy testing confirming the results.

The Secretary and other dedicated election officials defended nearly a dozen post-election lawsuits in Arizona, including several suits seeking to overturn the results of the presidential election. Every lawsuit failed. *E.g.*, *Bowyer v. Ducey*, 506 F. Supp. 3d 699, 716, 724 (D. Ariz. 2020) ("Plaintiffs failed to provide the Court with factual support for their extraordinary claims" challenging accuracy of election results in Maricopa County, including implausible allegations of fraud and "irregularities" relating to Dominion voting systems).

After these legal challenges failed, the Arizona Senate hired private companies called "Cyber Ninjas" and CyFIR, LLC to conduct an "audit" of the election results in Maricopa County. The audit team failed to meet industry standards for any credible audit (much less for an election audit), showed a lack of understanding of election processes, and tried to perform (and botched) a hand-count of the top two races. *E.g.*, Ariz. Sec'y of State, *Report on the Partisan Review of the 2020 Election in Maricopa County*, https://azsos.gov/sites/default/files/2020_Ballot_Review_Report_ver20210819-03_Review.pdf. The Cyber Ninjas' "audit report" took five months to complete and included various misleading and inaccurate findings, all of which were debunked by Maricopa County elections officials. [Doc. 29-1 Exh. 13]. Even so, the "audit" report didn't contradict the certified election results.

## III. Plaintiffs' Claims Challenging All Electronic Voting Systems.

Undeterred, Plaintiffs now challenge the use of electronic voting systems in Arizona, raising many of the same inaccurate theories about electronic voting systems. Plaintiffs vaguely allege that electronic voting systems—in general—have certain security risks,

3

complain about a lack of "transparency" from manufacturers, and allude to various election equipment issues in other jurisdictions. Based on these allegations in the Complaint, Plaintiffs ask [Doc. 3 ¶ 23] the Court to infer that all voting systems certified for use in Arizona are "potentially unsecure, lack adequate audit capacity, fail to meet minimum statutory requirements, and deprive voters of the right to have their votes counted and reported in an accurate, auditable, legal, and transparent process." They then ask the Court [¶ 153] to enjoin the use of electronic voting systems and compel Arizona's election officials to conduct elections following a 9-step list of Plaintiffs' preferred election procedures.

After filing their original complaint two months ago, Plaintiffs did nothing. Now they seek a preliminary injunction to change the procedures for an election that's already underway.

**Argument**

"A plaintiff seeking a preliminary injunction must establish that he is likely to succeed on the merits, that he is likely to suffer irreparable harm in the absence of preliminary relief, that the balance of equities tips in his favor, and that an injunction is in the public interest." *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 20 (2008). When asked to enjoin election procedures shortly before an election, courts also weigh "considerations specific to election cases," such as potential voter confusion and disruption of the orderly administration of elections, as well as the court system's "own institutional procedures" that may cause even more delay. *Purcell v. Gonzalez*, 549 U.S. 1, 4 (2006).

A preliminary injunction is "an extraordinary remedy never awarded as of right," and the requesting party "must generally show reasonable diligence." *Benisek v. Lamone*, __ U.S. __, 138 S. Ct. 1942, 1943-44 (2018). And mandatory injunctions—as Plaintiffs request here—are "particularly disfavored"; they should be denied "unless the facts and law <u>clearly</u> favor the moving party." *Garcia v. Google, Inc.*, 786 F.3d 733, 740 (9th Cir. 2015) (emphasis added) (quotations omitted).

Plaintiffs don't come close to meeting their heavy burden.

4

## I. Plaintiffs Cannot Succeed on the Merits.

Plaintiffs' motion doubles down on the same conjectural allegations in the First Amended Complaint, claiming all electronic voting equipment is "vulnerable" to interference, relying on irrelevant and abstract examples, and vaguely concluding that no security measures can prevent that interference. For the reasons below and in Defendants' Motions to Dismiss [Docs. 27, 45], which the Secretary incorporates here, Plaintiffs have no chance of succeeding on the merits and the FAC should be dismissed with prejudice.

### A. Plaintiffs lack Article III standing.

To establish Article III standing, Plaintiffs must show: (1) that they suffered an injury in fact "that is concrete and particularized and actual or imminent, not conjectural or hypothetical," *Spokeo, Inc. v. Robins*, 578 U.S. 330, 339 (2016) (quotations omitted); (2) that the challenged conduct caused their alleged injury; and (3) that a favorable decision would likely redress the claimed injury, *Barnum Timber Co. v. U.S. E.P.A.*, 633 F.3d 894, 897 (9th Cir. 2011). Plaintiffs fail at step one.

Plaintiffs' allegations depend on a long chain of contingencies to get to their alleged harm: that Arizona's <u>specific</u> electronic voting systems are in fact vulnerable to security breaches; that third parties will in fact exploit those vulnerabilities and interfere in a future election; that Arizona's election officials will not detect or stop this interference; and that this interference will affect Plaintiffs' votes or enough votes to impact the outcome of the election in a way that harms Plaintiffs. This is precisely the kind of "speculative chain of possibilities" that cannot establish an actual or imminent injury-in-fact. *Clapper v. Amnesty Int'l USA*, 568 U.S. 398, 414 (2013).

Indeed, courts have found that similar claims that electronic voting equipment is "vulnerable to undetectable hacking and malicious manipulation" is a "conjectural and hypothetical injury" that "cannot survive as the foundation for" a claim in federal court. *Shelby Cnty. Advocs. for Valid Elections v. Hargett*, 2019 WL 4394754, at *2 (W.D. Tenn. Sept. 13,

5

2019), *aff'd Shelby Advocs. for Valid Elections v. Hargett*, 947 F.3d 977 (6th Cir. 2020); *see also, e.g.*, *Stein v. Cortes*, 223 F. Supp. 3d 423, 432 (E.D. Pa. 2016) (voter's "allegation that voting machines may be 'hackable,' and the seemingly rhetorical question they pose respecting the accuracy of the vote count, simply do not constitute injury-in-fact"); *Samuel v. Virgin Islands Joint Bd. of Elections*, 2013 WL 842946, at *5 (D.V.I. Mar. 7, 2013) ("conjectural" allegations "that the election process 'may have been' left open to compromise" by using certain voting machines were "amorphous due process claims, without requisite concreteness"). The same is true here.

Plaintiffs fail to allege a concrete and particularized injury-in-fact and thus lack standing. *Spokeo, Inc. v. Robins*, 578 U.S. 330, 339 (2016).

**B.      The Eleventh Amendment bars Plaintiffs' claims.**

"The Eleventh Amendment bars a suit against state officials when," as here, "the state is the real, substantial party in interest." *Pennhurst State Sch. & Hosp. v. Halderman*, 465 U.S. 89, 101 (1984) (quotations omitted).

The *Ex parte Young* exception to Eleventh Amendment immunity applies only to "claims seeking prospective injunctive relief against state officials to remedy a state's ongoing violation of <u>federal</u> law." *Ariz. Students' Ass'n v. Ariz. Bd. of Regents*, 824 F.3d 858, 865 (9th Cir. 2016) (citing *Ex parte Young*, 209 U.S. 123 (1908) (emphasis added)). But this exception doesn't apply when a plaintiff asks a federal court to "order state actors to comply with state law." *Hale v. Arizona*, 967 F.2d 1356, 1369 (9th Cir. 1992); *see also Pennhurst*, 465 U.S. at 106 ("[I]t is difficult to think of a greater intrusion on state sovereignty than when a federal court instructs state officials on how to conform their conduct to state law."). Yet that's exactly what Plaintiffs do here.

Plaintiffs try to disguise their claims as alleged violations of the federal Constitution, but their claims turn on application of state law. [*E.g.*, Doc. 3 ¶¶ 156-61 (claiming the Secretary "has failed to meet the duties" in Arizona statutes, including A.R.S. §§ 16-446(B), 16-452, and

6

16-445(D)); ¶¶ 162-64 (describing statutory requirements that the County Defendants allegedly violated); ¶¶ 181, 194 (claiming Defendants "abrogated their statutory duties")]. Many courts have rejected similar state law claims cloaked as alleged federal law violations. *See, e.g.*, *S&M Brands, Inc. v. Georgia ex rel. Carr*, 925 F.3d 1198, 1204-05 (11th Cir. 2019) (Eleventh Amendment barred federal constitutional claim that "relied on a determination that state officials had not complied with state law"); *DeKalb Cty. Sch. Dist. v. Schrenko*, 109 F.3d 680, 682 (11th Cir. 1997) (rejecting attempt to assert federal constitutional claim because the "gravamen" and "substance" of the complaint was that the state improperly interpreted and applied a state statute); *Bowyer v. Ducey*, 506 F. Supp. 3d 699, 716 (D. Ariz. 2020) (Eleventh Amendment immunity bars "state law claims, masked as federal law claims") (citing *Massey v. Coon*, 865 F.2d 264 (9th Cir. 1989)).

Even more, Plaintiffs' requested relief creates significant federalism concerns. They not only seek to enjoin the use of electronic voting systems, but also want a mandatory injunction compelling Defendants to conduct elections according to Plaintiffs' detailed demands about how ballots must be cast, conveyed, counted, and recounted, and how the whole process must be recorded, streamed, and archived. [Doc. 3 ¶ 153].

The Court should reject Plaintiffs' request to entangle the Court, "as [an] overseer[] and micromanager[], in the minutiae of state election processes." *Ohio Democratic Party v. Husted*, 834 F.3d 620, 622 (6th Cir. 2016).

**C.   Plaintiffs fail to state a cognizable constitutional claim.**

**1.   Arizona's electronic voting systems do not infringe Plaintiffs' right to vote.**

All agree that voting is a fundamental constitutional right, *see Yick Wo v. Hopkins*, 118 U.S. 356, 370 (1886), and that the right to vote includes the right of "qualified voters . . . to vote and to have their votes counted," *Reynolds v. Sims*, 377 U.S. 533, 554 (1964) (citation omitted).

But Plaintiffs do not allege—much less offer any evidence—that <u>they</u> have been or will be deprived of that right.

Plaintiffs allege [at 5] that all electronic voting systems are "unreliable, unsecure, and vulnerable to undetected manipulation of the voting results they report." Their Motion parrots the same speculative, implausible allegations in the FAC, this time with attached declarations of so-called experts on various topics.[2] They broadly argue that all electronic voting equipment is vulnerable to unauthorized access and manipulation [at 5-12], that election equipment is vulnerable to a "supply chain attack" by "foreign adversaries" [at 12-14], that all "Dominion Democracy Suite software and hardware components" have security vulnerabilities [at 15-18], that "election infrastructure" has been "hacked" in various jurisdictions in the past [at 18-19], that "human error" can cause security risks [20-21], and that one type of Dominion voting system had a "misread" issue that was identified and addressed in Tennessee [at 21-22].

Plaintiffs' <u>only</u> evidence of security vulnerabilities in any election equipment certified for use in Arizona's 2022 elections is a CISA advisory on Dominion Voting Systems Democracy Suite ImageCast X. CISA, ICS Advisory (ICSA-22-154-01), *Vulnerabilities Affecting Dominion Voting Systems ImageCast X* (June 3, 2022) https://www.cisa.gov/uscert/ics/advisories/icsa-22-154-01. The ImageCast X is an accessible in-person voting system Maricopa County uses to allow voters with disabilities to mark their ballots. The CISA advisory identified vulnerabilities in certain ImageCast X versions "as used in Dominion Democracy Suite Voting System Version 5.5-A." *Id.* The advisory recommended that election officials take certain "defensive measures to reduce the risk of exploitation of these vulnerabilities." *Id.* Maricopa County doesn't even use Democracy Suite Version 5.5-A equipment (it uses the newer Version 5.5B), but in all events, Maricopa County already

---

[2] If the Court decides to consider Plaintiffs' declarations in deciding the Motion (it shouldn't), the Secretary reserves the right to object to those declarations, including on relevance and hearsay grounds, and under Fed. R. Evid. 702, 703 and *Daubert v. Merrell Dow Pharms., Inc.*, 509 U.S. 579, 594 (1993).

8

implements all the recommendations in the CISA advisory to secure its equipment. [Doc. 57-1 ¶¶ 29-30].

Plaintiffs offer <u>no</u> evidence that any other specific election equipment used in any Arizona county (1) has any security vulnerabilities, (2) has ever been breached, or (3) is at imminent risk of being breached.[3] Nor do Plaintiffs address the detailed security procedures Arizona's election officials use before, during, and after elections to ensure that electronic voting systems are secure. *E.g.*, A.R.S. §§ 16-449 (pre-election logic and accuracy testing), 16-602 (post-election hand count audits); 2019 EPM at 86-100 (pre-election logic and accuracy testing; security measures for electronic voting systems), 213-34 (hand count audit), 235 (post-election logic and accuracy testing); *see also* [Doc 29-1 Exh. 1 at 58-61]. The only procedure Plaintiffs even mention [at 31] is the hand-count audit, concluding without explanation (and without an ounce of irony or shame) that the hand-count "is known to be error-prone."

In short, Plaintiffs' claims are no more than their own policy preference that votes be counted by hand. But "it is the job of democratically-elected representatives to weigh the pros and cons of various balloting systems." *Weber v. Shelley*, 347 F.3d 1101, 1106-07 (9th Cir. 2003); *see also Green Party of N.Y. v. Weiner,* 216 F. Supp. 2d 176, 190-91 (S.D.N.Y. 2002) (debate over use of voting machines or paper ballots "is for the elected representatives of the people to decide, after balancing the pros and cons of different systems against their expense."). Indeed, the "framers of the Constitution intended the States to keep for themselves, as provided by the Tenth Amendment, the power to regulate elections." *Gregory v. Ashcroft*, 501 U.S. 452,

---

[3] They rely [at 10, 16-18] on the opinions of Doug Logan and Ben Cotton, members of the Cyber Ninjas and CyFIR "audit" team, who vaguely claim that election equipment used in Maricopa County in 2020 lacked certain security measures, but do not contest the vote totals in that election. These findings have been thoroughly debunked. [Doc. 29-1 Exh. 13]. Plaintiffs also offer [at 20] rank speculation from an "expert"—with no qualifications or experience analyzing elections—claiming that the "predictability and dependence" of the ratio of votes in the 2020 Presidential race in Maricopa and Pima Counties were "so statistically improbable as to be impossible without manipulation or control." These unsupported conclusions prove nothing.

9

461-62 (1991) (quoting *Sugarman v. Dougall*, 413 U.S. 634, 647 (1973)); *see also* U.S. Const. art. I, § 4, cl. 1 (delegating power to the states over the "times, places, and manner" of elections for congressional offices). Plaintiffs don't have a "constitutional right to any particular method of registering and counting votes." *Green Party of N.Y.,* 216 F. Supp. 2d at 191.

Plaintiffs rely [at 9-10, 25] on *Curling v. Raffensperger*, 493 F. Supp. 3d 1264, 1280 (N.D. Ga. 2020), but that case doesn't help them. There, the court found that the plaintiffs "may ultimately prevail" on the merits of their claims challenging the statewide use of electronic ballot-marking-device (BMD) voting systems in Georgia, because the plaintiffs presented detailed, compelling evidence about specific problems with the particular BMD voting system used in Georgia's elections. *Id.* at 1310.[4] And even then, the court rejected the plaintiffs' "expansive" request for an injunction replacing the entire statewide voting system during an election year. *Id.* at 1312 ("[I]mposition of such a sweeping change in the State's primary legally adopted method for conducting elections at this moment in the electoral cycle would fly in the face of binding appellate authority and the State's strong interest in ensuring an orderly and manageable administration of the current election").

At bottom, Plaintiffs fail to show a burden on their right to vote. They don't allege that Arizona's specific electronic voting systems are at risk of security breaches; that anyone has ever exploited any vulnerabilities; or that Arizona's election officials cannot detect or stop interference in our elections.

---

[4] As Plaintiffs note [at 31], an expert in that case stated that "Georgia can eliminate or greatly mitigate [the identified] risks by adopting the same approach to voting that is practiced in most of the country: using hand-marked paper ballots and reserving BMDs for voters who need or request them." That is Arizona's approach—the vast majority of voters vote early or on Election Day using hand-marked paper ballots. *E.g.*, A.R.S. §§ 16-462, 16-468(2), 16-502. And even for accessible electronic voting devices used by voters with disabilities, Arizona law requires that every accessible voting device produce a paper ballot or voter verifiable paper audit trail. 2019 EPM at 80.

### 2. Plaintiffs fail to state a cognizable claim that Arizona's voting systems violate the Equal Protection Clause.

Plaintiffs next argue [at 27] that "if" Arizona "counts ballots cast by absentee voters securely, but counts ballots cast at polls insecurely (or *vice versa*), the system infringes the Equal Protection rights of the Plaintiffs." (Emphasis added). Yet they don't explain how mail-in ballots are cast or counted differently (or more "securely") than in-person ballots. Every ballot cast in Arizona (whether in-person or by mail) is a paper ballot, and every ballot is tabulated using electronic tabulation equipment. Plaintiffs don't even try to describe how the use of electronic voting systems violates their Equal Protection rights.

### 3. The State has compelling interests in using electronic voting equipment.

Even if Plaintiffs could allege that electronic voting systems have security risks that could theoretically burden their right to vote, Arizona has compelling interests in using electronic voting systems.

Arizona authorized electronic voting systems over fifty years ago, and for good reason. Electronic tabulation of votes is much faster, more cost effective, and more accurate than hand counting millions of ballots with dozens of races. [Decl. of Pima Cnty. Elections Director Constance Hargrove ("Hargrove Decl.") ¶¶ 5-10, attached as **Exhibit A**; Decl. of Cochise Cnty. Elections Director Lisa Marra ("Marra Decl.") ¶¶ 5-10, attached as **Exhibit B**; Decl. of Navajo Cnty. Elections Director Rayleen Richards ("Richards Decl.") ¶¶ 5-10, attached as **Exhibit C**; Doc. 57-1 ¶¶ 31-57]. To hand-count every race on every ballot, every county would need to hire huge teams of bipartisan election workers, on top of the many poll workers and temporary election workers counties must already hire to successfully administer the election. [Hargrove Decl. ¶ 5; Marra Decl. ¶ 5; Richards Decl. ¶ 5; Doc. 57-1 ¶ 55]. A 100% hand count would be extremely costly and time-consuming and could interfere with mandatory deadlines, like the canvassing deadlines for counties and the Secretary. A.R.S. §§ 16-642(A), 16-648(A).

[Hargrove Decl. ¶¶ 6-8; Marra Decl. ¶¶ 6-8; Richards Decl. ¶¶ 6-8; Doc. 57-1 ¶ 53 (Maricopa County "would need 250 times the current space and resources to complete the hand count according to statutory timelines")]. There is also significant risk of human error in repetitive tasks like counting ballots, and there is no way to ensure an accurate hand count of all races on all ballots, even with quality control measures in place. [Hargrove Decl. ¶ 10; Marra Decl. ¶ 10; Richards Decl. ¶ 10; Doc. 57-1 ¶ 57].

Even more, using electronic accessible voting devices allows voters with disabilities, including physical or visual disabilities, to vote independently and in secret. [Hargrove Decl. ¶ 11; Marra Decl. ¶ 11; Richards Decl. ¶ 11]. Banning accessible voting machines would impede these voters' ability to exercise their right to vote and would force election administrators to violate state and federal law. [*Id.*]

Arizona's important interests in making voting accessible to all eligible voters and "reducing administrative burdens" more than justifies the non-existent burden on Plaintiffs' right to vote. *Ariz. Democratic Party v. Hobbs*, 18 F.4th 1179, 1190 (9th Cir. 2021).

## II.     Plaintiffs Will Suffer No Irreparable Harm Without an Injunction.

Even if Plaintiffs had any chance of success on the merits (they don't), they establish no other injunction factors.

Their 35-page motion includes two sentences [at 32] claiming "they will suffer irreparable harm absent the grant of preliminary relief" because "Arizona's intended use of Electronic Voting Systems" in the 2022 elections "will deprive Plaintiffs of their constitutional rights." But Plaintiffs don't even state a claim for a constitutional violation (as detailed above), and enjoining the State's "duly enacted" election statutes "would seriously and irreparably harm the State." *Abbott v. Perez*, __ U.S. __, 138 S. Ct. 2305, 2324 (2018).

What's more, Plaintiffs' long delay both in filing the complaint and requesting a preliminary injunction "implies a lack of urgency and irreparable harm." *Oakland Trib., Inc. v. Chron. Pub. Co.*, 762 F.2d 1374, 1377 (9th Cir. 1985); *see also Miller for & on Behalf of*

*N.L.R.B. v. California Pac. Med. Ctr.*, 991 F.2d 536, 544 (9th Cir. 1993) (that the plaintiff "tarried so long before seeking this injunction" weighed against finding of irreparable harm); *Barton & Assocs. Inc. v. Trainor*, 2020 WL 6081496, at *6 (D. Ariz. Oct. 15, 2020) (waiting months to file a complaint then waiting another three weeks to seek a preliminary injunction weighed against finding of irreparable harm).

Arizona has authorized electronic voting systems since at least 1966, yet Plaintiffs waited until April 2022 (an election year) to file suit. They then inexplicably waited almost <u>two months</u> to file the Motion, right before early ballots start going out for the Primary. "Plaintiffs fail to explain why they waited until mere months before the 20[22] general election to challenge this practice, and their long delay before seeking a preliminary injunction implies a lack of urgency and irreparable harm." *Feldman v. Ariz. Sec'y of State's Off.*, 2016 WL 5900127, at *8 (D. Ariz. Oct. 11, 2016), *aff'd,* 842 F.3d 613 (9th Cir. 2016) (quotation omitted).

### III.   The Balance of Hardships and Public Interest Favor Defendants.

After over half a century of electronic voting systems in Arizona and on the eve of an election, Plaintiffs now request a preliminary injunction upending the State's ballot tabulation process. This eleventh-hour request for an extraordinary remedy would cause significant hardship, and it's too late to grant Plaintiffs' requested relief this election year.

#### A.   The laches and *Purcell* doctrines bar Plaintiffs' motion.

First, the laches doctrine precludes Plaintiffs' request for an injunction. Laches "seeks to prevent dilatory conduct and will bar a claim if a party's unreasonable delay prejudices the opposing party or the administration of justice." *Lubin v. Thomas*, 213 Ariz. 496, 497 ¶ 10 (2006).

Plaintiffs' delay is no doubt unreasonable. When deciding whether delay is unreasonable, courts consider "the justification for the delay, the extent of the plaintiff's advance knowledge of the basis for the challenge, and whether the plaintiff exercised

diligence[.]" *Ariz. Libertarian Party v. Reagan*, 189 F. Supp. 3d 920, 923 (D. Ariz. 2016) (citation omitted). Plaintiffs have known about their claims for decades, and their mid-election year request for an order invalidating all electronic voting systems before the 2022 Primary and General elections is inexcusable. UOCAVA ballots have already been mailed for the Primary, and early voting in that election starts on July 7. Plaintiffs' delay until mere weeks before early voting begins is unreasonable. "The statue they challenge is not new." *Arizona Pub. Integrity All. Inc. v. Bennett*, 2014 WL 3715130, at *2 (D. Ariz. June 23, 2014) (laches barred request to enjoin 1980 statute shortly before election deadline).

The long delay also prejudices the Secretary, election officials in Arizona's fifteen counties, and above all else, Arizona voters. Counties have already successfully administered jurisdictional elections in March and May 2022 using the current election equipment, and they are deep in preparations for the statewide Primary and General elections. [Hargrove Decl. ¶ 3; Marra Decl. ¶ 3; Richards Decl. ¶ 3; Doc. 29-1 Exh. 1]. Enjoining the use of electronic voting systems in the middle of an election year would upend the administration of elections, cause counties to spend significant time and resources, and create severe disruptions for election administrators and voters. [Hargrove Decl. ¶ 4; Marra Decl. ¶ 4; Richards Decl. ¶ 4; Doc. 57-1 ¶¶ 32-49]. Late filings like Plaintiffs' also prejudice the administration of justice by "depriv[ing] judges of the ability to fairly and reasonably process and consider the issues and rush appellate review, leaving little time for reflection and wise decision making." *Ariz. Libertarian Party*, 189 F. Supp. 3d at 923 (cleaned up).

Second, the *Purcell* principle bars Petitioners' claims. Under that doctrine, courts generally will not alter election rules on the eve of an election. *Purcell v. Gonzalez*, 549 U.S. 1, 5 (2006). This is for good and practical reasons; "[c]ourt orders affecting elections can themselves result in voter confusion and consequent incentive to remain away from the polls," a risk that only increases "[a]s an election draws closer." *Id.* at 4-5. And this "important principle of judicial restraint not only prevents voter confusion but also prevents election

administrator confusion" and "protects the State's interest in running an orderly, efficient election." *Democratic Nat'l Comm. v. Wis. State Leg.*, 141 S. Ct. 28, 31 (2020) (Kavanaugh, J., concurring). These risks are even greater here, where Plaintiffs seek to overturn enduring election procedures that Arizonans and election administrators have relied on for decades.[5]

"How close to an election is too close may depend in part on the nature of the election law at issue, and how easily the State could make the change without undue collateral effects. Changes that require complex or disruptive implementation must be ordered earlier than changes that are easy to implement." *Merrill v. Milligan*, 142 S. Ct. 879, 881 n.1 (2022) (Kavanaugh, J., concurring). Making Plaintiffs' dramatic change to the election process this late in the game would be disastrous. Many counties have already administered local elections this year using existing equipment, and all counties are working to prepare for the Primary and General elections. Forcing counties to hand-count every ballot cast would require herculean efforts to recruit and hire bipartisan election boards, develop new procedures for a 100% hand count, train the new workers on these procedures, develop and implement quality control measures, come up with more funding beyond what they already budgeted for the 2022 elections, and find extensive space where they can perform the hand count. [Hargrove Decl. ¶¶ 5-10; Marra Decl. ¶¶ 5-10; Richards Decl. ¶¶ 5-10; Doc. 57-1 ¶¶ 50-57].

**B.   Enjoining electronic election equipment would cause extreme hardship for election administrators and impair the public interest.**

For the same reasons, an injunction would cause significant hardship for Arizona's election administrators. It would also create hardship for voters with disabilities who need to

---

[5] The *Purcell* principle, of course, "does not supervene other relevant legal considerations applicable when reviewing the grant or denial of preliminary relief. There may well be cases where a state election rule is so constitutionally problematic . . . that a federal court must intervene, even shortly before an election. But this is not such a case[.]" *Mi Familia Vota v. Hobbs*, 977 F.3d 948, 953 (9th Cir. 2020).

use accessible voting devices to vote independently while preserving their right to a secret ballot. Ariz. Const. art. VII § 1.

In contrast, preserving the status quo would impose no hardship on Plaintiffs—they haven't shown that electronic voting systems impose <u>any</u> burden on their right to vote. "And as we rapidly approach the election, the public interest is well served by preserving Arizona's existing election laws, rather than by sending the State scrambling to implement and to administer a new procedure for [counting] ballots at the eleventh hour." *Arizona Democratic Party v. Hobbs*, 976 F.3d 1081, 1086 (9th Cir. 2020). Indeed, "the public interest favors orderly administration of the election." *Mi Familia Vota v. Hobbs*, 977 F.3d 948, 954 (9th Cir. 2020).

## Conclusion

Plaintiffs cannot succeed on the merits, they will suffer no harm, and their lack of diligence is inexcusable. The Court should deny their Motion, dismiss the Complaint, and award the Secretary her fees and costs.

Respectfully submitted this 22nd day of June, 2022.

**COPPERSMITH BROCKELMAN PLC**

By /s/ Kristen Yost
    Roopali H. Desai
    D. Andrew Gaona
    Kristen Yost

**STATES UNITED DEMOCRACY CENTER**

Sambo (Bo) Dul
Christine Bass *

*\* Pro Hac Vice*

*Attorneys for Defendant Arizona Secretary of State Katie Hobbs*