**WO**

# IN THE UNITED STATES DISTRICT COURT

# FOR THE DISTRICT OF ARIZONA

| | |
|---|---|
| Kari Lake, *et al.*, | No. CV-22-00677-PHX-JJT |
| Plaintiffs, | **ORDER** |
| v. | |
| Katie Hobbs, *et al.*, | |
| Defendants. | |

At issue are the following motions:

1) Defendants Bill Gates, Clint Hickman, Jack Sellers, Thomas Galvin, and Steve Gallardo's (hereinafter referred to collectively as "Maricopa County Defendants") Motion to Dismiss (Doc. 27), joined by Sharon Bronson, Steve Christy, Adelita Grijalva, Matt Heinx, and Rex Scott (hereinafter referred to collectively as "Pima County Defendants") (Doc. 31) and Arizona Secretary of State, Katie Hobbs ("the Secretary") (Doc. 45), to which Plaintiffs Kari Lake and Mark Finchem responded (Doc. 56), and the Maricopa County Defendants replied (Doc. 61);

2) The Maricopa County Defendants' Motion for Judicial Notice of Exhibits 1 through 17 (Doc. 29), joined by the Pima County Defendants (Doc. 31), to which Plaintiffs responded (Doc. 55);

3) The Secretary's Motion to Dismiss (Doc. 45), to which Plaintiffs responded (Doc. 58), and the Secretary replied (Doc. 62);

4)   Plaintiffs' Motion for Preliminary Injunction (Doc. 50), to which the Maricopa County Defendants and the Secretary responded (Docs. 57, 59, respectively), joined by the Pima County Defendants (Doc. 60), and Plaintiffs replied (Docs. 64, 63, respectively);

5)   The Secretary's Motion to Strike and Motion in Limine (Doc. 74), joined by the Maricopa County Defendants (Doc. 75), to which Plaintiffs responded (Doc. 91); and

6)   Plaintiffs' Expedited Request for Permission to Supplement Record (Doc. 93), to which Defendant Maricopa County responded (Doc. 95), joined by the Secretary (Doc. 96).

On July 21, 2022, the Court heard the parties' arguments on Defendants' Motions to Dismiss and Plaintiffs' Motion for Preliminary Injunction. (*See* Doc. 79; Doc. 98, Tr.) For the reasons set forth below, the Court grants Defendants' Motions to Dismiss, and therefore does not reach Plaintiffs' Motion for Preliminary Injunction.[1] The Court also denies Plaintiffs' Expedited Request for Permission to Supplement Record.

## I.   BACKGROUND

### A.   Plaintiffs' Allegations

Plaintiffs allege that the United States' transition to electronic systems and computer technology for voting has "created unjustified new risks of hacking, election tampering, and electronic voting fraud." (Doc. 3, First Amended Complaint ("FAC") ¶ 71.) According

---

[1] To obtain a preliminary injunction, a plaintiff must show that "(1) [it] is likely to succeed on the merits, (2) [it] is likely to suffer irreparable harm in the absence of preliminary relief, (3) the balance of equities tips in [its] favor, and (4) an injunction is in the public interest." *Garcia v. Google, Inc.*, 786 F.3d 733, 740 (9th Cir. 2015) (citing *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 20 (2008)). Plaintiffs cannot meet any of the factors. Further, even if Plaintiffs could satisfy the first, second, and third *Winter* factors, which they cannot, their Motion for Preliminary Injunction would undoubtedly fail on the fourth factor—such an injunction is not in the public interest. Not only do Plaintiffs fail to produce any evidence that a full hand count would be more accurate, but a hand count would also require Maricopa County to hire 25,000 temporary staff and find two million square feet of space. (Tr. 196:6-198:8.) Further, there is no question that the results of the election would be delayed. (Tr. 198:9-21; 199:22-201:14.) In fact, with the County's current employees it would be "an impossibility" to have the ballots counted in order to perform the canvass by the 20th day after the election, as required by law. (Tr. 194:16-23.) Thus, the injunctive relief Plaintiffs seek is not in the public interest.

to Plaintiffs, electronic ballot marking devices certified by Arizona are "potentially insecure, lack adequate audit capacity, fail to meet minimum statutory requirements, and deprive voters of the right to have their votes counted and reported in an accurate, auditable, legal, and transparent process." (FAC ¶ 23.) It follows, Plaintiffs say, that the use of these devices in the upcoming 2022 midterm election, "without objective validation, violates the voting rights of every Arizonan." (FAC ¶ 23.)

Plaintiffs assert that the electronic voting systems used in Arizona counties are "rife" with cybersecurity vulnerabilities and provide a means for unauthorized persons to manipulate the reported vote counts in an election and potentially change the winner. (FAC ¶¶ 12, 139.) Some of the vulnerabilities Plaintiffs identify include: operating systems and antivirus software that lack necessary updates; open ports on the election management server, which allow for possible remote access; shared accounts and common passwords; unauthorized user internet or cellular access through election servers and devices; and secret content not subject to objective and public analysis. (FAC ¶ 12.)

Plaintiffs contend that credible allegations of electronic voting machine glitches that materially impacted specific races began to emerge in 2002. (FAC ¶ 73.) Plaintiffs cite cyber experts and computer scientists who claim that they have created programs and software that can change votes without detection. (FAC ¶¶ 74-75.) Plaintiffs also note that electronic voting machine manufacturers "source and assemble their components in hostile nations," specifically naming China, Taiwan, and the Philippines. (FAC ¶¶ 90-92.)

According to Plaintiffs, both Republican and Democratic lawmakers have been aware of the problems with electronic voting systems for years but have failed to act. (FAC ¶¶ 93-107.) Further, Plaintiffs claim that electronic voting machine companies have not been transparent about their systems, specifically noting that the Department of Homeland Security's Cybersecurity and Infrastructure Agency ("CISA") revealed that "malicious hackers had compromised and exploited SolarWinds Orion network management software products." (FAC ¶¶ 108-112 (citing CISA, *CISA Issues Emergency Directive to Mitigate the Compromise of SolarWinds Orion Network Management Products* (Dec. 13, 2020)

(https://www.cisa.gov/news/2020/12/13/cisa-issues-emergency-directive-mitigate-compromise-solarwinds-orion-network).) Plaintiffs claim that open-source technology would mitigate some of these problems and promote both security and transparency, but Defendants have failed to institute such technologies. (FAC ¶¶ 117-118.) Instead, according to Plaintiffs, the lack of transparency has created a "black box" system of voting that lacks credibility and integrity. (FAC ¶ 124.)

Plaintiffs also allege that they have found evidence of illegal vote manipulation during the 2020 general election. (FAC ¶ 125.) Plaintiffs cite a report compiled by the Cyber Ninjas, which they claim found that: (1) "None of the various systems related to elections had numbers that would balance and agree with each other. In some cases, these differences were significant"; (2) "Files were missing from the Election Management System (EMS) Server"; (3) "Logs appeared to be intentionally rolled over, and all the data in the database related to the 2020 General Election had been fully cleared"; (4) "Software and patch protocols were not followed"; and (5) basic cyber security best practices and guidelines from the CISA were not followed. *Maricopa County Forensic Election Audit, Volume I* at 1-3 (Sept. 24, 2021), https://c692f527-da75-4c86-b5d1-8b3d5d4d5b43.filesusr.com/ugd/2f3470_a91b5cd3655445b498f9acc63db35afd.pdf). [2]

Next, Plaintiffs contend that Arizona's voting systems do not meet state or federal standards. (FAC ¶ 135 (citing 2002 Voting Systems Standards ("VSS"); A.R.S. § 16-442(B)).) The Secretary has statutory duties to test, certify, and qualify the software used on county election systems, and Plaintiffs allege she certified Dominion's DVS 5.5-B voting system despite the fact that it includes Dominion ImageCast Precent2 ("ICP2"), a

---

[2] Plaintiffs fail to mention that the report also states:

> [T]here were no substantial differences between the hand count of the ballots provided and the official election canvass results for Maricopa County. This is an important finding because the paper ballots are the best evidence of voter intent and there is no reliable evidence that the paper ballots were altered to any material degree.

*Maricopa County Forensic Election Audit, Volume I* at 1-3.

component program, which does not meet 2002 VSS standards or Arizona's statutory requirements. (FAC ¶ 137.) By seeking to use the DVS 5.5-B system, Plaintiffs assert that the Secretary intends to facilitate violations of Arizona and federal law, and that such a system cannot ensure that elections are "free and equal" as required by Article 2, Section 21 of the Arizona Constitution. (FAC ¶¶ 142-143.)

Plaintiffs also claim that Arizona's post-election audit process is insufficient to remediate the security problems inherent in the use of electronic voting machines, because they can be defeated by sophisticated manipulation of the voting machines. (FAC ¶¶ 144-145.) According to Plaintiffs, the only way to overcome the security issues they identify is for the Court to Order that the upcoming midterm election must be conducted by paper ballot. (FAC ¶ 153.) Plaintiffs summarize the procedures they ask the Court to implement as follows:

- Ballots are cast by voters filling out paper ballots, by hand. The ballots are then placed in a sealed ballot box. Each ballot bears a discrete, unique identification number, which is made known by election officials only to the voter, so that the voter can later verify whether his or her ballot was counted properly. All ballots will be printed on specialized paper to confirm their authenticity.
- Th[r]ough a uniform chain of custody, ballot boxes are conveyed to a precinct level counting location while still sealed.
- With party representatives, ballot boxes are unsealed, one at a time, and ballots are removed and counted in batches of 100, then returned to the ballot box. When all ballots in a ballot box have been counted, the box is resealed, with a copy of the batch tally sheets left inside the box, and the batch tally sheets carried to the tally center with a uniform chain of custody.
- Ballots are counted, one at a time, by three independent counters, who each produce a tally sheet that is compared to the other tally sheets at the completion of each batch.
- At the tally center, two independent talliers add the counts from the batch sheets, and their results are compared to ensure accuracy.
- Vote counting from paper ballots is conducted in full view of multiple, recording, streaming cameras that ensure a) no ballot is ever touched or accessible to anyone off-camera or removed from view between acceptance of a cast ballot and completion of counting, b) all ballots, while being counted are in full view of a camera and are readable on the video, and c) batch tally sheets and precinct tally sheets are in full view of a camera while being filled out and are readable on the video.
- Each cast ballot, from the time of receipt by a sworn official from a verified, eligible elector, remains on video through the completion of precinct counting and reporting.

- The video be live-streamed for public access and archived for use as an auditable record, with public access to replay a copy of that auditable record.
- Anonymity will be maintained however, any elector will be able to identify their own ballot by the discrete, serial ballot number known only to themselves, and to see that their own ballot is accurately counted.

(FAC ¶ 153.) Plaintiffs maintain that the Cyber Ninjas' hand count "offers Defendant Hobbs a proof-of-concept and a superior alternative to relying on corruptible voting systems," and that voting jurisdictions outside the U.S., including France and Taiwan, have shown that "hand-count voting can deliver swift, secure, and accurate election results."[3] (FAC ¶ 155.)

## B.   Elections in Arizona

Before discussing the legal merits of Plaintiffs' claims, the Court provides a brief overview of Arizona's current practices surrounding elections. Arizona authorized the use of electronic voting systems in 1966 and has been using them to tabulate votes for decades. H.B. 204, 27th Leg., 2d. Reg. Sess. (Ariz. 1966).

Before a single vote is cast, Arizona's election equipment undergoes thorough testing by independent, neutral experts. Electronic voting equipment must be tested by both the Secretary's Certification Committee and an Election Assistance Commission ("EAC")[4] accredited testing laboratory before it may be used in an Arizona election. A.R.S. § 16-442(A), (B). Before the 2020 election, for example, Maricopa County's Dominion Voting Systems Democracy Suite 5.5-B equipment underwent testing by Pro V&V, an EAC-accredited testing laboratory, and received a Certificate of Conformance from the EAC.

---

[3] When asked how long the Cyber Ninjas' hand count took to complete, Douglas Logan, one of Plaintiffs' witnesses, testified that "there was more than just hand counting, but we started hand counting in the middle of April and we finished with the delivery of the report . . . September 22." (Tr. 79:1-9.) "[T]he majority of [the hand count] was done in about two and a half or three months, but there was a lot of quality control work we did to make sure those numbers were accurate." (Tr. 73:21-24.) During the hand count, roughly 2,000 individuals worked to hand count only two races. (Tr. 72:12-22.)

[4] The EAC was established by the Help America Vote Act of 2002, which charged the Commission with providing "for the testing, certification, decertification, and recertification of voting system hardware and software by accredited laboratories." 52 U.S.C. § 20971(a)(1).

(Doc. 29, Exs. 2, 3, 4[5].) In October 2019, the Arizona Secretary of State's Equipment Certification Committee also conducted a demonstration of the equipment in a public meeting, which the equipment also passed. (Doc. 29, Ex. 5.)

In addition to the equipment certification process, Arizona's vote tabulation results are subject to four independent audits—two audits occur before the election, and two audits after. The first of these audits is a logic and accuracy test, which is performed by the Arizona Secretary of State on a sample of the tabulation equipment. A.R.S. § 16-449(A), (B). As Scott Jarrett ("Mr. Jarrett"), Maricopa County's Director of Elections, explained during the July 21, 2022 hearing, even before the Secretary of State performs her logic and accuracy testing, the County tests the equipment.[6] During Maricopa County's logic and accuracy tests for the 2020 general election, over 8,100 ballots were tested to ensure that every candidate, every rotational position, and every ballot style would be counted accurately. (Tr. 188:12-16.) The Secretary's logic and accuracy tests are blind to the County, and are observed by representatives from the political parties, who sign off on the results. (Tr. 188:19-189:4.) On October 6, 2020, prior to the 2020 election, the Secretary of State performed the logic and accuracy testing on Maricopa County's tabulation equipment, and the ballots were tabulated with 100% accuracy. (Doc. 29, Ex. 9; *see also* Maricopa Cnty., *Maricopa County Election Facts | Voting Equipment & Accuracy* (last

---

[5] The County Defendants filed a Motion for Judicial Notice of Exhibits 1 -17 to their Motion to Dismiss. (Doc. 29.) The Court grants the Motion only as to the government documents referenced in this Order. The remainder of the Motion is denied. The Court also acknowledges that in their memorandum in opposition to Defendants' Motion, Plaintiffs argue that judicial notice is inappropriate where Defendants seek to use government documents "willy-nilly to 'prove' disputed facts." (Doc. 55 at 1.) The Court disagrees with Plaintiffs' argument. The facts contained in the documents cited by the Court in this Order are not subject to reasonable dispute. Fed. R. Evid. 201(b)(2). For the same reasons, the Court takes judicial notice of the portions of government websites cited by both parties. Further, the Court notes that it only refers to these facts for the purpose of providing background for its later analysis, not to establish the truth of any disputed fact.

[6] Mr. Jarrett also explained that Maricopa County performs a "hash code verification" prior to the Secretary's logic and accuracy testing. (Tr. 187:15-24.) As the Court understands it, a unique hash code value provides a digital representation of every piece of equipment and software that should be installed on the Election Management System, and the County does a one-for-one check to ensure that no erroneous or malicious software or hardware has been added to the equipment.

accessed Aug. 17, 2022), https://www.maricopa.gov/5539/Voting-Equipment-Facts (hereinafter "Maricopa Cnty. Election Facts").) The second required audit also takes place before election day. For the second audit, Arizona counties must perform a logic and accuracy test on all of their tabulation equipment. 2019 Elections Procedures Manual ("2019 EPM") at 86. In 2020, the second Maricopa County audit also took place on October 6, and the tabulators counted the ballots with 100% accuracy. (Maricopa Cnty. Election Facts.)

When the time to vote arrives, every Arizona voter casts a ballot by hand, on paper. This is the law. *See* A.R.S. §§ 16-462 (primary election ballots "shall be printed"), 16-468(2) ("Ballots shall be printed in plain clear type in black ink, and for a general election, on clear white materials"), 16-502 (general election ballots "shall be printed with black ink on white paper"). Arizona's statutes carve out one exception to this rule—voters with disabilities may vote on "accessible voting devices" (sometimes referred to as "ballot marking devices," or "BMDs"), but these devices still must produce a paper ballot or voter verifiable paper audit trail, which the voter can review to confirm that the machine correctly marked his or her choices, and which can be used in the event of an audit.[7] A.R.S. §§ 16-442.01; § 16-446(B)(7); 2019 EPM at 80. As Mr. Jarrett explained, the accessible voting devices are not connected to the internet, and the ports on the devices are locked and have affixed tamper evident seals.[8] (Tr. 177:5-20.) There has never been an instance where one of the seals was removed or broken during voting. (Tr. 178:4-9.) The Secretary also

---

[7] In *Curling v. Raffensperger*, the plaintiffs' expert, Professor J. Alex Halderman, noted in his report that "Georgia can eliminate or greatly mitigate [the risks of electronic ballot marking devices ("BMDs")] by adopting the same approach to voting that is practiced in most of the country: using hand-marked paper ballots and reserving BMDs for voters who need or request them." (Halderman Dec. 33, Doc. 1304-3, *Curling v. Raffensperger*, No. 1:17-CV-2989-AT (N.D. Ga. Feb. 3. 2022) (emphasis added)). This is already Arizona's practice.

[8] Mr. Jarrett testified that serialized port blockers with customized keys are also used on Maricopa County's vote tabulation equipment. (Tr. 178:19-179:7.) The equipment is also enclosed in security containers, which prevent access to all ports, even those that may have a mouse or a keyboard plugged in. (Tr. 179:8-15.) The keys to the security containers are locked in a secure server room, to which only three people have access, and upon entering the secure server room, those three individuals must keep a log of their reasons for doing so. (Tr. at 179:15-20.)

certifies the accessible voting systems for each county. *See* Ariz. Sec'y of State, *Voting Equipment* (last accessed Aug. 17, 2022), https://azsos.gov/elections/voting-election/voting-equipment. In the 2020 general election, 2,089,563 ballots were cast in Maricopa County, and only 453 of those were cast using an accessible voting device. (Tr. 174:24-175:4.)

Following the election, the third required audit—a hand count—takes place.[9] A.R.S. § 16-602(B). Representatives of the political parties, under the oversight of the Elections Department, randomly select two percent of the polling locations, as well as one percent of the early ballots cast or five thousand early ballots, whichever is less, and count all the ballots by hand. A.R.S. §§ 16-602(B), (F); EPM at 215. Maricopa County's hand count audit of the 2020 general election was conducted from November 4 through 9, 2020, and showed that the tabulators had counted the ballots with 100% accuracy. (Doc. 29, Ex. 10.)

The fourth required audit is the post-election logic and accuracy testing performed by the counties. Each county performs its own post-election logic and accuracy testing. EPM at 235. This process uses the same test ballots as the counties' pre-election logic and accuracy testing, and should generate the same results, verifying that no changes were made to the tabulators' software between the two tests. EPM at 235. Maricopa County's post-election logic and accuracy testing took place on November 18, 2020, and showed that the tabulators counted the votes with 100% accuracy. (Doc. 29, Ex. 11; see also Maricopa Cnty., Media Advisory: Post Election Logic and Accuracy Test on Nov. 18 (Nov. 17, 2020) https://content.govdelivery.com/accounts/AZMARIC/bulletins/2acffff; Maricopa Cnty., Board of Supervisors Certifies Maricopa County Election Results (Nov. 20, 2020) https://content.govdelivery.com/accounts/AZMARIC/bulletins/2ada05e.)

---

[9] This audit can only be performed if the county chairs of each political party designate and provide election board members to conduct the hand count. (Doc. 27 at 5, fn. 4; A.R.S. § 16-602(B)(7).) One or more of the political party chairs in Apache, Gila, Graham, La Paz, and Yuma did not designate election board members for the 2020 general election, so hand count audits were not performed in those counties. (Doc. 27 at 5, fn. 4; *see also* Ariz. Sec'y of State, *Summary of Hand Count Audits - 2020 General Election* (Nov. 17, 2020), https://azsos.gov/2020-general-election-hand-count-results.)

In February 2021, Pro V&V and SLI Compliance, another EAC-accredited laboratory, conducted audits of Maricopa County's tabulation equipment. (Doc. 27, Ex. 6.) The two auditors reached the same conclusions: (1) all systems and equipment were using software and equipment certified by the EAC and Arizona Secretary of State; (2) no malicious hardware or software discrepancies were detected; (3) the system was determined to be a "closed network" and no internet connections were identified; and (4) logic and accuracy testing resulted in accurate numbers.[10]

### C.   Procedural History

Plaintiffs brought this action under 42 U.S.C. § 1983 and *Ex parte Young*, 209 U.S. 123 (1908) and its progeny to challenge government officers' "ongoing violation of federal law and [to] seek[] prospective relief" under the equity jurisdiction conferred on federal district courts by the Judiciary Act of 1789. (FAC ¶ 48.) Specifically, Plaintiffs allege that the Secretary has violated A.R.S. §§ 16-452 (A), (B), and (D); 16-446 (B); 16-445(D); and § 16-442(B).[11] (FAC ¶¶ 156-161.) They also allege that the County Defendants have violated A.R.S. §§ 11-251[12] and 16-452 (A). (FAC ¶¶ 162-165.) Plaintiffs further allege that all Defendants have violated the Due Process Clause of the Fourteenth Amendment of the U.S. Constitution and Article 2, Section 4 of the Arizona Constitution; the Equal Protection Clause of the Fourteenth Amendment; and the fundamental right to vote as protected by the U.S. Constitution. (*See generally* FAC.) They seek declaratory and injunctive relief against all Defendants pursuant to 42 U.S.C. § 1983, as well as a declaratory judgment pursuant to 28 U.S.C. § 2201. (FAC ¶¶ 196-199, 207-211.)

---

[10] Logic and accuracy testing was outside SLI Compliance's scope of work, so was performed only by Pro V&V. (Doc. 29, Ex. 6 at 1.)

[11] During the July 21, 2022 hearing, Plaintiffs took the position that the FAC does not present claims that are based in state law, and they "are not alleging [Defendants' actions] violate[] state statute[s]." (Tr. 224:12-225:3.) However, paragraphs 177, 184, 190, 196, and 207 are clear: in bringing their claims under federal law, "Plaintiffs incorporate and reallege all paragraphs in this Complaint." This includes paragraphs 156-161, where Plaintiffs allege the Secretary acted in violation of Arizona state law.

[12] Plaintiffs are no longer pursuing their A.R.S. § 11-251 claim. (Doc. 27 at 19.)

The County Defendants filed a Motion to Dismiss Plaintiffs' claims under Federal Rule of Civil Procedure 12(b)(6), arguing that (1) Plaintiffs' claims are untimely; (2) Plaintiffs fail to allege sufficient factual allegations; and (3) Plaintiffs fail to allege a cognizable legal theory. (*See generally* Doc. 27.) The Secretary joined in the County Defendants' arguments, and also filed her own Motion to Dismiss under Federal Rules of Civil Procedure 12(b)(1) and 12(b)(6), arguing that (1) Plaintiffs lack standing; (2) the Eleventh Amendment bars Plaintiffs' claims; and (3) Plaintiffs fail to state a cognizable constitutional claim. (*See generally* Doc. 45.)

On July 21, 2022, the Court heard the parties' arguments on Plaintiff's Motion for Preliminary Injunction and Defendants' Motions to Dismiss. In this Order, the Court addresses only the Defendants' arguments concerning standing, the Eleventh Amendment, and portions of Defendants' arguments that pertain to the timing of Plaintiffs' suit, because it finds that each of these arguments is dispositive on its own.

## II.   LEGAL STANDARDS

### A.   Federal Rule of Civil Procedure 12(b)(1)

"A motion to dismiss for lack of subject matter jurisdiction under Rule 12(b)(1) may attack either the allegations of the complaint as insufficient to confer upon the court subject matter jurisdiction, or the existence of subject matter jurisdiction in fact." *Renteria v. United States*, 452 F. Supp. 2d 910, 919 (D. Ariz. 2006) (citing *Thornhill Publ'g Co. v. Gen. Tel. & Elecs. Corp.*, 594 F.2d 730, 733 (9th Cir. 1979)). "Where the jurisdictional issue is separable from the merits of the case, the [court] may consider the evidence presented with respect to the jurisdictional issue and rule on that issue, resolving factual disputes if necessary." *Thornhill*, 594 F.2d at 733; *see also Autery v. United States*, 424 F.3d 944, 956 (9th Cir. 2005) ("With a 12(b)(1) motion, a court may weigh the evidence to determine whether it has jurisdiction."). The burden of proof is on the party asserting jurisdiction to show that the court has subject matter jurisdiction. *See Indus. Tectonics, Inc. v. Aero Alloy*, 912 F.2d 1090, 1092 (9th Cir. 1990).

### B.   Article III Standing

Article III Courts are limited to deciding "cases" and "controversies." U.S. Const. art. III, § 2. "Article III of the Constitution requires that one have "the core component of standing." *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560 (1992). To have standing under Article III, a plaintiff must show: (1) an injury in fact that is (a) concrete and particularized and (b) actual or imminent; (2) the injury is fairly traceable to the challenged action of the defendant; (3) it is likely, not merely speculative, that the injury will be redressed by decision in the plaintiff's favor. *Maya v. Centex Corp.*, 658 F.3d 1060, 1067 (9th Cir. 2011). A complaint that fails to allege facts sufficient to establish standing requires dismissal for lack of subject-matter jurisdiction under Federal Rule of Civil Procedure 12(b)(1). *See, e.g., Chandler v. State Farm Mut. Auto. Ins. Co.*, 598 F.3d 1115, 1123 (9th Cir. 2010).

### C.   The Eleventh Amendment

The Eleventh Amendment prevents a state from being sued in federal court without its consent. *Seven Up Pete Venture v. Schweitzer*, 523 F.3d 948, 952 (9th Cir. 2008). When the state is "the real, substantial party in interest," Eleventh Amendment immunity extends to "suit[s] against state officials." *Pennhurst State Sch. & Hosp. v. Halderman*, 465 U.S. 89, 101 (1984) (quotations omitted). *Ex parte Young* provides an exception to Eleventh Amendment immunity, but it applies only to "claims seeking prospective injunctive relief against state officials to remedy a state's ongoing violation of federal law.*" Ariz. Students' Ass'n v. Ariz. Bd. of Regents*, 824 F.3d 858, 865 (9th Cir. 2016) (citing *Ex parte Young*, 209 U.S. 123 (1908)).

### D.   The *Purcell* Doctrine

The *Purcell* doctrine directs federal appellate courts "to weigh, in addition to the harms attendant upon issuance or nonissuance of an injunction, considerations specific to election cases and its own institutional procedures." *Purcell v. Gonzalez*, 549 U.S. 1, 4 (2006). The Supreme Court "has repeatedly emphasized that lower federal courts should ordinarily not alter the election rules on the eve of an election." *Republican Nat'l Comm.*

1  *v. Democratic Nat'l Comm.*, 140 S. Ct. 1205, 1207 (2020) (collecting cases); *Short v.*
2  *Brown*, 893 F.3d 671, 676 (9th Cir. 2018) ("[T]he Supreme Court has warned us many
3  times to tread carefully where preliminary relief would disrupt a state voting system on the
4  eve of an election."); *see also New Georgia Project v. Raffensperger*, 976 F.3d 1278, 1283
5  (11th Cir. 2020) ("And we are not on the eve of the election—we are in the middle of it,
6  with absentee ballots already printed and mailed.").

7  **III.   ANALYSIS**

8      **A.   Plaintiffs Lack Article III Standing**

9          To establish an injury in fact, the first element of standing, "a plaintiff must show
10  that he or she suffered an invasion of a legally protected interest that is concrete and
11  particularized and actual or imminent, not conjectural or hypothetical." *Spokeo, Inc. v.*
12  *Robins*, 578 U.S. 330, 339 (2016) (quotations omitted). A "concrete" and "particularized"
13  injury must be "real," not "abstract," *id.*, and "must affect the plaintiff in a personal and
14  individual way." *Raines v. Byrd*, 521 U.S. 811, 819 (1997) (quotation omitted). And to be
15  "actual or imminent," a threatened injury must be "certainly impending"— "allegations of
16  possible future injury are not sufficient." *Clapper v. Amnesty Int'l USA*, 568 U.S. 398, 409
17  (2013) (cleaned up).

18          The Secretary argues that Plaintiffs cannot establish an injury in fact for two
19  reasons. First, the Secretary argues that Plaintiffs' claimed injuries are too speculative to
20  establish standing. (Doc. 45 at 5.) According to the Secretary, the bulk of Plaintiff's
21  allegations are vague, and have to do with electronic voting systems generally. (Doc. 45 at
22  6.) She also notes that all of Plaintiffs' examples of "issues" with election equipment
23  involve other jurisdictions, not Arizona. (Doc. 45 at 6; *see also* FAC ¶¶ 4, 23, 29, 32 61,
24  73-80, 81-89, 90-92, 93-102, 103-106, 107, 108-116, 125-131, 133-134, 181, 199.) The
25  Secretary cites *Shelby Cnty. Advocs. for Valid Elections v. Hargett* to support her position.
26  2019 WL 4394754 (W.D. Tenn. Sept. 13, 2019), *aff'd Shelby Advocs. for Valid Elections*
27  *v. Hargett*, 947 F.3d 977 (6th Cir. 2020). There, the district court found that the plaintiffs'
28  allegations that their county's electronic voting equipment was "vulnerable to undetectable

hacking and malicious manipulation" were "based only on speculation, conjecture and [the plaintiffs'] seemingly sincere desire for their 'own value preferences' in having voting machines with a paper trail." *Id.* at *2, 7. The district court held that the plaintiffs had failed to allege facts to show that "Shelby County's voting system is more likely to miscount votes than any other system used in Tennessee," and the allegations in their complaint were therefore too conjectural to survive. *Id.* at 10.

Plaintiffs argue that "[a]n allegation of future injury may suffice if . . . there is a substantial risk that the harm will occur." *Susan B. Anthony List v. Driehaus*, 573 U.S. 149, 158 (2014) (quotation omitted). They point to their Complaint for support, contending that it "pleads detailed allegations showing that existing safety procedures and certifications can be defeated and that manipulation of votes can be performed without leaving any record of the changes." (Doc. 58 at 4; FAC ¶¶ 31, 75, 98, 128, 138-40, 145-46.) Plaintiffs also cite *Curling v. Kemp*, where the U.S. District Court for the Northern District of Georgia held that the plaintiffs had standing where they "plausibly allege[d] a threat of a future hacking event that would jeopardize their votes and the voting system at large." *Curling v. Kemp*, 334 F. Supp. 3d 1303, 1316 (N.D. Ga. 2018).

Ultimately, even upon drawing all reasonable inferences in Plaintiffs' favor, the Court finds that their claimed injuries are indeed too speculative to establish an injury in fact, and therefore standing. This case is nothing like *Curling v. Kemp*. There, the plaintiffs alleged that specific voting machines used in Georgia had actually been accessed or hacked multiple times, and despite being notified about the problem repeatedly, Georgia officials failed to take action. *Curling v. Kemp*, 334 F. Supp. 3d at 1314-1317. Here, as the Secretary points out, a long chain of hypothetical contingencies must take place for any harm to occur— (1) the specific voting equipment used in Arizona must have "security failures" that allow a malicious actor to manipulate vote totals; (2) such an actor must actually manipulate an election; (3) Arizona's specific procedural safeguards must fail to detect the manipulation; and (4) the manipulation must change the outcome of the election. (*See* Doc. 62 at 2-3.) Plaintiffs fail to plausibly show that Arizona's voting equipment even has such

security failures.[13] And even if the allegations in Plaintiff's complaint were plausible, their alleged injury is not "certainly impending" as required by *Clapper*. 568 U.S. at 409.[14]

Second, the Secretary argues that Plaintiffs cannot establish an injury in fact because they fail to show that their alleged injury is particularized. (Doc. 45 at 8.) The Secretary again cites *Shelby Cnty. Advocs. for Valid Elections* to assert that Plaintiffs' claims represent a "general dissatisfaction with the voting system and processes" used in Arizona. 2019 WL 4394754, at *9. While it is well-established that a generalized "interest in seeing that the law is obeyed" is neither concrete nor particularized, Plaintiffs allege, and the Secretary does not consider, whether Plaintiffs' status as candidates may confer standing. *See, e.g., Pierce v. Ducey*, 965 F.3d 1085, 1089 (9th Cir. 2020).

During the July 21 hearing, Plaintiffs argued "[a]nytime … the playing field in an election is tilted in any way, standing is -- exists for the candidates." (Tr. 244:8-9.) It is true that, as candidates, Plaintiffs "have a cognizable interest in ensuring that the final vote tally accurately reflects the legally valid votes cast. An inaccurate vote tally is a concrete and particularized injury to candidates." *Carson v. Simon*, 978 F.3d 1051, 1058 (footnote omitted*); Trump v. Wis. Elections Comm'n*, 983 F.3d 919, 924 (7th Cir. 2020). However, while Plaintiffs' status as candidates does make the argument that their alleged injuries are particularized more compelling, it is not sufficient to establish standing. Simply put, Plaintiffs have not alleged facts to show that it is plausible that the field is "tilted" here. *See Stein v. Cortés*, 223 F. Supp. 3d 423, 432-33 (E.D. Pa. 2016) (finding no standing where the plaintiff, an unsuccessful candidate, alleged that Pennsylvania's DRE electronic voting machines may be susceptible to hacking).

---

[13] Defendants have taken numerous steps to ensure such security failures do not exist or occur in Arizona or Maricopa County. As the Court chronicled in painstaking detail in Section I.B, every vote cast can be tied to a paper ballot (*see* A.R.S. §§ 16-442.01; § 16-446(B)(7); 2019 EPM at 80), voting devices are not connected to the Internet (*see* Doc. 29, Ex. 6) any ports are blocked with tamper evident seals (*see* Tr. 177:5-20), and access to voting equipment is limited (*see* Tr. at 179:15-20).

[14] As set forth in Section I.B, Defendants have extensive post-election audit procedures in place to detect and reconcile any problems with tabulation machine counts if an intrusion did occur.

1   For the foregoing reasons, this Court joins many others that have held that
2   speculative allegations that voting machines may be hackable are insufficient to establish
3   an injury in fact under Article III. *See Stein*, 223 F. Supp. 3d at 432-33; *Samuel v. Virgin*
4   *Islands Joint Bd. of Elections*, 2013 WL 842946, at *5 (D.V.I. Mar. 7, 2013*)* (finding no
5   standing on the grounds that the plaintiffs' "conjectural" allegations "that the election
6   process 'may have been' left open to compromise" by using certain voting machines were
7   "amorphous due process claims, without requisite concreteness"); *Schulz v. Kellner*, 2011
8   WL 2669456, at *7 (N.D.N.Y. July 7, 2011) (allegations that "votes will allegedly not be
9   counted accurately" because of "machine error and human fraud resulting from
10  Defendants' voting procedures" were "merely conjectural and hypothetical" and
11  insufficient to establish standing)*; Landes v. Tartaglione*, 2004 WL 2415074, at *3 (E.D.
12  Pa. Oct. 28, 2004), *aff'd,* 153 F. App'x 131 (3d Cir. 2005) (finding no standing because the
13  plaintiff's claim "that voting machines are vulnerable to manipulation or technical failure"
14  was "conjectural or hypothetical").

15      **B.      The Eleventh Amendment Bars Plaintiffs' Claims**

16      Even if Plaintiffs had standing, dismissal of their claims is warranted under the
17  Eleventh Amendment. As mentioned *supra*, Plaintiffs bring this action under 42 U.S.C.
18  § 1983 and *Ex parte Young* to challenge government officers' "ongoing violation of federal
19  law." (FAC ¶ 48 (citing 209 U.S. 123 (1908)).) However, as the Secretary points out,
20  *Ex parte Young* cannot apply here, because, despite Plaintiffs' claims that their
21  constitutional rights have been violated, Plaintiffs do not plausibly allege a violation of
22  federal law. (Doc. 45 at 9.) To support this argument, the Secretary cites a multitude of
23  cases. For example, in *Weber v. Shelley*, the Ninth Circuit held that "[n]othing in the
24  Constitution" forbade the use of touchscreen voting systems as an alternative to paper
25  ballots, noting that it is "the job of democratically-elected representatives to weigh the pros
26  and cons of various balloting systems." 347 F.3d 1101, 1107 (9th Cir. 2003). Other federal
27  courts have reached similar conclusions. In *Pettengill v. Putnam County R-1 Sch. Dist.*, the
28  Eighth Circuit unequivocally stated that there is no constitutional basis for federal courts

to oversee the administrative details of local elections. 472 F.2d 121, 122 (8th Cir. 1973) ("[The] complaint asks the federal court to oversee the administrative details of a local election. We find no constitutional basis for doing so."). The Fourth Circuit has also held that "[a] state may employ diverse methods of voting, and the methods by which a voter casts his vote may vary throughout the state." *Hendon v. N.C. State Bd. of Elections*, 710 F.2d 177, 181 (4th Cir. 1983.) Furthermore, in a case similar to the one presently before the Court, the Southern District of New York held that the use of voting machines is "for the elected representatives of the people to decide[.] There is no constitutional right to any particular method of registering and counting votes." *Green Party of N.Y. v. Weiner*, 216 F. Supp. 2d 176, 190-91 (S.D.N.Y. 2002).[15]

Plaintiffs counter that the Secretary's Eleventh Amendment argument is erroneous, because she argues the Plaintiff's claims fail on the merits and ignores their constitutional arguments. (Doc. 58 at 9.) According to Plaintiffs, "[t]o be constitutional, election regulations must produce a reliable count of the legal votes. Plaintiffs' … allege that Arizona's equipment and system do not." (Doc. 58 at 9-10.) Thus, according to Plaintiffs, they allege a violation of federal law. Plaintiffs also attempt to distinguish *Weber*, which the Secretary cites, because the court there reviewed a grant of summary judgment. 347 F.3d at 1105. The Court finds this line of argument unpersuasive.

The Eleventh Amendment bars Plaintiffs' claims. Because the Constitution charges states with administering elections, Plaintiffs' claims can only stem from an argument that Defendants are violating state law by using what Plaintiffs allege are insecure or inaccurate voting systems. Plaintiffs argued at the hearing in this matter that their claims do not depend on any application of Arizona state law, and the Court need not determine whether Defendants' procedures comply with state law to grant Plaintiffs relief, but as set forth

---

[15] In any event, insofar as Plaintiffs argue a constitutional violation grounded in Arizona's failure to require voting by paper ballots, their allegations are flatly wrong. The Court finds for purposes of determining jurisdiction, that as set forth *supra*, 99.98% of voters in Arizona cast their votes by marking and submitting paper ballots in the 2020 election, and the remaining 0.02% —representing mostly sight impaired voters—cast their ballots on system-generated paper ballots which could be verified before casting to ensure they reflected those voters' choices.

above, they are incorrect. Indeed, Arizona state laws set forth detailed requirements concerning how ballots are counted and how voting systems are used. *See* A.R.S. §§ 16-400 and 16-411 *et seq*. Absent a constitutional right to a particular method of voting, Plaintiffs' claims that Arizona's voting systems are flawed can *only* arise under state law[16], and such claims are barred. Courts have repeatedly rejected alleged federal constitutional claims that rely on a determination that state officials have not complied with state law. *See S&M Brands, Inc. v. Georgia ex rel. Carr*, 925 F.3d 1198, 1204-05 (11th Cir. 2019); *see also Bowyer v. Ducey*, 506 F.Supp.3d 699, 716 (D. Ariz. 2020) ("where the claims are state law claims, masked as federal law claims" Eleventh Amendment immunity applies). Moreover, the Court fails to see how Plaintiffs' requested relief would not violate the "principles of federalism that underlie the Eleventh Amendment." *Pennhurst State Sch. & Hosp. v. Halderman*, 465 U.S. 89, 106 (1984). If the Court were to enjoin Defendants from using electronic voting systems, retain jurisdiction to ensure compliance, and require Defendants to conduct elections according to Plaintiffs' preferences, the Court wound unavoidably become impermissibly "entangled, as [an] overseer[] and micromanager[], in the minutiae of state election processes." *Ohio Democratic Party v. Husted*, 834 F.3d 620, 622 (6th Cir. 2016).

## C.   Plaintiffs' Suit is Untimely

Finally, even if the Court could properly retain jurisdiction over Plaintiff's claims, it could not grant the injunctive relief Plaintiffs request. The 2022 Midterm Elections are set to take place on November 8. In the meantime, Plaintiffs request a complete overhaul of Arizona's election procedures.

In advancing their *Purcell* argument, the County Defendants emphasize the strain on elections officials that would be prompted by such a late change to elections procedures. (Doc. 27 at 9.) During the July 21 hearing, Mr. Jarrett testified that Maricopa County "could not" switch to precinct-based polling locations, as Plaintiffs request, before the November

---

[16] In fact, Plaintiffs' First Amended Complaint repeatedly so alleged (FAC ¶¶ 156-161), directly contradicting the position Plaintiffs now take in an attempt to overcome the Eleventh Amendment bar Defendants have raised.

election. (Tr. 198:14-21.) Mr. Jarrett also testified that thousands more workers would be needed for a full hand count, and Maricopa County already struggles to retain enough poll workers. (Tr. 198:2-8, 199:22-200:5.) For example, for the August primary, Maricopa County had to increase its wages from $14 to $19 per hour, and still fell "woefully short" of the number of workers it needed for the primary. (Tr. 198:2-6.)

The County Defendants also cite a number of cases from this election cycle where federal courts have invoked *Purcell* to deny requests for injunctive relief. The Court finds *League of Women Voters of Fla., Inc. v. Fla. Sec'y of State* instructive. 32 F.4th 1363, 1371 (11th Cir. 2022). In that case, the district court granted an injunction when voting was set to begin in less than four months, but the Eleventh Circuit stayed the district court's injunction pending appeal. *Id.* The Eleventh Circuit based its reasoning on Justice Kavanaugh's concurrence in *Merrill v. Milligan*, ––– U.S. ––––, 142 S. Ct. 879, 880, ––– L.Ed.2d ––– (2022), holding that under *Purcell*, the standard a plaintiff must meet to obtain "injunctive relief that will upset a state's interest in running its elections without judicial interference" is heightened. *Id.* at 1372. This means that the plaintiff "must demonstrate, among other things, that its position on the merits is 'entirely clearcut'" in order for a district court to grant injunctive relief. *Id.* Here, Plaintiffs filed their Motion for Preliminary Injunction on June 15, 2022 (Doc. 50), and on July 21, 2022, soon after the motion was fully briefed the Court held a hearing. At the time of the hearing, the November election was already less than four months away. Further, as the Court has suggested throughout this Order, Plaintiffs' position is a far cry from "entirely clearcut."

Plaintiffs argue that *Purcell* does not apply on these facts, because it stands for the "principle that a federal court should not cause confusion among voters by enjoining state election laws immediately before an election." (Doc. 56 at 8 (citing 549 U.S. at 4-5).) Here, according to Plaintiffs, the election was not imminent when they brought this action. *See, e.g.*, *Ariz. Democratic Party v. Hobbs*, 976 F.3d 1081, 1086-87 (9th Cir. 2020). Plaintiffs also argue that here, voters will be "entirely unaffected" by the injunctive relief they seek, because the relief "applies only after a ballot is submitted." *Self Advocacy Sol. N.D. v.*

*Jaeger*, 464 F. Supp. 3d 1039, 1055 (D.N.D. 2020) (internal quotations omitted). Instead, Plaintiffs assert, *Purcell* weighs in favor of granting injunctive relief, because they seek to "vindicate" *Purcell*'s concern for the "integrity of our electoral processes." (Doc. 56 at 10 (citing 549 U.S. at 4).)

The Court finds Plaintiffs' reading of *Purcell* unconvincing. In applying *Purcell*, Courts have made clear that it stands for more than just the proposition that federal courts should avoid changes in law that may cause voter confusion. The County Defendants are correct to assert that courts applying *Purcell* also "caution federal courts to refrain from enjoining election law too close in time to an election if the changes will create administrative burdens for election officials." (Doc. 61 at 5.) *See Ariz. Democratic Party*, 976 F.3d at 1086 ("And, as we rapidly approach the election, the public interest is well served by preserving Arizona's existing election laws, rather than by sending the State scrambling to implement and to administer a new procedure for curing unsigned ballots at the eleventh hour.") The injunctive relief Plaintiffs seek would not just be challenging for Arizona's election officials to implement; it likely would be impossible under the extant time constraints.

**IV.    CONCLUSION**

For the foregoing reasons, Plaintiffs' First Amended Complaint is dismissed in its entirety. While the Court agrees with Plaintiffs that the right to vote is precious, and should be protected, Plaintiffs lack standing because they have articulated only conjectural allegations of potential injuries that are in any event barred by the Eleventh Amendment, and seek relief that the Court cannot grant under the *Purcell* principle.

**IT IS THERFORE ORDERED** granting Defendants' Motions to Dismiss (Docs. 27, 45), and granting in part the County Defendants' Motion for Judicial Notice (Doc. 29).

**IT IS FURTHER ORDERED** denying as moot Plaintiffs' Motion for Preliminary Injunction (Doc. 50) and Defendants' Motion to Strike (Doc. 74).

**IT IS FURTHER ORDERED** denying Plaintiffs' Expedited Motion to Supplement Record (Doc. 93).[17]

**IT IS FURTHER ORDERED** directing the Clerk of Court to enter judgment accordingly and close this case.

Dated this 26th day of August, 2022.

_____
Honorable John J. Tuchi
United States District Judge

_____
[17] In their Expedited Motion (Doc. 93), Plaintiffs request to supplement the record with evidence they argue would either undermine or impeach the testimony of Mr. Jarrett as to the security of Maricopa County's electronic ballot counting equipment. The request is extraordinarily and inexcusably untimely, and in any event does not remedy the speculative nature of Plaintiffs' claims. Plaintiffs initiated this action according to their preference. The Court set the hearing by an Order issued well in advance, and Plaintiffs had ample time to prepare their evidence. At the hearing, Mr. Jarrett's testimony was consistent with, if not identical to, his prior appearance before the Arizona Senate and his other statements detailing Maricopa County's election system security and verification procedures, so Plaintiffs had ample notice of what he was going to say at the hearing here. Nonetheless, Plaintiffs waited nearly two weeks after the hearing to ask to submit another declaration, in what appears to be an effort to get the last word and cast doubt on Mr. Jarrett's testimony at a point when the County could no longer respond. The Court will not allow such potential gamesmanship; nor will it, in the alternative, allow the submission and then a response from Defendants. Such a step would breed satellite litigation and deprive the Court of the ability to evaluate witnesses and their credibility live at hearing.