**WO**

# IN THE UNITED STATES DISTRICT COURT

# FOR THE DISTRICT OF ARIZONA

| | |
|---|---|
| Kari Lake, *et al.*, | No. CV-22-00677-PHX-JJT |
| Plaintiffs, | **ORDER** |
| v. | |
| Katie Hobbs, *et al.*, | |
| Defendants. | |

At issue is the Federal Rule of Civil Procedure 11 and 28 U.S.C. § 1927 Motion for Sanctions (Doc. 97, "Mot.") filed by Defendants Bill Gates, Clint Hickman, Jack Sellers, Thomas Galvin, and Steve Gallardo in their official capacities as members of the Maricopa County Board of Supervisors (hereinafter referred to collectively as "Maricopa County Defendants"), to which Plaintiffs Kari Lake and Mark Finchem filed a Response (Doc. 99, "Resp."), and the Maricopa County Defendants filed a Reply (Doc. 102, "Reply"). The Court finds this matter appropriate for disposition without oral argument. LRCiv 7.2(f). For the reasons set forth below, the Court grants the Maricopa County Defendants' motion.

## I.      BACKGROUND

In this case, Plaintiffs challenged the procedures for administering elections in Arizona and sought an injunction compelling Defendants—election officials at the state and county levels—to follow alternative procedures for collecting, storing, counting, and tabulating votes in the 2022 midterm election. (Doc. 3, Plaintiffs' first Amended Complaint ("FAC") ¶¶ 1, 153.) These alternative procedures included requiring voters to cast their

votes on paper ballots and ordering election administrators to count every ballot cast by hand. (*Id.* ¶ 153.) On August 26, 2022, the Court granted motions to dismiss filed by Defendants and dismissed Plaintiffs' FAC in its entirety. (Doc. 100, "Dismissal Order.") The 2022 midterm election took place on November 8, 2022.

The Court's Dismissal Order described in detail the allegations Plaintiffs raised in their FAC, as well as the current procedures used to administer elections in Arizona. (Dismissal Order at 2–11.) Here, the Court will presume the reader's familiarity with its Dismissal Order and provide a more truncated description of Plaintiffs' allegations, the pertinent procedural history of the case, and the parties' positions on remaining issues.

Broadly, Plaintiffs alleged that the electronic voting machines certified for use in Arizona, including optical scanners and ballot marking devices ("BMDs"), are "potentially unsecure, lack adequate audit capacity, fail to meet minimum statutory requirements, and deprive voters of the right to have their votes counted and reported in an accurate, auditable, legal, and transparent process." (FAC ¶ 23.) Plaintiffs alleged that the machines are "rife" with cybersecurity vulnerabilities and allow for unauthorized persons to manipulate the reported vote counts in an election and potentially change the winner. (*See, e.g.*, *id.* ¶¶ 12-13, 73–75, 77, 81–82, 108–12, 125–34, 139.) Plaintiffs claimed that Arizona's audit regime is insufficient to negate these vulnerabilities and that the only way to overcome the security issues they identify is "for the Court to Order, an election conducted by paper ballot, as an alternative to the current framework." (*Id.* ¶¶ 144–53.) Plaintiffs requested that the Court implement certain procedures, including the use of paper ballots and a live-streamed hand-count of all ballots cast. (*Id.* ¶ 153.) Plaintiffs maintained that the Cyber Ninjas' hand count of two contests in the 2020 general election in Maricopa County offers "a proof-of-concept and a superior alternative to relying on corruptible electronic voting systems." (*Id.* ¶ 155.)

In a letter dated May 20, 2022, counsel for the Maricopa County Defendants notified Plaintiffs' counsel that this lawsuit was frivolous. (Doc. 97-1.) Counsel advised that unless Plaintiffs voluntarily dismissed their suit, counsel intended to file a motion to dismiss

1   pursuant to Federal Rule of Civil Procedure 12(b)(6) and a motion for sanctions pursuant

2   to Rule 11. (*Id.*) The Maricopa County Defendants filed a Motion to Dismiss Plaintiffs'

3   FAC on June 7, 2022 (Doc. 27). Defendant Arizona Secretary of State Katie Hobbs ("the

4   Secretary") joined the Maricopa County Defendants' motion and filed her own Motion to

5   Dismiss on June 8, 2022 (Doc. 45).

6       On June 8, 2022, nearly seven weeks after filing their initial Complaint (Doc. 1),

7   Plaintiffs lodged a Motion for Preliminary Injunction (Doc. 50, "MPI"), which the Court

8   ordered filed on June 15, 2022 (Doc. 49). In their MPI, Plaintiffs requested that the Court

9   "enter a preliminary injunction barring Defendants from using computerized equipment to

10  administer the collection, storage, counting, and tabulation of votes in any election until

11  such time that the propriety of a permanent injunction is determined." (MPI at 2.) Plaintiffs

12  filed multiple declarations and exhibits in support of their MPI (Docs. 33–44).

13       On July 21, 2022, the Court held a hearing at which the parties presented witness

14  testimony and the Court heard argument on Plaintiffs' MPI and Defendants' Motions to

15  Dismiss. (Doc. 98, Transcript of Proceedings ("Tr.").) On August 26, 2022, the Court

16  granted Defendants' Motions to Dismiss, denied as moot Plaintiffs' MPI, and dismissed

17  Plaintiffs' FAC in its entirety. (Dismissal Order at 13–21.)

18      The Maricopa County Defendants now move for sanctions against Plaintiffs and

19  their counsel under Rule 11 and 28 U.S.C § 1927. Broadly, Defendants argue that Plaintiffs

20  and their counsel made numerous false allegations about Arizona elections in their FAC

21  and MPI, that Plaintiffs' claims are frivolous, and that they pursued this case for the

22  improper purpose of undermining confidence in elections and furthering their political

23  campaigns. (Mot. at 1–5, 7–12.) Plaintiffs oppose Defendants' motion and argue that

24  sanctions cannot be imposed because their claims are meritorious and their factual

25  contentions are well-founded. (Resp. at 1–17.)

26  . . . .

27  . . . .

28  . . . .

- 3 -

## II.    LEGAL STANDARDS

### A.    Federal Rule of Civil Procedure 11

Rule 11(b) provides, in relevant part:

By presenting to the court a pleading, written motion, or other paper—whether by signing, filing, submitting, or later advocating it—an attorney or unrepresented party certifies that to the best of the person's knowledge, information, and belief, formed after an inquiry reasonable under the circumstances:

(1)    it is not being presented for any improper purpose, such as to harass, cause unnecessary delay, or needlessly increase the cost of litigation;

(2)    the claims, defenses, and other legal contentions are warranted by existing law or by a nonfrivolous argument for extending, modifying, or reversing existing law or for establishing new law; [and]

(3)    the factual contentions have evidentiary support or, if specifically so identified, will likely have evidentiary support after a reasonable opportunity for further investigation or discovery.

Rule 11(c)(1) provides: "If, after notice and a reasonable opportunity to respond, the court determines that Rule 11(b) has been violated, the court may impose an appropriate sanction on any attorney, law firm, or party that violated the rule or is responsible for the violation." However, "[t]he court must not impose a monetary sanction . . . against a represented party for violating Rule 11(b)(2)." Fed. R. Civ. P. 11(c)(5)(A).

Applying Rule 11 "requires sensitivity to two competing considerations." *United Nat'l Ins. Co. v. R&D Latex Corp.*, 242 F.3d 1102, 1115 (9th Cir. 2001). "On the one hand, . . . on occasion attorneys engage in litigation tactics so vexatious as to be unjustifiable even within the broad bounds of our adversarial system, and . . . neither the other parties nor the courts should have to abide such behavior or waste time and money coping with it." *Id.* Thus, "the central purpose of Rule 11 is to deter baseless filings." *Cooter & Gell v. Hartmarx Corp.*, 496 U.S. 384, 393 (1990). "On the other hand, . . . our system of litigation *is* an adversary one, and . . . presenting the facts and law as favorably as fairly possible in favor of one's client is the nub of the lawyer's task." *United Nat'l Ins. Co.*, 242 F.3d at

- 4 -

1115. Sanctions therefore should be imposed "only in the most egregious situations, lest lawyers be deterred from vigorous representation of their clients." *Id.* (citation omitted).

Where "a complaint is the primary focus of a Rule 11 proceeding, a district court must conduct a two-prong inquiry to determine (1) whether the complaint is legally or factually baseless from an objective perspective, and (2) if the attorney has conducted a reasonable and competent inquiry before signing and filing it." *Holgate v. Baldwin*, 425 F.3d 671, 676 (9th Cir. 2005) (quoting *Christian v. Mattel, Inc.*, 286 F.3d 1118, 1127 (9th Cir. 2002)). The complaint need not be wholly baseless to be sanctionable: A partially supported, partially unsupported filing may still be sanctionable. *See Townsend v. Holman Consulting Corp.*, 929 F.2d 1358, 1362–65 (9th Cir. 1990) ("The relation of the allegedly frivolous claim to the pleading as a whole is thus a relevant factor, but the mere existence of one non-frivolous claim is not dispositive. . . ."). Nor does a subjective good faith belief provide safe harbor. Rule 11's objective standard eliminates the "empty-head pure-heart" justification for frivolous arguments. *Smith v. Ricks*, 31 F.3d 1478, 1488 (9th Cir. 1994).

In assessing the pre-filing inquiry required under Rule 11, the court's task is to determine "whether an attorney, after conducting an objectively reasonable inquiry into the facts and law, would have found the complaint to be well-founded." *Holgate*, 425 F.3d at 677 (citation omitted). The court must consider "all the circumstances of a case," *Cooter*, 496 U.S. at 401, focusing on the information available when the paper is filed. *See Golden Eagle Dist. Corp. v. Burroughs Corp.*, 801 F.2d 1531, 1538 (9th Cir. 1986). Courts consider factors including time constraints and deadlines, the complexity of the subject matter and the party's familiarity with it, and the ease of access to the requisite information. *See CG Int'l Co. v. Rochem Int'l, Inc., USA*, 659 F.3d 53, 63 (1st Cir. 2011); *Garr v. U.S. Healthcare, Inc.*, 22 F.3d 1274, 1279 (3d Cir. 1994); *Townsend*, 929 F.2d at 1364.

**B.    28 U.S.C. § 1927**

Section 1927 provides: "Any attorney . . . who so multiplies the proceedings in any case unreasonably and vexatiously may be required by the court to satisfy personally the excess costs, expenses, and attorneys' fees reasonably incurred because of such conduct."

1

2

3

In other words, the statute "authorizes the imposition of sanctions against any lawyer who wrongfully proliferates litigation proceedings once a case has commenced." *Pac. Harbor Capital, Inc. v. Carnival Air Lines, Inc.*, 210 F.3d 1112, 1117 (9th Cir. 2000).

4

5

6

7

8

9

10

11

12

13

"Sanctions pursuant to section 1927 must be supported by a finding of subjective bad faith." *Blixseth v. Yellowstone Mtn. Club, LLC*, 796 F.3d 1004, 1008 (9th Cir. 2015) (quoting *New Alaska Dev. Corp. v. Guetschow*, 869 F.2d 1298, 1306 (9th Cir. 1989)). "Bad faith is present when an attorney knowingly or recklessly raises a frivolous argument or argues a meritorious claim for the purpose of harassing an opponent." *Id*. at 1007; *see also Fink v. Gomez*, 239 F.3d 989, 993 (9th Cir. 2001) ("[R]ecklessness suffices for section 1927."). Sanctions based on recklessness must be accompanied by a finding that the objectionable conduct is frivolous or was intended to harass. *In re Keegan Mgmt. Co., Secs. Litig.*, 78 F.3d 431, 436 (9th Cir. 1996). Section 1927, like Rule 11, is an extraordinary remedy that courts should exercise with caution. *Id.* at 437.[1]

14

## III.   ANALYSIS

15

### A.     Rule 11

16

17

18

19

20

21

22

The Maricopa County Defendants argue that Rule 11 sanctions are warranted against Plaintiffs and their counsel because they made false allegations in violation of Rule 11(b)(3), asserted untenable and unsupported claims for relief in violation of Rules 11(b)(2) and 11(b)(3), and brought this case for an improper purpose in violation of Rule 11(b)(1). (Mot. at 1, 7–11.) The Court assesses these arguments in turn. For the purposes of its analysis in this section, the Court uses the term "Plaintiffs" generally, without yet deciding whether Plaintiffs or their counsel, or both, are responsible for any violations of Rule 11.

23

24

25

26

27

28

---

[1] In addition to its authority under Rule 11 and 28 U.S.C. § 1927, the Court possesses inherent authority to sanction conduct "which abuses the judicial process." *Chambers v. NASCO, Inc.*, 501 U.S. 32, 44–45 (1991). The Maricopa County Defendants have not invoked the Court's inherent authority, which the Court finds unnecessary to raise *sua sponte* in light of its rulings under Rule 11 and Section 1927.

### 1.    Allegations Regarding the Use of Paper Ballots

The Maricopa County Defendants argue that Plaintiffs made false allegations and representations that Arizona voters do not vote by hand on paper ballots. (Mot. at 1, 2–4, 8.)[2] This is an important issue, which the Court discussed in detail in its Dismissal Order:

> When the time to vote arrives, every Arizona voter casts a ballot by hand, on paper. This is the law. *See* A.R.S. §§ 16-462 (primary election ballots "shall be printed"), 16-468(2) ("Ballots shall be printed in plain clear type in black ink, and for a general election, on clear white materials"), 16-502 (general election ballots "shall be printed with black ink on white paper"). Arizona's statutes carve out one exception to this rule—voters with disabilities may vote on "accessible voting devices" (sometimes referred to as "ballot marking devices," or "BMDs"), but these devices still must produce a paper ballot or voter verifiable paper audit trail, which the voter can review to confirm that the machine correctly marked his or her choices, and which can be used in the event of an audit. 7 A.R.S. §§ 16-442.01; § 16-446(B)(7); 2019 [Elections Procedures Manual] at 80. . . . In the 2020 general election, 2,089,563 ballots were cast in Maricopa County, and only 453 of those were cast using an accessible voting device. (Tr. 174:24–175:4.)

(Dismissal Order at 8–9.) In short, it cannot be disputed that Arizona already requires and uses paper ballots. Allegations to the contrary are simply false.

Plaintiffs argue that they never alleged that Arizona does not use paper ballots. (Resp. at 7–9.) In fact, they contend that the FAC either "presumes that Arizona uses paper ballots" (*id*. at 8), or "implicitly acknowledges that Arizona uses paper ballots." (*Id*. at 9.) And they urge the issue is immaterial in any event because the use of paper ballots has no effect on the substance of their claims, which they say focus on "prohibition of the counting and tabulation of ballots using 'centralized machine-counting or computerized optical scanners.'" (*Id*. at 8–9, citing FAC ¶¶ 14–15, 57, 67–68, 154, 167, 170, 174.)

---

[2] Plaintiffs fault the Maricopa County Defendants for failing to cite to the allegations that the Defendants contend to be false. (Resp. at 7, 9, 10, 14–15.) While it is true that the Maricopa County Defendants do not provide such citations in the "Legal Argument" section of their Motion, they provide citations to the FAC and MPI in a preceding section titled "Plaintiffs' false allegations and misleading 'evidence.'" (Mot. at 2–5.) Plaintiffs responded in detail to these citations in their Response. (Resp. at 7–15.) Thus, the Motion sufficiently "describe[d] the specific conduct that allegedly violates Rule 11(b)" such that Plaintiffs had and were afforded sufficient "notice and a reasonable opportunity to respond." *See* Fed. R. Civ. P. 11(c)(1), (2).

These statements are wrong. The FAC did not presume that Arizona uses paper ballots and, in fact, alleged and implied the contrary. This is clear from the outset. Paragraph 7 of the FAC summarizes the case:

> Through this Action, Plaintiffs seek an Order that Defendants *collect and count* votes through a constitutionally acceptable process, which relies on tried and true precepts that mandates [sic] integrity and transparency. *This includes votes cast by hand on verifiable paper ballots that maintains voter anonymity*; votes counted by human beings, not by machines; and votes counted with transparency, and in a fashion observable to the public.

(FAC ¶ 7 (emphasis added).) Paragraph 153 is more explicit, stating that "Plaintiffs seek for the Court to Order, an election conducted by paper ballot, as an alternative to the current framework." (*Id*. ¶ 153.) An "alternative" framework is necessarily one not currently used.

Plaintiffs argue that "none of these paragraphs say that Arizona does not use paper ballots." (Resp. at 7–8.) That is true only in the most facile sense. A more reasonable reading of these paragraphs—the only reasonable reading—is that Plaintiffs requested that the Court order Arizona to do something that they contend it is not currently doing: to use paper ballots. Moreover, even if Plaintiffs' characterization of these paragraphs were correct, it would only serve to establish that a central component of Plaintiffs' request for injunctive relief—requiring Arizona to use paper ballots—was entirely frivolous because Defendants are already doing what Plaintiffs want them to do.

There is more. Paragraphs 58 to 60 of the FAC raise concerns regarding Arizona's purported move from an "auditable paper-based system" to a "computer-based system":

> 58.    Prior to 2002, most states, including Arizona, conducted their elections overwhelmingly using relatively secure, reliable, and auditable paper-based systems.

> 59.    After the recount of the 2000 presidential election in Florida and the ensuing *Bush v. Gore* decision, Congress passed the Help America Vote Act in 2002. In so doing, Congress opened the proverbial spigot. Billions of federal dollars were spent to move states, including Arizona, from paper-based voting systems to electronic, computer-based systems.

> 60.    Since 2002, elections throughout the United States have increasingly and largely been conducted using a handful of computer-based election management systems. These systems are created, maintained, and

administered by a small number of companies having little to no transparency to the public, producing results that are far more difficult to audit than paper-based systems, and lack any meaningful federal standards or security requirements beyond what individual states may choose to certify. Leaders of both major parties have expressed concern about this lack of transparency, analysis and accountability.

(FAC ¶¶ 58–60.) Plaintiffs argue that "in the context of the full Complaint, the[se] allegation[s] refer[] to the systems used to count and tabulate votes." (Resp. at 8.) Not so. The section that follows these introductory paragraphs includes numerous allegations about the vulnerabilities of machines by which voters cast ballots, including direct-recording electronic voting machines ("DREs") and ballot marking devices ("BMDs"), not only those which count and tabulate votes. (*See, e.g.*, FAC ¶¶ 68, 77, 78, 84, 102, 104, 139.)

More fundamentally, a move from an "auditable paper-based voting system" to an "electronic, computer-based system" more than implies a transition away from paper ballots. Put differently, a system that uses paper ballots for recording votes and electronic machines for tabulating them remains a "paper-based voting system." *See* U.S. Election Assistance Commission Glossary of Terms Database, https://www.eac.gov/glossary/p (defining "Paper-Based Voting System" as a "voting system that records votes, counts votes, and tabulates the vote count, using one or more ballot cards or paper ballots"). Evidence submitted by Plaintiffs describes Dominion's DVS 5.5-B voting system, which is used in Maricopa County and features prominently in Plaintiffs' allegations, as a "paper-based optical scan voting system with a hybrid paper/DRE option." (Doc. 42-1, Decl. of Andrew D. Parker, Ex. C at 1.) Thus, contrary to Plaintiffs' allegations, Arizona's voting system remains paper based. If it were otherwise, the Cyber Ninjas would not have been able to conduct the audit of paper ballots Plaintiffs allege to be a "proof-of-concept" for a full hand count. (FAC ¶¶ 70, 155.)

The section of the FAC titled "Imminent Injury" also contains allegations that Arizona voters, including Plaintiffs, cast their ballots by electronic voting machines. Paragraph 168 alleges that "Plaintiff Lake intends to vote in the Midterm Election in

Arizona. To do so, she will be required to cast her vote, and have her vote counted, through electronic voting systems." (FAC ¶ 168.) Paragraph 171 makes the same allegation as to Plaintiff Finchem. (*Id*. ¶ 171.) These assertions are wrong: Plaintiffs are not required under Arizona's current procedures to "cast [their] vote[s]" "through electronic voting systems."[3] Indeed, Defendants have submitted evidence indicating Plaintiffs themselves have voted on paper ballots for nearly twenty years. (Doc. 29-16, Lake and Finchem Voter Files.)[4]

Plaintiffs are wrong that the FAC presumes that Arizona uses paper ballots because the FAC attacks Arizona's use of optical scanners. (Resp. at 8, 9.) In fact, the FAC also attacks the use of "electronic voting machines" and "electronic voting systems," which are conspicuously broader terms than "optical scanners." (*See, e.g.*, FAC ¶¶ 1, 2, 4, 5, 10, 17, 24–28, 30–34, 57–61, 69, 72, 74, 76, 84, 89, 90, 92, 102, 117, 125, 144, 152.) Plaintiffs' expert, Douglas Logan, testified that these terms broadly "refer to any computerized devices or equipment utilized to cast, print, count, tabulate, process, and/or store ballot images and/or election results." (Doc. 39, Decl. of Douglas Logan ¶ 15.) Using these broader terms allowed Plaintiffs to misleadingly analogize the machines used in Arizona to those used in other jurisdictions, including machines at issue in the *Curling v. Raffensperger* case in the Northern District of Georgia. (*See, e.g.*, FAC ¶¶ 4, 81–84, 139, 146.) The FAC cited to the *Curling* court's assessment that electronic voting machines were vulnerable to manipulation or interference, quoting the court's warning that "this is not a question of 'might this actually ever happen?'—but 'when it will happen.'" (*Id*. ¶ 84.) However, as the Court previously noted, the *Curling* case is nothing like this one, in part

---

[3] The Maricopa County Defendants did not cite Paragraphs 168 and 171 in their Motion. (*See* Mot. at 2–4, 8.) Thus, there is at least the possibility of an issue whether Plaintiffs were given sufficient notice that these paragraphs were potentially sanctionable. Out of an abundance of caution, the Court refrains from considering these paragraphs to be sanctionable as false allegations regarding Arizona's use of paper ballots. However, the Court considers them for the purposes of evaluating the arguments Plaintiffs make in their Response generally characterizing the FAC's allegations.

[4] On June 7, 2022, the Maricopa County Defendants filed a Motion for Judicial Notice (Doc. 29), in which they requested the Court to take judicial notice of certain government documents. (Docs. 29-2—29-18.) In its Dismissal Order, the Court granted the Motion—which Plaintiffs partially opposed—only as to the government documents referenced in that Order. (Dismissal Order at 7 n.5.) The Court now reconsiders and grants the Motion as to the additional government documents referenced in this Order.

- 10 -

because Arizona, unlike Georgia, uses paper ballots. (*See* Dismissal Order at 8 n.7, 14–15.) Indeed, in the passage Plaintiffs quoted in the FAC, the *Curling* court was describing risks posed to BMDs—not optical scanners—and gave the quoted warning in the context of denying a request to replace Georgia's mandatory BMD system with "a statewide hand-marked paper ballot system"—the kind of system that Arizona already uses. *See* 493 F. Supp. 3d 1264, 1341–42 (N.D. Ga. 2020).

Similarly, the FAC cited to testimony before the Senate Rules and Administration Committee by Dara Lindenbaum, then the nominee for Federal Elections Commissioner, about allegations that "voting machines were used to illegally switch votes from one candidate to another during the 2018 election in Georgia." (FAC ¶ 102 & n.21.) However, in the video testimony linked in the FAC, Ms. Lindenbaum testified that these allegations concerned "DRE machines with no paper trail." *See* Forbes Breaking News, "'I'm a Little Bit Puzzled By That Answer': Cruz Grills FEC Nominee On Stacey Abrams' Concession," YouTube (Apr. 7, 2022), https://www.youtube.com/watch?v=wCPLL_D_spc, at 2:47–3:37. As noted, unlike the systems at issue in Georgia, Arizona's machines produce a voter-verifiable paper audit trail even as to those few votes cast electronically.

Thus, Plaintiffs' argument that the FAC merely "attacks Arizona's use of optical scanners to count votes" (Resp. at 8) is incorrect. Not only did the FAC use the broader terms "electronic voting machines" and "electronic voting systems" in misleadingly analogizing to machines used in other jurisdictions; it specifically attacked the use of both "optical scanners and ballot marking devices." (FAC ¶ 23.) But the overwhelming majority of Arizona voters—99.98% of voters in the 2020 general elections in Maricopa County, for example—do not use BMDs to cast their votes. (Tr. 174:24–175:7.) The FAC variously alleged that "some" (FAC ¶¶ 16, 57) or "many" Arizona voters cast their votes use BMDs. (*Id*. ¶¶ 68, 167.) While it is true, as Plaintiffs note (Resp. at 8), that these allegations may be reasonably read to imply that other Arizona voters use paper ballots, they did not cure the FAC's other allegations and overarching implication that Arizona does not have an auditable, paper-ballot based voting system.

The Maricopa County Defendants contend that Plaintiffs continued to make false representations about the use of paper ballots in their MPI. (Mot. at 3–4, citing MPI at 2; *see also* Mot. at 8.)[5] An introductory paragraph of the MPI reads:

> Experience has now shown the move to *computerized voting* in Arizona was a mistake—an unnecessary, unsecure change that opened election results to manipulation by unauthorized persons. This is not a partisan issue. Experts across the political spectrum have long sounded the alarm about the inherent insecurity and lack of transparency in *computerized voting systems* such as those used in Arizona. It is time to reverse this mistake. The right to vote is constitutionally guaranteed. *Computerized voting systems* leave an open door for votes to be changed, deleted, or fabricated in violation of constitutional requirements. *A return to the tried-and-true paper ballots of the past—and of the present, in countries like France, Taiwan, and Israel—is necessary.*

(MPI at 2 (emphasis added).) In their Response, Plaintiffs argue that their use of the term "computerized voting" is accurate because "[Arizona's] is a computerized voting system, notwithstanding the role that paper ballots play in it, because the *outcomes of the election contests* are determined by what computers *do* with the paper ballots." (Resp. at 14 (emphasis in original).) Even viewing the term "computerized voting" in isolation, the Court is not persuaded. In any event, the MPI does not use the term in isolation. The preceding paragraph contrasts "electronic, computerized voting systems" with the prior practice by which "American voters recorded their votes by hand on paper ballots that were counted by human beings." (MPI at 1.) Moreover, the MPI directly states that a "return to . . . tried-and-true paper ballots . . . is necessary" (*id*. at 2), clearly implying that Arizona does not currently use paper ballots. If it did, then this statement would be meaningless and therefore a central component of Plaintiffs' request for injunctive relief would be frivolous.

Finally, Plaintiffs argue that any allegations or implications that Arizona does not use paper ballots are not sanctionable because the use of paper ballots is immaterial to their

---

[5] In their Response, Plaintiffs do not specifically address the Maricopa County Defendants' arguments about these allegedly false statements in the MPI. (*See* Resp. at 7–9.) As noted in Footnote 2, *supra*, Plaintiffs fault the Maricopa County Defendants for failing to cite to their allegedly false statements. (*Id*. at 7, 9, 10, 12, 14–15.) But the Maricopa County Defendants provided citations to the allegedly false statements in the MPI in the section of their Motion titled "Plaintiffs' false allegations and misleading 'evidence.'" (Mot. at 2–4, citing MPI at 2.) The Court therefore considers whether the cited statements in the MPI are sanctionable, notwithstanding Plaintiffs' failure to address them in their Response.

claims. (Resp. at 8–9.) Plaintiffs cite, for example, to the Second Circuit's opinion in *Kiobel v. Millson* for the proposition that "even literally false minor overstatement error 'does not violate Rule 11' where 'pleading as a whole remains well grounded in fact.'" (*Id.* at 8, citing 592 F.3d 78, 83 (2d Cir. 2010) (quotation omitted).) But the Ninth Circuit long ago expressly rejected the "pleading-as-a-whole" rule. *See Townsend*, 929 F.2d at 1362–65 (overruling *Murphy v. Bus. Cards Tomorrow, Inc.*, 854 F.2d 1202, 1205 (9th Cir. 1988)).

Instead, the Ninth Circuit instructs that courts may consider the relation of the unsupported portion of the complaint to the pleading as a whole. *See Townsend*, 929 F.2d at 1363–65. Here, Plaintiffs' misrepresentations about Arizona's use of paper ballots played a central role in the purported basis for Plaintiffs' claims. By alleging and implying that Arizona does not currently have an auditable paper-ballot system, Plaintiffs set up a strawman, constructed in substantial part based on the *Curling* case and concerns about voting machines in other jurisdictions. But the strawman was just that. Arizona already follows the course to "eliminate or greatly mitigate" the risks of manipulation and interference that Prof. Halderman recommended in the *Curling* litigation: It uses paper ballots and reserves BMDs for the small number of voters who need or request them. (*See* Dismissal Order at 8–9 & n.7, quoting Halderman Dec. 33, Doc. 1304-3, *Curling v. Raffensperger*, No. 1:17-CV-2989-AT (N.D. Ga. Feb. 3, 2022).) And again, even those BMD-assisted voters produce a paper ballot or voter-verifiable paper audit trail. (*Id.*)[6]

---

[6] On the day of the 2022 midterm election, Maricopa County officials stated that equipment problems affected at least 30% of the County's voting centers. Robert Anglen *et al.*, "It all turns on Maricopa County: Takeaways from a day of glitches, conspiracies and a lawsuit," *The Arizona Republic* (Nov. 9, 2022), https://www.azcentral.com/story/news/politics/elections/2022/11/09/maricopa-county-election-glitches-conspiracies-and-lawsuit/8312190001/. In a video, Defendant Gates, Chairman of the Maricopa County Board of Supervisors, stated that the County would proceed to tabulate at the County's Ballot Tabulation Center the ballots that the tabulators at the voting centers were unable to read. *Id.* According to press reports, officials with the U.S. Cybersecurity and Infrastructure Security Agency ("CISA") said that CISA saw no specific or credible threat to disrupt election infrastructure or election day operations, that the issue in Maricopa County appeared to be a fairly routine technical glitch, and that Arizona's use of paper ballots would provide opportunities to verify—and audit—the votes if necessary. *Id.* The Court's observation regarding these day-of-vote issues would seem to underscore the significance of Arizona's use of auditable paper ballots. However, this observation plays no part in the Court's decisions herein.

1

2.      **Allegations Regarding Testing of Arizona's Election Equipment**

2   The Maricopa County Defendants argue that the FAC made false allegations that

3   Arizona's tabulation machines are not independently tested by experts. (Mot. at 2–3, citing

4   FAC ¶¶ 20, 57, 69; *see also* Mot. at 8.) Plaintiffs respond that none of the cited paragraphs

5   in the FAC say that Arizona does not test its tabulation machines. (Resp. at 9–10.) But they

6   nonetheless further question whether such testing took place, contending that "[a] statutory

7   requirement of testing does not prove that testing actually occurred." (*Id*.) Finally, they

8   dispute that the testing and certification procedures used in Arizona "constitute neutral,

9   expert analysis," and therefore argue that the FAC's allegations merely reflect a reasonable

10  difference of opinion between the parties that is not sanctionable under Rule 11. (*Id*.)

11  Of the three paragraphs cited by Defendants on this point, the Court agrees with

12  Plaintiffs that Paragraph 69 is not sanctionable because it arguably refers to Dominion's

13  purported failure to subject its machines to testing, rather than Arizona's failure to test its

14  machines. The other two are not so ambiguous, however. Paragraph 20 alleges that the

15  Secretary's "certification of the Dominion Democracy Suite 5.5b voting system, as well as

16  its component parts, was improper, *absent objective evaluation*." (FAC ¶ 20 (emphasis

17  added).) Paragraph 57 alleges that "Arizona intends to rely on electronic voting systems to

18  record some votes and to tabulate *all* votes cast in the State of Arizona in the 2022 Midterm

19  Election, *without disclosing the systems and subjecting them to neutral, expert analysis*."

20  (*Id*. ¶ 57 (first emphasis in original and second emphasis added).) These are allegations that

21  Arizona's electronic voting systems have not been subjected to objective evaluation or

22  neutral, expert analysis. And they are wrong. As the Court previously discussed, Arizona's

23  equipment undergoes thorough testing by independent, neutral experts with the Secretary

24  of State's Certification Committee and a testing laboratory accredited by the Election

25  Assistance Commission ("EAC").[7] (*See* Dismissal Order at 6–7 and documents cited

26

27  [7] The EAC is an independent federal agency that was established by the Help America
    Vote Act of 2022 and is charged with providing for "the testing, certification,
    decertification, and recertification of voting system hardware and software by accredited
28  laboratories." 52 U.S.C. § 20971(a)(1).

therein.) For example, Maricopa County's equipment was tested by Pro V&V, an EAC-accredited testing laboratory, and tested—in public—by the Secretary of State's Equipment Certification Committee. (*See id.*) This is in addition to the County's testing of its equipment and the audits of vote-tabulation results. (*See id.* at 7–10 & n.6.)[8]

In their Response, Plaintiffs criticize the process by which Arizona's equipment is tested and argue that the parties may reasonably dispute whether the process constitutes "objective evaluation" or "neutral, expert analysis." (Resp. at 10.) At bottom, however, Plaintiffs' concerns are about the sufficiency and reliability of Arizona's testing process. But the FAC does not merely allege that testing of Arizona's equipment is insufficient or unreliable; it alleges that the equipment has not been subjected to objective evaluation or neutral, expert analysis, which is not true. Plaintiffs and their experts may be entitled to opine about the sufficiency of the testing that Arizona's machines undergo, but they are not entitled to allege that no such testing takes place.

### 3.    Allegations Regarding the Lack of Vote-Verifying Audits

The Maricopa County Defendants argue that Plaintiffs' FAC falsely alleged that Arizona's tabulation results are not subject to vote-verifying audits. (Mot. at 2–3, citing FAC ¶¶ 23, 72, 144–52; *see also* Mot. at 8.) Plaintiffs respond that Defendants mischaracterize the FAC. (Resp. at 10–12.) They argue that the FAC does not allege that Arizona does not conduct audits; it contests the sufficiency of the audits. (*Id.*)

While this issue presents a closer call, the Court agrees with Plaintiffs that the FAC did not directly allege that Arizona's tabulation results are not audited. Paragraphs 23 and 72 allege that Arizona's voting machines cannot deliver accurate results, and therefore comport with constitutional and statutory requirements, "without objective evaluation," in part because the machines "lack adequate audit capacity." (FAC ¶¶ 23, 72.) On their own, these paragraphs may be reasonably read as an assertion that Arizona's tabulation results are not objectively evaluated, which, as discussed, is not true. However, Paragraphs 144 to

---

[8] As to whether testing in fact occurred, Plaintiffs' expert, Douglas Logan, testified he was aware that Arizona's system was EAC certified and subjected to logic and accuracy testing, though he criticized the sufficiency and reliability of those processes. (Tr. 62:11—65:13.)

152 subsequently allege that Arizona's existing audit regime is insufficient, necessarily implying that such a regime exists. (*Id.* ¶¶ 144–52.)

### 4.  Allegations Regarding the Cyber Ninjas' Hand Count in Maricopa County

Defendants label as untrue the FAC's "allegation that '[t]he recent hand count in Maricopa County, the second largest voting jurisdiction in the United States, offers Defendant Hobbs a proof-of-concept and a superior alternative to relying on corruptible electronic voting systems.'" (Mot. at 3, quoting FAC ¶ 155; *see also* Mot. at 8.) Plaintiffs counter that whether the Cyber Ninjas' hand count can be characterized as a "proof-of-concept and a superior alternative" is a matter of judgment. (Resp. at 12–13.) They argue that the word "superior" should be interpreted as a measure of "transparency" rather than "speed or cost," and that the Cyber Ninjas "showed a hand count can be done; it does not show the optimized method of doing it." (*Id.*)

Setting aside issues concerning the reliability of the Cyber Ninjas' audit, it strains credulity to characterize the hand count as a proof-of-concept that a full hand count is "feasible"—let alone a "superior alternative." Arizona law requires that county boards of supervisors canvass general elections within twenty days after the election. A.R.S. § 16-642(A). Mr. Logan testified that in the Cyber Ninjas' hand count, it took roughly 2,000 people more than two-and-a-half months to hand count only two (out of several dozen) contests on each ballot in only one of Arizona's fifteen counties. (Tr. 71:20–74:4.) Scott Jarrett, the co-director of the Maricopa County Elections Department, estimated that a full hand count for the 2022 midterm election in Maricopa County alone would require hiring 25,000 temporary workers and finding two million square feet of space. (Tr. 196:6–198:8.) He testified that with the County's current employees, "it would be an impossibility" to have the ballots counted to perform the canvass by the twentieth day after the election, as required by law. (Tr. 194:16–23.) In short, Plaintiffs' characterizations of the Cyber Ninjas' hand count would be wholly unpersuasive to any objective reader with

an understanding of the underlying facts. Nonetheless, the Court will treat Plaintiffs' incredible arguments on this point as such, rather than as false assertions of fact.

Defendants further assert that Plaintiffs made factual misstatements regarding Cyber Ninjas' findings that have been debunked. (Mot. at 3, citing FAC ¶¶ 70, 132, 164; *see also* Mot. at 8.) But the cited portions of the FAC quote and summarize the Cyber Ninjas' report and therefore do not constitute Plaintiffs' direct allegations, at least not in a manner the Court finds sanctionable. The Court notes, however, that Plaintiffs cherry-picked among the Cyber Ninjas' findings and ignored those that undermine their claims. They conspicuously failed to mention that the Cyber Ninjas' report states that "there were no substantial differences between the hand count of the ballots provided and the official election canvass results for Maricopa County. This is an important finding because the paper ballots are the best evidence of voter intent and there is no reliable evidence that the paper ballots were altered to any material degree." *Maricopa County Forensic Election Audit, Volume I* at 1 (Sept. 24, 2021), https://www.azsenaterepublicans.com/_files/ugd/2f3470_a91b5cd3655445b498f9acc63d b35afd.pdf.

### 5.     Allegations Regarding the Internet Connectivity of Maricopa County's Elections Systems

Defendants argue that "the entire FAC is premised on the erroneous theory that machine counting of ballots is unreliable because the machines used are 'potentially susceptible to malicious manipulation that can cause incorrect counting of votes' and these alleged vulnerabilities stem from the possibility that the machines 'can be connected to the internet.'" (Mot. at 5, quoting FAC ¶¶ 26, 33; *see also* Mot. at 5, citing FAC ¶¶ 70, 132, 164; *see also* Mot. at 8.) Plaintiffs respond that their allegations about the internet connectivity of Maricopa County's systems are well-founded. (Resp. at 14.)

To support their argument, Plaintiffs cite to the testimony of their expert, Benjamin Cotton, who analyzed election systems provided by Maricopa County during the Cyber Ninjas' audit. (Resp. at 14, citing Tr. 27:2–29:13.) In the cited portion of his testimony,

Mr. Cotton testified that he saw "actual evidence of remote log-ins into [Maricopa County's election management server]." (Tr. 27:2–7.) When asked "whether those were permissible or security breach," he responded: "The attributable log-ins—because I did see some anonymous log-ins that I could not trace back to an event. The ones that I saw came from the local EMS subnet, if you will, the IP address that—for the voting system." (Tr. 27:8–13.) Mr. Cotton's testimony is somewhat unclear, but to the extent it refers to the findings in the Cyber Ninjas' report that an "anonymous user" accessed Maricopa County's EMS server, the County asserted that those findings are false because "[t]hese logged actions are simply part of the EMS server protocols and standard Microsoft functions." (Doc. 29-14, *Correcting the Record* at 34–35.) Mr. Cotton further testified that "each of the Dell computers that were within that system did have wifi cards and that those wifi cards had been registered as a network on the computing devices." (Tr. 27:18–28:11.) When asked if he was describing a "hotspot" and whether "[i]f someone gained access, they could utilize the hotspot to gain access," Mr. Cotton responded: "Sure, yeah. That would give access to the Internet." (Tr. 28:12–17.) He proceeded to give examples of breaches through other air-gapped systems not used by Maricopa County. (Tr. 29:16–28:6.)

In March 2022, the Special Master designated by the Arizona State Senate and Maricopa County to examine the County's election network and equipment reported finding "NO evidence that the routers, managed switches, or electronic devices [in Maricopa County's Ballot Tabulation Center] connected to the public Internet." (Doc. 37, Decl. of Benjamin R. Cotton, Ex. H, *Answers to Senate Questions Regarding Maricopa County Election Network* (Mar. 23, 2022) at 10.) The Special Master stated that Maricopa County uses an air-gapped system that "provides the necessary isolation from the public Internet, and in fact is in a self-contained environment" with "no wired or wireless connections in or out of the Ballot Tabulation Center," and "[a]s such, the election network and election devices cannot connect to the public Internet." (*Id.* at 10–11.) The Special Master's findings are consistent with what the County has long maintained (*see, e.g.*, Doc. 29-14, *Correcting the Record* at 36–44), and what previous audits have likewise

concluded. (*See, e.g.*, Doc. 29-8, SLI Compliance, *Forensic Audit Report: Dominion Voting Systems, Democracy Suite 5.5B* at 14–16 (Feb. 23, 2021).)

Although Plaintiffs' claims that Maricopa County's systems can be or have been connected to the internet are in direct contradiction to the County Defendants' evidence and the Special Master's findings, the Court will treat them as unpersuasive arguments rather than as false assertions of fact, allowing Plaintiffs the benefit of the doubt. However, the Court notes that to rely on the Cyber Ninjas' findings on this issue, without mentioning in the FAC that the Special Master contradicted those findings, is misleading. Litigants are entitled to raise disputed issues, but they may not misrepresent or withhold material facts that refute their allegations. *See Burroughs*, 801 F.2d at 1539 (finding "no quarrel" with the district court's admonition that the "omission of critical facts" may be sanctionable under Rule 11). Nonetheless, the Court does not deem this issue sanctionable here.

### 6.     Unsupported Claims Based on Speculation and Conjecture

The Maricopa County Defendants argue that Plaintiffs violated Rules 11(b)(2) and (b)(3) by pursuing untenable and unsupported claims based on conjecture and speculation—claims that are, in a word, frivolous. (Mot. at 2, 8–9.) They point to Plaintiffs' reliance on "testimony and allegations that are entirely unrelated to elections in Arizona" (*id.* at 4, citing FAC ¶¶ 73–89, 125–31, 133, 134); Plaintiffs' allegations concerning alleged foreign manufacture of election machines that fail to identify specific machines or parts (*id.*, citing FAC ¶¶ 90–92); and Plaintiffs' tangential discussion of "open source" technology. (*Id.*, citing FAC ¶¶ 108–24.) Defendants further cite to their Response to Plaintiffs' MPI (Doc. 57), in which they discussed Plaintiffs' reliance on the distinguishable *Curling* case (*id.* at 3–4); Plaintiffs' use of out-of-context quotations and testimony in other proceedings (*id.* at 4–5); and Plaintiffs' reliance on a recent statement from the U.S. Cybersecurity and Infrastructure Agency ("CISA") concerning vulnerabilities in a version of Dominion's DVS 5.5 voting system that Arizona does not currently use. (*Id.* at 5.) What Plaintiffs failed to allege, Defendants argue, is that Arizona's

ballot tabulation equipment has ever been hacked or manipulated or improperly counted votes—"because no such evidence exists." (Mot. at 8.)

Plaintiffs counter that their claims are well-founded and meritorious. (Resp. at 1-2.) They argue that the summary allegations in the FAC about the vulnerabilities of Arizona's voting machines are supported by detailed allegations which are, in turn, supported by the evidentiary record on Plaintiffs' MPI. (*Id*. at 1–4.) Plaintiffs discuss some of this evidence in their Response, including a declaration by Professor Walter Daugherity (Doc. 38) discussing his analysis of cast vote records from the 2020 general election in Maricopa and Pima Counties. (*Id*. at 3–6.) More fundamentally, Plaintiffs argue that

> even if no past manipulation of Arizona ballots had not been shown [sic], *an absence of undisputed evidence that a particular harm has happened before in a particular location does not prove that the harm cannot happen in the future, particularly where similar events have happened elsewhere*. . . . 'It hasn't happened here *yet*' does not prove 'it *can't* happen here.' It is not sanctionable to bring an action seeking to prevent a foreseeable and likely harm that has not yet happened here.

(Resp. at 5 (emphasis in original).) Because they put forth evidence from which "[i]t is reasonable to infer . . . that an electronic intrusion designed to take advantage of the vulnerabilities in Maricopa's electronic system and manipulate votes is likely to occur in the future," Plaintiffs assert their claims "are meritorious, not sanctionable." (*Id*. at 5–6.)

An in-depth discussion of Plaintiffs' allegations and supporting evidence is unnecessary here for the purposes of evaluating whether their claims rest on an adequate legal and factual basis. Whatever weight one assigns to Plaintiffs' evidence, an essential flaw remains in their overarching theory of the case. Simply put, there are yawning gaps between the factual assertions made, the harm claimed, and the ultimate relief requested.

Plaintiffs never put forth sufficient allegations about Arizona's election systems— let alone sufficient evidence to support any such allegations—to demonstrate a likelihood that Arizonans' votes would be incorrectly counted in the 2022 midterm election due to manipulation. The Court reached this conclusion in its Dismissal Order, where it ruled that Plaintiffs' claimed injuries were too speculative to meet the injury-in-fact requirement for

standing under Article III. (Dismissal Order at 13–16.) *See Clapper v. Amnesty Int'l USA*, 568 U.S. 398, 409 (2013) (holding that a threatened injury must be "actual or imminent" and "certainly impending" to confer Article III standing and that "allegations of possible future injury are not sufficient") (citations omitted). The Court explained:

> [A] long chain of hypothetical contingencies must take place for any harm to occur—(1) the specific voting equipment in Arizona must have "security failures" that allow a malicious actor to manipulate vote totals; (2) such an actor must actually manipulate an election; (3) Arizona's specific procedural safeguards must fail to detect the manipulation; and (4) the manipulation must change the outcome of the election. (*See* Doc. 62 at 2–3.) Plaintiffs fail to plausibly show that Arizona's voting equipment even has such security failures. And even if the allegations in Plaintiff's complaint were plausible, their alleged injury is not "certainly impending" as required by *Clapper*. 568 U.S. at 409.

(Dismissal Order at 14–15 (footnotes omitted).) The Court noted the numerous steps that Defendants have taken to ensure that the alleged security failures do not exist or occur, including extensive post-election audit procedures. (*Id*. at 15 nn.13, 14.)

At bottom, Plaintiffs' allegations raised questions about whether Arizona's voting machines are "potentially susceptible to malicious manipulation" (FAC ¶ 33), or "potentially unsecure" (*id*. ¶ 23), or have vulnerabilities that "at the very least, call into question" the results they produce (*id*. ¶ 69), but they went no further. A central theory of the FAC is that Arizona's voting machines cannot legally be used "unless and until the electronic voting system is made open to the public and subjected to scientific analysis by objective experts *to determine whether it is secure from manipulation or intrusion*." (FAC ¶ 1 (emphasis added); *see also, e.g.*, *id*. ¶¶ 6, 20, 23, 72.) This is speculative on its face. And in any event, Plaintiffs are not constitutionally entitled to their preferred voting methods. *See, e.g.*, *Weber v. Shelley*, 347 F.3d 1101, 1106–07 (9th Cir. 2003). They had the burden to plausibly allege that Arizona's use of electronic voting systems would violate their constitutional rights or federal law. They failed to do so. Indeed, they appeared to assume the very thing they had the burden to allege and ultimately prove, alleging that Defendants have "subject[ed] voters to cast votes on an illegal and unreliable system—a system that must be *presumed* to be compromised and incapable of producing verifiable

results." (*Id.* ¶ 181 (emphasis added).) But Plaintiffs never established any adequate factual or legal basis to support such a presumption.

Plaintiffs sought to fill the gap between their assertions about Arizona's voting equipment and their speculative conclusions about its vulnerability with allegations that were false and misleading, as the Court discussed above. The Court further agrees with the Maricopa County Defendants that Plaintiffs also sought to fill this gap with assertions regarding elections in other jurisdictions that provided little if any support for their claims and served only to muddy the waters. For example, as discussed above, Plaintiffs heavily relied on the *Curling* case in Georgia (*see, e.g.*, FAC ¶¶ 4, 81–84, 139, 146), despite the fact that Arizona, unlike Georgia, uses hand-marked paper ballots. In testimony before the Senate Select Committee on Intelligence—a transcript of which Plaintiffs included as an exhibit— Professor Halderman responded to a question about recommended actions for safeguarding elections by stating "[t]he most important things are to make sure we have votes recorded on paper, paper ballots, which just cannot be changed in a cyber attack . . . ." (Doc. 43, *Russian Interference in the 2016 U.S. Elections* at 91, S. Hrg. 115–92 (June 21, 2017).) Arizona has that, and has had it all along.

As the Maricopa County Defendants note, Plaintiffs raised other tangential allegations that provided little if any support for their claims, including vague allegations about foreign manufacture of election machines (FAC ¶¶ 90–92); digressions about "open source" technology (*id.* ¶¶ 117–23); and discussions of Dominion's DVS 5.5-A BMDs (*id.* ¶¶ 103–05) and CISA's report about potential vulnerabilities of these devices (MPI at 5 & n.2)—which again are the *prior* versions of the since-updated devices Maricopa County uses. (Doc. 57-1, First Decl. of Scott Jarrett ¶¶ 27–30.) Nor did the evidence Plaintiffs point to in their Response bring their claims out of the realm of speculation. Even if this evidence were sufficient to identify vulnerabilities—which the Court does not decide—it is insufficient to establish a likelihood that Arizonans' votes will not be correctly counted due to manipulation of electronic voting machines.

The relief that Plaintiffs sought in this case was remarkable. Mere months away from the 2022 midterm election, Plaintiffs requested, among other relief, an Order "declaring it unconstitutional for any public election to be conducted using any model of electronic voting system to cast or tabulate votes"; an injunction prohibiting Defendants from utilizing any of their electronic voting systems; and an Order that all Arizona ballots be cast on paper, by hand, and that every vote be counted, by hand, according to specific procedures outlined by Plaintiffs. (FAC at 49-50; *see also id.* ¶ 153.) Setting aside that the overwhelming majority of Arizona voters already cast paper ballots, the relief that Plaintiffs requested in this case would have called for a massive, perhaps unprecedented federal judicial intervention to overhaul Arizona's elections procedures shortly before the election. Plaintiffs bore a substantial burden to demonstrate that such an intervention was constitutionally required and in the public interest. Yet they never had a factual basis or legal theory that came anywhere close to meeting that burden. Underscoring just how far short of that heavy burden they fell, Plaintiffs failed to show that their preferred full hand count would be feasible or more accurate than Arizona's current procedures, as the Court previously discussed in denying Plaintiffs' MPI. (*See* Dismissal Order at 2 n.1.)

In sum, Plaintiffs lacked an adequate factual or legal basis to support the wide-ranging constitutional claims they raised or the extraordinary relief they requested. Plaintiffs filled the gaps between their factual assertions, claimed injuries, and requested relief with false, misleading, and speculative allegations. At its core, Plaintiffs' FAC presented mere conjectural claims of potential injuries. Rule 11 requires more. "While there are many arenas—including print, television, and social media—where protestations, conjecture, and speculation may be advanced, such expressions are neither permitted nor welcomed in a court of law." *King v. Whitmer*, 556 F. Supp. 3d 680, 689 (E.D. Mich. 2021).

### 7.    Failure to Conduct a Reasonable Pre-Filing Inquiry

Plaintiffs had plenty of time in which to thoroughly investigate the factual and legal basis for their claims. The statutory scheme that Plaintiffs sought to challenge in this case has authorized Arizona's counties to use vote-tabulation machines since at least 1966. (*See*

Doc. 29-15, 1966 Ariz. Sess. Laws 178–87.) The Secretary certified the Dominion DVS 5.5-B electronic voting systems that Plaintiffs sought to invalidate in November 2019. (Doc. 29-6, Certification Letter (Nov. 5, 2019).) Further, while the subject matter of this case is not simple, counsel for Plaintiffs have been involved in litigation concerning voting procedures before, including litigation involving unsupported claims about electronic voting machines. *See US Dominion, Inc. v. MyPillow, Inc.*, No. CV-21-0445 (CJN), 2022 WL 1597420, at *14 & n.11 (D.D.C. May 19, 2022) (ordering sanctions against Michael Lindell and his earlier counsel, whom counsel for Plaintiffs later replaced, for filing groundless and frivolous claims). As for Plaintiffs themselves, Mr. Finchem is a candidate for the state's chief election officer and Ms. Lake is a candidate for its top executive office.[9] Both have apparently voted on paper ballots for nearly twenty years. (Doc. 29–15, Lake and Finchem Voter Files.)

The circumstances of this case not only allowed for, but required, a significant pre-filing inquiry. As noted, Plaintiffs' requested relief called for a massive, late-breaking, and perhaps unprecedented federal judicial intervention in Arizona's elections. And although Plaintiffs asserted that this case was "not about undoing the 2020 presidential election" (FAC ¶ 8), the Court cannot ignore the dangers posed by making wide-ranging allegations of vote manipulation in the current volatile political atmosphere. Indeed, the Maricopa County Defendants raise troubling allegations about "the County's witnesses and counsel being confronted upon exiting the courtroom by someone who had watched the proceedings, who called them 'liars' and 'traitors.'" (Reply at 8.) As the court warned in *King v. Whitmer*, unfounded claims about election-related misconduct "spread the narrative that our election processes are rigged and our democratic institutions cannot be trusted. Notably, many people have latched on to this narrative, citing as proof counsel's submissions in this case." *King*, 556 F. Supp. 3d at 732. The Court shares this concern.

Plaintiffs evidently failed to conduct the factual and legal pre-filing inquiry that the circumstances of this case reasonably permitted and required. The Court need not conduct

---

[9] At the time the Court issued this Order, the results of the 2022 midterm election have not yet been certified; thus the Court deems all persons running still to be candidates.

a further evidentiary inquiry to make this finding. As discussed herein, any objectively reasonable investigation of this case would have led to publicly available and widely circulated information contradicting Plaintiffs' allegations and undercutting their claims. Thus, Plaintiffs either failed to conduct the reasonable factual and legal inquiry required under Rule 11, or they conducted such an inquiry and filed this lawsuit anyway. Either way, no reasonable attorney, "after conducting an objectively reasonable inquiry into the facts and law, would have found the complaint to be well-founded." *Holgate*, 425 F.3d at 677 (citation omitted).

### 8.   Improper Purpose

Finally, the Maricopa County Defendants argue that Plaintiffs and their counsel brought this lawsuit "for the improper purpose of undermining confidence in elections and to further their political campaigns." (Mot. at 9–10.) Defendants argue that even though Arizona has long used electronic voting machines, Plaintiffs waited to challenge Arizona's use of these systems until it was "politically profitable" because "they were running for statewide political office, [and] a significant portion of their likely voters had become erroneously convinced that the 2020 election was 'stolen.'" (*Id.* at 9.) Defendants point to statements by Plaintiff Finchem regarding his intention not to concede his election contest and to require a hand count of all ballots "if there's the slightest hint of any impropriety"— statements with which Plaintiff Lake apparently agreed. (*Id.*, citing Mary Jo Pitzl, "Setting up another conflict with Trump, Ducey endorses Beau Lane for Arizona secretary of state," *The Arizona Republic* (July 13, 2022), https://www.azcentral.com/story/news/politics/arizona/2022/07/13/arizona-gov-doug-ducey-endorses-beau-lane-secretary-state/10053166002/.)

Plaintiffs respond that the evidence of improper purpose cited by the Maricopa County Defendants merely shows that "Plaintiffs only recently became aware of the full extent of the problems with electronic election equipment," "genuinely believe hand counting is the only reliable means of counting votes,"[10] and "will not concede defeat in their

---

[10] In an election-night address posted to her Twitter account, Plaintiff Lake criticized the "incompetency" of Arizona's elections officials in light of the length of time it takes to

1   election contests without pursuing their rights to contest any impropriety." (Resp. at 6.)

2   Plaintiffs further argue that their claims are not frivolous and thus not sanctionable. (*Id*.)

3          While it is a very close call, the Court finds the record as it stands insufficient to

4   compel a finding as to whether Plaintiffs brought this lawsuit for an improper purpose. The

5   Court is not inclined to further develop the record on this issue, particularly in light of its

6   findings regarding other violations of Rules 11(b)(2) and 11(b)(3), as discussed above.

7   Rule 11 confers discretion, *see Perez v. Posse Comitatus*, 373 F.3d 321, 325–26 (2d Cir.

8   2004), and it counsels restraint. *See Keegan*, 78 F.3d at 437. The deterrent goal of Rule 11

9   can be furthered in this case without conducting further inquiry into the circumstances

10  under which this lawsuit was filed.

11         It should be clear, however, that the Court does not find that Plaintiffs have acted

12  appropriately in this litigation. The Court shares the concerns expressed by other federal

13  courts about misuse of the judicial system to baselessly cast doubt on the electoral process

14  in a manner that is conspicuously consistent with the plaintiffs' political ends. *See*

15  *O'Rourke v. Dominion Voting Systems, Inc.*, 552 F. Supp. 3d 1168, 1176 (D. Colo. 2021)

16  ("While Plaintiffs' counsel insist that the lawsuit was not intended to challenge the election

17  or reverse the results, the effect of the allegations and relief sought would be to sow doubt

18  over the legitimacy of the [subsequent] presidency and the mechanisms of American

19  democracy (the actual systems of voting) in numerous states."); *King*, 556 F. Supp. 3d at

20  689 ("[T]his case was never about fraud—it was about undermining the People's faith in

21  our democracy and debasing the judicial process to do so."); *Trump v. Clinton*, --- F. Supp.

22  3d ----, 2022 WL 16848187, at *5–8 (S.D. Fla. Nov. 10, 2022) ("The rule of law is

23  
_____

24  count and verify votes, stating: "We the people deserve to know, on election night, the
winner and the loser. And we will bring that kind of election back to Arizona, I assure you

25  of that." Kari Lake (@KariLake), Twitter (Nov. 8, 2022, 10:40 p.m.),
https://twitter.com/KariLake/status/1590217668849647616, at 4:15–55. Given how long it

26  takes to hand count ballots—according to Plaintiffs' own expert (Tr. 71:20–74:4), among
others—it is difficult, if not impossible, to square Plaintiff Lake's election-night statements

27  with her position in this litigation that a full hand count should be required. At a minimum,
her statements are inconsistent with a "genuine belief" that hand counts are the only reliable

28  means of counting votes. While the Court finds this inconsistency troubling, it concludes
the Twitter post should not form any part of its decision, as the post is outside the record
of the case.

undermined by . . . efforts to advance a political narrative through lawsuits without factual basis or any cognizable legal theory.").

**B.    28 U.S.C. § 1927**

The Maricopa County Defendants also argue that sanctions against Plaintiffs' counsel are independently warranted under 28 U.S.C. § 1927. (Mot. at 10–11.) They argue that Plaintiffs' counsel violated Section 1927 by making numerous false allegations and misrepresentations, pursuing baseless claims, and moving for preliminary injunctive relief even after counsel for Defendants alerted them that Plaintiffs' claims were time-barred and utterly lacking in support. (*Id.*) Defendants contend that the "inexplicable years-long delay in seeking injunctive relief" is further evidence that Plaintiffs' counsel have acted improperly. (Mot. at 11.)

Plaintiffs argue that Defendants' arguments fail because they do not show "that any proceeding was 'unreasonably' or 'vexatiously' multiplied," or provide evidence of subjective bad faith. (Resp. at 16–17.) With respect to delay, Plaintiffs draw comparisons to *Brown v. Board of Education*, 357 U.S. 483 (1954), and note that "[a] defendant's unconstitutional conduct is not immunized against legal challenge merely because a certain amount of time passes before a plaintiff decides to challenge it." (*Id.*)

The Court has already concluded that Plaintiffs' claims are frivolous in that they are "both baseless and made without a reasonable and competent inquiry." *Townsend*, 929 F.2d at 1362. It further agrees with Defendants that under the circumstances, it was objectively unreasonable and vexatious for Plaintiffs' counsel to initiate additional, time- and resource-intensive preliminary injunction proceedings based on frivolous claims and to continue making false and misleading representations about Arizona elections. The remaining question under Section 1927 is whether Plaintiffs' counsel acted recklessly or in bad faith. *See Blixseth*, 796 F.3d at 1008. The Court concludes they did.

Plaintiffs' counsel waited nearly seven weeks after filing this case to move for a preliminary injunction, despite alleging imminent and irreparable injury in their original Complaint. (*See* Compl. ¶¶ 156–66.) By the time of the MPI hearing on July 21, 2022, the

midterm election was fewer than four months away. As noted, the relief Plaintiffs requested was remarkable and perhaps unprecedented. And as the Maricopa County Defendants note, the timing of Plaintiffs' MPI resulted in "wasting the time of election employees on the eve of the August 2022 primary election and forcing the unnecessary expenditure of taxpayer resources." (Mot. at 11.) Further, Plaintiffs' counsel filed the MPI soon after counsel for the Maricopa County Defendants notified them as to the frivolousness of Plaintiffs' claims and the applicable bars to relief, including the *Purcell* doctrine.

Plaintiffs should have heeded the warning. In dismissing Plaintiffs' claims, the Court applied the *Purcell* doctrine, among others, and found that the relief Plaintiffs sought "would not just be challenging for Arizona's election officials to implement; it likely would be impossible under the extant time constraints." (Dismissal Order at 20.) Doctrinally and practically, the *Purcell* doctrine encapsulates a central problem of Plaintiffs' MPI:

> [T]he principle . . . reflects a bedrock tenet of election law: When an election is close at hand, the rules of the road must be clear and settled. Late judicial tinkering with election laws can lead to disruption and to unanticipated and unfair consequences for candidates, political parties, and voters, among others. It is one thing for a State on its own to toy with its election laws close to a State's elections. But it is quite another thing for a federal court to swoop in and re-do a State's election laws in the period close to an election.

*Merrill v. Milligan*, 142 S. Ct. 879, 880–81 (2022) (Kavanaugh, J., concurring in grant of applications for stays). Plaintiffs knew or reasonably should have known that the Court could not and would not grant the wide-ranging, late-breaking relief they sought.[11] The Court finds that Plaintiffs' counsel acted at least recklessly in multiplying the proceedings.

## IV.   SANCTIONS

The Court concludes that sanctions are warranted under Rule 11 and 28 U.S.C. § 1927. It finds that Plaintiffs made false, misleading, and unsupported factual assertions in their FAC and MPI and that their claims for relief did not have an adequate factual or

---

[11] Although Plaintiffs have filed a Notice of Appeal of the Court's Dismissal Order, they have yet to request emergency relief from the Ninth Circuit. *See* Docket, *Lake et al. v. Hobbs et. al*, Ninth Circuit Case No. 22-16413. Of course, Plaintiffs and their counsel were not obligated to seek such emergency relief, but it raises questions about the good faith basis for their request for immediate relief filed in this Court based on allegedly imminent and irreparable harm flowing from an election that has now already taken place.

legal basis grounded in a reasonable pre-filing inquiry, in violation of Rules 11(b)(2) and (b)(3). The Court further finds that Plaintiffs' counsel acted at least recklessly in unreasonably and vexatiously multiplying the proceedings by seeking a preliminary injunction based on Plaintiffs' frivolous claims, in violation of Section 1927.

Two issues remain. First, the Court must identify the parties responsible for the offending conduct. Rule 11 authorizes the Court to "to impose an appropriate sanction on any attorney, law firm, or party that violated the rule or is responsible for the violation." Fed. R. Civ. P. 11(c)(1). The standard applicable to represented parties is more forgiving than the attorney standard, as "represented parties may often be less able to investigate the legal basis for a paper or pleading." *Bus. Guides, Inc. v. Chromatic Commc'ns. Enters.*, 498 U.S. 533, 550 (1991). Moreover, represented parties cannot be sanctioned for violations of Rule 11(b)(2) or Section 1927, both of which impose duties only on attorneys.

Here, while there are reasons to believe that Plaintiffs themselves contributed to the violations of Rule 11(b)(3) in this case—including that they themselves apparently have voted on paper ballots, contradicting allegations and representations in their pleadings about Arizona's use of paper ballots—there is not a sufficient record that compels the Court to exercise its discretion to sanction Plaintiffs under that part of the rule. Thus, although the Court does not find that Plaintiffs have acted appropriately in this matter—far from it— the Court concludes that sanctions are warranted only against Plaintiffs' counsel, who signed and filed the offending papers. To sanction Plaintiffs' counsel here is not to let Plaintiffs off the hook. It is to penalize specific attorney conduct with the broader goal of deterring similarly baseless filings initiated by anyone, whether an attorney or not.

Lastly, the Court must identify the appropriate sanction. Under Rule 11, the "sanction imposed . . . must be limited to what suffices to deter repetition of the conduct or comparable conduct by others similarly situated." Fed. R. Civ. P. 11(c)(4). Where sanctions are "imposed on motion and warranted for effective deterrence," they may include payment of reasonable attorneys' fees. *Id*. Section 1927 likewise authorizes the Court to order the payment of reasonable attorneys' fees. 28 U.S.C. § 1927. Here, the Court

finds that payment of the Maricopa County Defendants' reasonable attorneys' fees is an appropriate sanction for the conduct of Plaintiffs' counsel, which forced Defendants and their counsel to spend time and resources defending this frivolous lawsuit rather than preparing for the elections over which Plaintiffs' claims baselessly kicked up a cloud of dust. Plaintiffs' counsel are therefore held jointly and severally liable for the Maricopa County Defendants' attorneys' fees reasonably incurred in this case.

Imposing sanctions in this case is not to ignore the importance of putting in place procedures to ensure that our elections are secure and reliable. It is to make clear that the Court will not condone litigants ignoring the steps that Arizona has already taken toward this end and furthering false narratives that baselessly undermine public trust at a time of increasing disinformation about, and distrust in, the democratic process. It is to send a message to those who might file similarly baseless suits in the future.

**IT IS THEREFORE ORDERED** granting the Maricopa County Defendants' Rule 11 and 28 U.S.C. § 1927 Motion for Sanctions (Doc. 97).

**IT IS FURTHER ORDERED** that, within 14 days of entry of this Order, the Maricopa County Defendants shall file a memorandum setting forth the attorneys' fees they have reasonably incurred in this case from the time of the filing of Plaintiffs' first Amended Complaint (Doc. 3) to the filing of this Order, along with supporting documentation and in conformance with LRCiv 54.2. No later than 14 days thereafter, Plaintiffs shall file any Response only as to the reasonableness of the requested award under LRCiv 54.2(c)(3) and (f).

Dated this 1st day of December, 2022.

_____
Honorable John J. Tuchi
United States District Judge