**WO**

# IN THE UNITED STATES DISTRICT COURT

## FOR THE DISTRICT OF ARIZONA

| | |
|---|---|
| Kari Lake, *et al.*, | No. CV-22-00677-PHX-JJT |
| Plaintiffs, | **ORDER** |
| v. | |
| Adrian Fontes, *et al.*, | |
| Defendants. | |

In a prior Order (Doc. 106), the Court granted a Motion for Sanctions under Federal Rule of Civil Procedure 11 and 28 U.S.C. § 1927 filed by Defendants Bill Gates, Clint Hickman, Jack Sellers, Thomas Galvin, and Steve Gallardo in their official capacities as members of the Maricopa County Board of Supervisors (hereinafter referred to collectively as "Maricopa County Defendants"). At issue are two Applications relating to that Order.

The first is the Maricopa County Defendants' Application for Attorneys' Fees (Doc. 107), to which counsel for Plaintiffs Kari Lake and Mark Finchem filed a Response in opposition (Doc. 110) and Defendants filed a Reply in support (Doc. 112). The second is the Application for Order to Show Cause (Doc. 108) filed by Alan Dershowitz as a non-party respondent specially appearing through counsel. Mr. Dershowitz directed his Application for Order to Show Cause to the Maricopa County Defendants, who filed a Response in opposition thereto (Doc. 111). Mr. Dershowitz filed a Reply in support of his Application (Doc. 113) along with supplemental evidence for the Court's consideration (Docs. 128, 130), as well as a Response to the Application for Attorneys' Fees (Doc. 109).

On May 24, 2023, the Court heard argument on the Maricopa County Defendants' Application for Attorneys' Fees and held an evidentiary hearing on Mr. Dershowitz's Application for Order to Show Cause. (Doc. 127, Transcript of Proceedings ("Tr.").) The Court took under advisement the issues raised in the Applications, which it now resolves.

## I.    BACKGROUND

Plaintiffs filed this lawsuit in late April 2022 to prohibit the use of electronic voting machines in the 2022 midterm election in Arizona and to compel Defendants—election officials at the state and county levels—to follow alternative procedures for collecting, storing, counting, and tabulating votes. (Doc. 3, First Amended Complaint ("FAC") ¶¶ 1, 153.) These alternative procedures included requiring voters to cast their votes on paper ballots and ordering election administrators to count by hand every ballot cast. (*Id.* ¶ 153.) On August 26, 2022, the Court granted Defendants' Motions to Dismiss and dismissed Plaintiffs' FAC in its entirety. *Lake v. Hobbs*, 623 F. Supp. 3d 1015 (D. Ariz. 2022).

On August 10, 2022, the Maricopa County Defendants filed their Motion for Sanctions. (Doc. 97.) They argued that Plaintiffs and their counsel made false allegations about Arizona elections in violation of Rule 11(b)(3) and brought this case for the improper purpose of "sow[ing] doubts about the reliability and trustworthiness of elections for their own financial and political benefit" in violation of Rule 11(b)(1). (*Id.* at 8.) Defendants argued that Plaintiffs' counsel further violated Rules 11(b)(2) and (3) and 28 U.S.C. § 1927 by pursuing frivolous constitutional claims and untimely injunctive relief. In their Motion, Defendants referred to Plaintiffs' counsel generally and did not mention attorneys by name. However, Defendants included as an exhibit a May 20, 2022 safe-harbor letter that they addressed, mailed, and emailed to attorneys Andrew Parker, Kurt Olsen, and Alan Dershowitz. (Doc. 97-1.) The letter referred to Plaintiffs as "your clients."

Plaintiffs responded to the Maricopa County Defendants' allegations in a detailed Response. (Doc. 99.) The Response included on its cover page the names of Messrs. Parker, Olsen, and Dershowitz, as well as two other attorneys from Mr. Parker's firm, who were

collectively referred to as "Attorneys for Plaintiffs." The last page of the Response bore the electronic signatures of Messrs. Parker, Olsen, and Dershowitz. (*Id*. at 18.)

On December 1, 2022, the Court granted the Maricopa County Defendants' Motion. *Lake v. Hobbs*, --- F. Supp. 3d ----, 2022 WL 17351715 (D. Ariz. 2022). The Court's Order addressed the statements and claims at issue and the parties' arguments regarding the same. Analyzing the challenged assertions of fact, the Court found that certain allegations in Plaintiffs' FAC and statements in their Motion for Preliminary Injunction ("MPI") rose to the level of sanctionable, and others did not. The Court further found that Plaintiffs' speculative claims for likely unprecedented injunctive relief lacked an adequate basis in law and fact. Given the public availability and wide circulation of information contradicting or undermining Plaintiffs' allegations, the Court concluded that the reasonable pre-filing investigation required by Rule 11 was not done. The Court also found that Plaintiffs' counsel acted at least recklessly in pursuing such disruptive injunctive relief in the run-up to the 2022 midterm election even after Defendants' counsel had alerted them to the inadequacy of their claims. In light of the existing record, however, the Court declined to make a finding as to whether the case was brought for an improper purpose.

Accordingly, the Court concluded that sanctions against Plaintiffs' counsel were warranted under Rule 11 and section 1927 in the form of payment of the attorneys' fees reasonably incurred by the Maricopa County Defendants in defending this case. The Court declined to sanction Plaintiffs themselves. The Court deferred determination of the precise monetary sanction until it considered submissions regarding Defendants' attorneys' fees, which the parties have since provided. The Court's Order referred to Plaintiffs' counsel generally and did not mention attorneys by name.

On December 29, 2022, Mr. Dershowitz filed his Application for Order to Show Cause. (Doc. 108.) Mr. Dershowitz requests the Court order the Maricopa County Defendants "to show cause as to why an award of sanctions should be entered against Mr. Dershowitz personally or his consulting firm." (*Id*. at 1.) He requests the Court "deny any such award given his limited involvement in this matter and his lack of any involvement

in the issues raised by the Court in its Order granting sanctions." (*Id.*) Mr. Dershowitz submitted declarations describing his involvement in the case (*id.* at 10-13; Doc. 113-1) and a brief declaration of Mr. Parker regarding the same (Doc. 113-2). Messrs. Dershowitz and Parker provided further explanation of Mr. Dershowitz's involvement during the evidentiary hearing on May 24, 2023.[1] Mr. Dershowitz thereafter provided a supplemental declaration and further information for the Court to consider. (Docs. 128, 130.)

Mr. Dershowitz is a nationally-known attorney and professor of law emeritus at Harvard Law School. He explained he has mostly retired from practicing law and teaching and limits his role to "consultation on legal and constitutional issues." (Doc. 108 at 10 ¶ 1.) He came into this case through Michael Lindell, a business executive who retained Mr. Dershowitz to represent him and his company against claims they defamed companies that supply electronic voting machines. (*See id.* ¶ 2.) He explained:

> My role was to serve as a consultant to [Mr. Lindell's] primary legal team on First Amendment and related constitutional issues. I helped to develop the following argument: when a private company is hired by the government to perform a quintessential governmental function such as vote counting, it cannot refuse to provide relevant information about the workings of its machines on the ground of business secrets.

(*Id.*) After researching this issue in the defamation case brought by the voting machine companies, he adapted his research to the facts of this case challenging the use of such machines in Arizona. (*See* Tr. at 25:2–6.) He formulated Paragraph 8 of the FAC alleging that voting machine companies "refuse to disclose their software and system components and subject them to neutral expert evaluation." (*Id.* at 29:20–23.)

Mr. Dershowitz maintains that his involvement in this case was limited to that constitutional issue. He was paid for his time—which he approximates at three or four hours—at his normal hourly rate. (*Id.* at 50:5–51:4.) He testified he had no input on the decision to bring suit and has no opinion on whether voting machines are vulnerable to

---

[1] The Court did not require Messrs. Dershowitz or Parker to testify under oath given their status as officers of the court. During the hearing, however, Mr. Dershowitz requested to give his statements under oath. (Tr. at 36:9–24.) Mr. Dershowitz's counsel had no objection to his going under oath when asked, and he was duly sworn as a witness. (*Id.* at 38:3–12.)

hacking, which was one of the central claims underlying this case. (*Id.* at 23:10–11, 24:17-19.) He was not retained to investigate the facts and contends he did not participate in drafting the FAC other than as it related to voting machine companies' alleged refusal to disclose their software. (Doc. 108 at 11 ¶ 4.) Mr. Parker confirmed his firm retained Mr. Dershowitz as an "of counsel consultant" to Plaintiffs' legal team to provide "legal counsel regarding constitutional issues." (Doc. 113-2 ¶ 2.) He explained his firm has worked with Mr. Dershowitz on previous matters. (Tr. at 51:22–25.) When retaining him for this case,

> we had him look at the case, we had him look at a draft. I sent a specific email about the retention and indicated that we would want him on the filings with us. He agreed to that. He indicated he would do it only as of counsel. I said I understood, just as we had done a number of times previously.

(*Id.* at 52:4–7.)

Accordingly, Mr. Dershowitz's signature block appeared on the Complaint alongside those of Messrs. Parker and Olsen. (Doc. 1 at 55.) Mr. Dershowitz signed the Complaint with an electronic signature under "Alan Dershowitz Consulting LLC," listing an address in Florida. He was listed as "Of Counsel for Plaintiffs," while Messrs. Parker and Olsen were listed as "Counsel." Mr. Dershowitz's signature block likewise appeared on the FAC filed two weeks later. He was again listed as "of counsel" for Plaintiffs, but this time with a Cambridge, Massachusetts address and without the name of his consulting company. These edits to his signature block as it had appeared on the Complaint are reflected in the redlined version of the FAC filed pursuant to LRCiv 15.1(b). (Doc. 4 at 55.) Messrs. Dershowitz and Parker confirmed that Mr. Dershowitz authorized his signature on these filings as "of counsel" for Plaintiffs. (Docs. 113-1 ¶ 2, 113-2 ¶ 4.)

In a statement posted to her Twitter account soon after the Complaint was filed, Plaintiff Lake touted Mr. Dershowitz's involvement in the lawsuit:

> I am listed as the Plaintiff along with AZ House Rep @RealMarkFinchem. Legal heavyweight Alan Dershowitz will be representing us. @AlanDersh is a Liberal Democrat. All voters will benefit from the removal of these machines. Defendants are @katiehobbs and Maricopa Co & Pima Co BOS.

Kari Lake (@KariLake), Twitter (Apr. 24, 2022, 9:33 a.m.), https://perma.cc/97NS-6R5Q. In a video posted to his web series, Mr. Lindell called Mr. Dershowitz's involvement "one of the surprises for the fake news media" and identified him as "one of the lead attorneys on this." The Lindell Report, *Mike Lindell & Gubernatorial Candidate Kari Lake, Attorney Alan Dershowitz on Injunction Filed in Arizona Regarding Electronic Voting Machines*, Frankspeech.com, at 15:40–55 (Apr. 22, 2022), https://frankspeech.com/video/mike-lindell-gubernatorial-candidate-kari-lake-attorney-alan-dershowitz-injunction-filed.[2] Mr. Dershowitz testified he was not contemporaneously aware of public statements suggesting that he was a lead attorney for Plaintiffs, including by Mr. Lindell. (Tr. at 42:13-43:19.)

While the "of counsel" designation appeared on the Complaint and FAC, it was left off numerous subsequent filings, including the MPI (Doc. 50), Responses to Defendants' Motions to Dismiss (Docs. 56, 58), and Replies in support of Plaintiffs' MPI (Docs 63, 64). These filings list Messrs. Parker, Olsen, and Dershowitz all as "Counsel for Plaintiffs." Mr. Parker averred that omission of the word "of" from these filings was "an administrative oversight." (Doc. 113-2 ¶ 3.) Mr. Dershowitz never moved to correct the filings and suggested he did not review them. (*See* Tr. at 35:11–36:23, 41:18–43:19; Doc. 108 at 3–4, 11 ¶ 4; Doc. 113-1 ¶ 1.) Mr. Parker disputed the latter point, stating that not only did Mr. Dershowitz authorize his signature on the filings—albeit only as "of counsel"—but email communications showed that he included Mr. Dershowitz's name

> only after Mr. Dershowitz sent an email saying, 'Very Good." "Excellent work." "Yes, let's go," and I had assumed reviewed all of the filings that we sent to him. And, in fact, when it comes to the complaint or the first amended complaint, there are a number of edits that were made throughout and we counseled. He did an excellent job of counseling with us on the Constitutional issues that we had retained him for.

(*Id*. at 54:15–55:3.)

---

[2] Pursuant to Federal Rule of Evidence 201(b), the Court takes judicial notice of these statements posted online to show "what was in the public realm at the time, not whether the contents of those [statements] were in fact true." *Von Saher v. Norton Simon Museum of Art at Pasadena*, 592 F.3d 954, 960 (9th Cir. 2010) (citation omitted); *see also, e.g.*, *Hawaii v. Trump*, 859 F.3d 741, 773 n.14 (9th Cir.) (taking judicial notice of tweets posted on President Trump's Twitter account), *vacated on other grounds*, 138 S. Ct. 377 (2017).

Despite his claimed status as a consultant, Mr. Dershowitz applied for admission to practice in this Court *pro hac vice*. He testified he did so reluctantly, asserting in his declaration that it was at Mr. Parker's request (Doc. 108 at 11 ¶ 4) and at the evidentiary hearing that the Clerk's office had requested it first. (Tr. at 33:13–22.) In any event, on May 10, 2022, Mr. Parker informed Mr. Dershowitz he would need to be admitted *pro hac vice*. (Doc. 108 at 11 ¶ 4.) Mr. Parker explained at the evidentiary hearing:

> I asked that Mr. Dershowitz complete the *pro hac vice* information. He did question why is that necessary if I'm not going to be handling proceedings. I indicated that, well, you're on the pleadings and that's part of our retention and so you need to do that.
>
> He then agreed. It took an extended period of time to get that accomplished and by May 18, . . . the Clerk issued an order removing him as counsel in the case, of counsel in the case.
>
> Mr. Dershowitz and I then worked through getting him—getting the proper papers completed.

(Tr. at 52:24–53:10.) His *pro hac vice* motion was ultimately granted on June 15, 2022.

On May 20, 2022, counsel for the Maricopa County Defendants sent the safe-harbor letter to Messrs. Parker, Olsen, and Dershowitz advising them of Defendants' position that this lawsuit was frivolous. (Doc. 97-1.) As noted, the letter referred to Plaintiffs as "your clients." It was addressed to Mr. Dershowitz at an address in Cambridge and also sent via email. Mr. Dershowitz does not recall receiving the letter. (Tr. at 39:11–40:3.) After receiving no response, Defendants' counsel, Emily Craiger, sent a follow-up email requesting a telephonic conference. (Doc. 97-2.) In a certification, Ms. Craiger stated that "all Defendants' counsel participated in a telephonic conference with Plaintiffs' counsel." (Doc. 30 at 2.) When asked whether he recalled participating in this or any other telephonic conferences in this matter, Mr. Dershowitz testified he did remember listening to one conversation "in a very passive way," but could not recall the subject matter. (Tr. at 40:22–41:3.) At the July 21, 2022 hearing on the MPI and Motions to Dismiss, Mr. Parker announced that Mr. Dershowitz, "counsel in this case, is also on the listen-only [telephone] line." (Doc. 98 at 12:14–15.) As noted, when the Maricopa County Defendants moved for

sanctions, his signature appeared on Plaintiffs' Response under "Attorneys for Plaintiffs." (Doc. 99 at 18.) According to him, this was "clearly . . . a mistake." (Tr. at 31:13–20.)

Mr. Dershowitz testified he believes he only became aware he might be subject to sanctions when media reports about the Court's Sanctions Order named him among Plaintiffs' counsel. (Tr. at 42:13–43:19.) He testified that prior to that time, he believed the "of counsel" designation adequately advised the Court of his limited role as a legal consultant and delimited his ethical obligations accordingly. (*Id*. at 23:1–16.) He believed this role to be distinct from that of "counsel," who must conduct the reasonable pre-filing inquiry required by Rule 11. (*See id*. at 25:11–24.) He testified: "I did not believe that agreeing to be an 'of counsel' legal consultant places any obligation on me to evaluate factual allegations." (Doc. 108 at 12 ¶ 4.) He testified he did not rely on specific authority supporting this use of the "of counsel" designation, but noted he and others have used it on "many, many briefs" before. (Tr. at 23:1, 26:20–24; *see also* Doc. 131-1.) He added:

> I never familiarized myself with the practice or the traditions of what of counsel means. I just operated on what I had been doing for almost ten years in the honest belief that that was the most candid way of communicating the actual role that I was intending to play and did play.

(Tr. at 26:20–24.) In a subsequent declaration, Mr. Dershowitz recalled he first used the "of counsel" designation in a 1973 federal case in which he had a limited retainer agreement. (Doc. 130-1 ¶ 1.) He recalled discussing the issue with both the lead attorney in that case, United States Attorney Robert Fiske, and legal ethics scholar Monroe Freedman, who agreed the "designation 'of counsel' seemed most appropriate under the circumstances." (*Id*.) He says he has since used the designation when he has "played a limited and discrete role in researching and writing a pleading, without having done the full investigation required of lead counsel, counsel of record, or counsel." (*Id*. ¶ 2.) For all of these reasons, Mr. Dershowitz maintains he should not be sanctioned in this case.

## II.   LEGAL STANDARDS

The Court set forth the legal standards under Rule 11 and 28 U.S.C. § 1927 in its Sanctions Order. Briefly, Rule 11(b) provides that by presenting a filing to the court, an

attorney certifies that the filing is not being presented for an improper purpose and that the legal and factual contentions are adequately supported. Rule 11(c)(1) provides: "If, after notice and a reasonable opportunity to respond, the court determines that Rule 11(b) has been violated, the court may impose an appropriate sanction on any attorney, law firm, or party that violated the rule or is responsible for the violation." The "sanction imposed . . . must be limited to what suffices to deter repetition of the conduct or comparable conduct by others similarly situated," and, if "imposed on motion and warranted for effective deterrence," may include payment of reasonable attorneys' fees. Fed. R. Civ. P. 11(c)(4). The purpose of imposing sanctions under Rule 11 is not "compensating the prevailing party," but "deterring, and if necessary punishing improper conduct." *United States ex rel. Leno v. Summit Const. Co.*, 892 F.2d 788, 791 n.4 (9th Cir. 1989) (quoting Schwarzer, *Sanctions Under the New Federal Rule 11 – A Closer Look*, 104 F.R.D. 181, 185 (1985)).

Section 1927 "authorizes the imposition of sanctions against any lawyer who wrongfully proliferates litigation proceedings once a case has commenced." *Pac. Harbor Capital, Inc. v. Carnival Air Lines, Inc.*, 210 F.3d 1112, 1117 (9th Cir. 2000). The Ninth Circuit has recognized that the purpose of sanctions under section 1927 is either "to deter attorney misconduct, or to compensate the victims of an attorney's malfeasance." *Haynes v. City & Cnty. of San Francisco*, 688 F.3d 984, 988 (9th Cir. 2012) (citations omitted).

Under either authority, the imposition of sanctions is an extraordinary remedy to be exercised with caution and restraint. *In re Keegan Mgmt. Co., Secs. Litig.*, 78 F.3d 431, 436–37 (9th Cir. 1996). The Ninth Circuit has instructed that "[j]udges . . . should impose sanctions on lawyers for their mode of advocacy only in the most egregious situations, lest lawyers be deterred from vigorous representation of their clients." *United Nat'l Ins. Co. v. R&D Latex Corp.*, 242 F.3d 1102, 1115 (9th Cir. 2001). The procedures by which sanctions are imposed must comport with due process requirements. *Tom Growney Equip., Inc. v. Shelley Irr. Dev., Inc.*, 834 F.2d 833, 835–37 (9th Cir. 1987).

III.   **ANALYSIS**

The Court first addresses the Maricopa County Defendants' Application for Attorneys' Fees and determines the total amount of attorneys' fees to be awarded in this matter pursuant to the Sanctions Order. The Court then addresses the issues raised in Mr. Dershowitz's Application for Order to Show Cause and determines his share of responsibility for the total fee award, if any.

A.   **Application for Attorneys' Fees**

The Maricopa County Defendants seek to recover a total of $139,950.00 in attorneys' fees incurred in defending this lawsuit in 2022. (Doc. 112 at 6.) To determine whether the requested fees are reasonable, the Court applies the two-step "lodestar" method. *See Welch v. Met. Life Ins. Co.*, 480 F.3d 942, 945–46 (9th Cir. 2007). "First, the court establishes a lodestar by multiplying the number of hours reasonably expended on the litigation by a reasonable hourly rate," excluding from the requested amount "any hours that are 'excessive, redundant, or otherwise unnecessary.'" *Id.* (quoting *Hensley v. Eckerhart*, 461 U.S. 424, 434 (1983)). At the second step, "in rare and exceptional cases, the district court may adjust the lodestar upward or downward using a multiplier based on facts not subsumed in the initial lodestar calculation." *Id.*

Defendants have provided the lodestar records for outside counsel Emily Craiger (Doc. 107-3) and attorneys Thomas Liddy, Joseph La Rue, and Karen Hartman-Tellez of the Maricopa County Attorney's Office ("MCAO") (Doc. 107-4), as well other documentation required by Local Civil Rule 54.2 (Docs. 107-1, 107-2, and 107-5). In their Response, Plaintiffs do not dispute the hourly rates claimed by Defendants' counsel, which the Court likewise finds reasonable. Rather, Plaintiffs argue that certain deficiencies in counsel's billing records justify reducing the number of compensable hours. Plaintiffs identify certain time entries they contend are: (1) insufficiently specific; (2) for non-recoverable clerical or administrative tasks; (3) duplicative; (4) excessive; or (5) erroneous. (Doc. 110 at 3–13.) The Court evaluates these arguments in turn.

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

### 1.      Insufficient Specificity

Plaintiffs argue the following entries by Mr. La Rue are too vague: 5.0 hours on June 1 for "[v]arious work on this matter"; 7.0 hours on June 20 for "[v]arious work on this lawsuit"; and 11.3 hours on June 21 for "[d]raft work on several versions of Scott Jarrett's declaration; various phone confs re this matter; various other work re this matter." Defendants do not defend these specific entries in their Reply. "The party seeking fees bears the burden of documenting the hours expended in the litigation and must submit evidence supporting those hours . . . ." *Welch*, 480 F.3d at 945–46. "[C]ounsel . . . is not required to record in great detail how each minute of his time was expended," but "should identify the general subject matter of his time expenditures." *Hensley*, 461 U.S. at 437 n.12. The challenged entries fail this test and therefore will be excluded.

Next, Plaintiffs identify several entries they argue should either be rejected or reduced by 30% because they are block-billed—that is, they "include[e] various tasks within one time entry without specifying the time spent on each task within an entry." *Banas v. Volcano Corp.*, 47 F. Supp. 3d 957, 966 n.9 (N.D. Cal. 2014). Defendants counter by distinguishing the facts of *Banas* and suggesting a court should make reductions for block billing only "to the extent it cannot determine whether the compensation sought is for hours reasonably related to the litigation of successful claims and claims closely related to successful claims." (Doc. 112 at 2–3.) But the rule applied in *Banas* was not so fact-dependent. It reflects concerns not only about the relatedness of the claimed tasks, but also the reasonableness of the time spent on them. "[B]lock billing makes it more difficult to determine how much time was spent on particular activities." *Welch*, 480 F.3d at 948.

For this reason, the Ninth Circuit has affirmed district courts' authority to reduce block-billed hours. *Id*. Accordingly, the Court will impose a 25% reduction on the following block-billed entries by Ms. Craiger: 6.3 hours on May 18; 5.8 hours on May 31; 5.6 hours on June 15; 11.8 hours on June 17; and 8.4 hours on July 20. The Court will impose the same reduction on Mr. La Rue's 0.8-hour block-billed entry on August 9.

### 2.   Administrative or Clerical Tasks

Plaintiffs label several of Mr. La Rue's claimed tasks as administrative or clerical. Defendants concede that because MCAO attorneys' time is "tracked for internal budgeting purposes . . . , time for 'clerical-related' activities are sometimes billed." (Doc. 112 at 1 n.1) Thus, "Defendants take no position on whether these entries are appropriate for inclusion in an award of attorneys' fees under the circumstances of this matter." (*Id*.) The Court appreciates that the time-sensitive nature of this case required an all-hands-on-deck approach. However, Plaintiffs are correct that "[c]lerical work is not compensable." *Bellflower Unified Sch. Dist. v. Arnold*, 586 F. Supp. 3d 1010, 1018 (C.D. Cal. 2022) (collecting cases). The Court therefore will exclude the challenged clerical entries.

### 3.   Duplication

Plaintiffs argue several of counsel's entries reflect duplicative work. First, they dispute the reasonableness of each of Defendants' four attorneys billing approximately 9.0 hours for attending the consolidated merits hearing on July 21. They note that Ms. Hartman-Tellez billed 9.0 hours but did not speak at the hearing. Plaintiffs cite to a line of cases from the District of Oregon holding that "good 'billing judgment' requires attorneys to not bill for more than two attorneys to review pleadings or to attend oral argument." *Lemus v. Timberland Apts., LLC*, 876 F. Supp. 2d 1169, 1179 (D. Or. 2012) (citation omitted). Defendants contend "the staffing of four attorneys is entirely reasonable and . . . comparable to the staffing by Plaintiffs' counsel." (Doc. 112 at 4.) In light of the all-hands-on-deck approach made necessary by the accelerated nature of the proceedings to that point, the Court concludes the hearing reasonably required the presence of all four attorneys, each of whom may well have had delegated areas of responsibility necessitating their personal availability to the team. The Court finds Defendants' argument on this issue more persuasive and therefore will not reduce the compensable hours.

Second, Plaintiffs identify several intra-defense team conferences with multiple attorneys, which they suggest involved duplicative work. Plaintiffs point to no additional evidence to support this suggestion, however, and the Court finds the observation it made

immediately above regarding the division of labor equally applicable to this circumstance. The Court therefore will allow the hours claimed for participation in these conferences.

### 4. Excessiveness

Plaintiffs argue that in light of counsel's expertise in election law, counsel spent an excessive amount of time researching basic election-law tenets. Defendants dispute this, contending that while this case was "not extremely novel," it nonetheless presented "difficult constitutional and statutory questions concerning election administration." (Doc. 107 at 5.) They also contend the case required combing through "factual allegations that had little to no basis in reality and were not relevant to elections in Arizona." (*Id.*)

To the extent Plaintiffs challenge Ms. Craiger's block-billed entries on May 18 and June 15, the Court has already discounted them. The 2.2-hour entry by Ms. Craiger on August 26 is block-billed but includes "review[ing] research re sanctions post-dismissal." The law on this issue is well settled and this entry therefore will be reduced by 25%. Ms. Hartman-Tellez's May 23, 25, 26, and 28 entries for a total of 9.6 hours for "[l]egal research re constitutional claims" cannot be fully justified without further explanation and will also be reduced by 25%. However, Ms. Hartman-Tellez's July 17 entry for 1.2 hours of "research re Daubert motions" and her July 14 entry for 2.1 hours for "[l]egal research re sanctions" are sufficiently detailed and reasonable, and will be allowed in full. Finally, Ms. Craiger's July 13 and 14 entries for 11.5 hours to "[c]ontinue draft of Rule 11 Motion" appear potentially excessive in light of the dozens of hours she and her colleagues billed for other tasks relating to this motion and the predicate safe-harbor letter in mid-May. The Court therefore will reduce these entries by 25%.

Finally, to the extent Plaintiffs challenge the approximately 200 hours counsel spent "drafting," "editing," and "revising" filings, they fail to identify specific entries. *See Arizona v. Maricopa Cnty. Med. Soc.*, 578 F. Supp. 1262, 1264 (D. Ariz. 1984) ("The party opposing the application must . . . submit specific and detailed objections." (citing *Nat. Ass'n of Concerned Vets v. Sec'y of Defense*, 675 F.2d 1319, 1338 (D.C. Cir. 1982)).

### 5.    Discrepancies

Defendants have corrected several entries Plaintiffs showed to be incorrect and have reduced their request accordingly. (*See* Doc. 112 at 1 n.1.) One challenged entry remains. Plaintiffs challenge Ms. Craiger's entry of 0.6 hours on June 7 for a meeting with Mr. La Rue and Ms. Hartman-Tellez, which appears only on Ms. Craiger's records. It is plausible the other two attorneys simply neglected to bill for the meeting. The Court will allow it.

### 6.    Other Issues

The Court has identified several other entries to be excluded. Ms. Craiger and Ms. Hartman-Tellez each claimed 0.7 hours on September 16 for tasks relating to the pending appeal in this matter, but this Court's fee-award will be limited to the litigation before it. The Court will also exclude Ms. Craiger's entries totaling 2.5 hours in October regarding correspondence with Plaintiffs' experts because no explanation has been given as to the relevance of these tasks to defending this lawsuit, which by then had been dismissed.

### 7.    Summation

Incorporating these reductions results in a lodestar of $122,200. The Court finds no basis to conclude this amount is unreasonable or compelling grounds to adjust the lodestar upward or downward. *See* LRCiv 54.2(c)(3); *Kerr v. Screen Extras Guild, Inc.*, 526 F.2d 67, 70 (9th Cir. 1975). It therefore will award attorneys' fees in this amount.

### B.    Application for Order to Show Cause

Mr. Dershowitz maintains he should bear no responsibility for the attorneys' fees awarded to the Maricopa County Defendants because he did not violate Rule 11 or 28 U.S.C. § 1927 and "has not done anything improper that sanctions would serve to 'deter' in this matter." (Doc. 113 at 6.) Having considered all of the parties' arguments and evidence bearing on these issues, the Court now determines whether Mr. Dershowitz's involvement in this matter subjects him to sanctions under Rule 11 and section 1927, and what sanctions, if any, are warranted under the circumstances.

### 1.     Rule 11

The first question is whether Mr. Dershowitz may be sanctioned under Rule 11. Mr. Dershowitz maintains he cannot be sanctioned because he did not violate the rule. He argues that his use of the "of counsel" designation appropriately identified his limited role and effectively exempted him from the Rule 11 requirements imposed on Plaintiffs' "counsel." As Mr. Dershowitz has conceded, there is a dearth of formal legal authority supporting this proposition. (*See* Tr. at 63:11–13.) The Maricopa County Defendants argue that the plain language of the rule contradicts it. The Court turns first to the text.

Rule 11(a) provides that "[e]very pleading, written motion, and other paper must be signed by at least one attorney of record in the attorney's name—or by a party personally if the party is unrepresented." As noted, Rule 11(b) provides that by presenting a filing to the court, "an attorney or unrepresented party certifies that to the best of the person's knowledge, information, and belief, formed after an inquiry reasonable under the circumstances": (1) the filing is "not being presented for any improper purpose"; (2) the "legal contentions are warranted by existing law or by a nonfrivolous argument for extending, modifying, or reversing existing law or for establishing new law"; and (3) "the factual contentions have evidentiary support or, if specifically so identified, will likely have evidentiary support after a reasonable opportunity for further investigation or discovery."

Rule 11(b) expressly includes the act of signing a filing in its definition of "presenting" a filing. That part of the rule recognizes only two categories of signers: attorneys and unrepresented parties, who are equally subject to its requirements. Rule 11(c) authorizes the court to impose sanctions where those requirements have not been met. The list of sanctionable parties in Rule 11(c)(1) is broadened to include "any attorney, law firm, or party that violated the rule or is responsible for the violation." Although Rule 11(a) only requires one attorney of record to sign a filing, no provision of Rule 11 expressly limits the court's authority to sanction multiple attorneys if each of them voluntarily signed an inadequate filing or is otherwise responsible for the violation. Nor does the text of the rule qualify the import of a signature based on the designation used by the signer.

The act of signing thus lies at the heart of Rule 11. The Supreme Court has noted that "the purpose of Rule 11 as a whole is to bring home to the individual signer his personal, nondelegable responsibility." *Pavelic & LeFlore v. Marvel Ent. Grp.*, 493 U.S. 120, 126 (1989). In *Pavelic*, the Court considered whether a prior version of the rule authorized the imposition of sanctions "not only against the individual attorney who signed, but also against that attorney's law firm." *Id*. at 121. The Court held it did not, noting the importance of the nondelegable nature of the requirement it imposes:

> The signing attorney cannot leave it to some trusted subordinate, or to one of his partners, to satisfy himself that the filed paper is factually and legally responsible; by signing he represents not merely the fact that it is so, but also the fact that he personally has applied his own judgment.
> . . . [J]ust as the court expects the signer personally—and not some nameless person within his law firm—to validate the truth and legal reasonableness of the papers filed, so also it will visit upon him personally—and not his law firm—its retribution for failing in that responsibility. The message thereby conveyed to the attorney, that this is not a "team effort" but in the last analysis *yours alone*, is precisely the point of Rule 11.

*Id*. at 125–27 (emphasis in original).

The Court again emphasized the importance of signatures for Rule 11 purposes in *Business Guides, Inc. v. Chromatic Communications Enterprises, Inc.*, which considered whether the prior version of the rule applied to represented parties who sign filings alongside their counsel. 498 U.S. 533, 544–48 (1991). The Court held it unambiguously did. *Id.* The Court found it irrelevant whether such signatures were voluntary, as the plain text of the rule applied not only to required signatures "but also to signatures that are not required but nevertheless present." *Id*. at 543. The Court rejected the argument "that a represented party is free to sign frivolous or vexatious documents with impunity because its signature on a document carries with it no additional risk of sanctions." *Id*. at 544–46. The Court held that such a "risk free" construction of the rule was at odds with the rule's purpose and lacked support in the text. *Id*. The Court stated that "[t]he essence of Rule 11

is that signing is no longer a meaningless act; it denotes merit. A signature sends a message to the district court that this document is to be taken seriously." *Id*. at 546.

The Advisory Committee amended Rule 11 in the wake of these decisions, removing the restrictions on sanctioning a law firm—which, "[a]bsent exceptional circumstances, . . . must be held jointly responsible for a violation committed by its partner, associate, or employee"—and clarifying that monetary sanctions for meritless legal contentions may not be imposed against a represented party. *See* Fed. R. Civ. P. 11(c)(1), (c)(5)(A). But these amendments did not lessen the import of an attorney's signature. The Committee maintained that "[t]he person signing, filing, submitting, or advocating a document has a nondelegable responsibility to the court, and in most situations is the person to be sanctioned for a violation." Fed. R. Civ. P. 11 Advisory Comm.'s Note (1993).

The Ninth Circuit has recognized an attorney's signature is "tantamount to a warranty that the complaint is well grounded in fact and 'existing law' (or proposes a good faith extension of the law) and that it is not filed for an improper purpose." *Christian v. Mattel, Inc.*, 286 F.3d 1118, 1127 (9th Cir. 2002). In *Holgate v. Baldwin*, the Ninth Circuit rejected the notion that an attorney who later withdraws from a case is protected from sanctions. 425 F.3d 671, 677 (9th Cir. 2005). "The signing requirement in Rule 11 makes clear that any attorney who, at any time, certified to the court that a pleading complies with Rule 11 is subject to the rule, even if the attorney later withdraws from the case." *Id*.

Thus, courts have sanctioned attorneys who sign filings violative of Rule 11 notwithstanding their limited involvement in investigating or drafting them. For example, in *Jenkins v. Methodist Hospitals of Dallas, Inc.*, the Fifth Circuit affirmed sanctions against an attorney who signed a brief drafted primarily by his associate and cite-checked by two other partners, and which he merely proofread and signed. 478 F.3d 255, 264–66 (5th Cir. 2007). The district court sanctioned him with a public remand because the brief contained an inflammatory factual misstatement. *Id.* The signing attorney did not contest that his signature on the brief made him responsible for its contents, but rather argued on the merits that an "isolated factual error should not be the basis of Rule 11 sanctions"—an argument the Fifth

Circuit rejected. *Id.* at 265. In *Val-Land Farms, Inc. v. Third National Bank in Knoxville*, the Sixth Circuit affirmed sanctions against both local counsel and out-of-state counsel, cautioning that "[t]he lawyers who sign materials submitted to federal courts have the responsibility to determine that those materials comply with Rule 11. If . . . local counsel signed [the] complaint relying entirely on the representations of [outside counsel], so much the worse for them." 937 F.2d 1110, 1118 (6th Cir. 1991).

That is not to say a signer's personal obligations under Rule 11 "preclude the signer from any reliance on information from other persons." *Garr v. U.S. Healthcare, Inc.*, 22 F.3d 1274, 1278 (3d Cir. 1994). "In relying on another lawyer, however, counsel must acquire knowledge of facts sufficient to enable him to certify that the paper is well-grounded in fact." *Unioil, Inc. v. E.F. Hutton & Co., Inc.*, 809 F.2d 548, 558 (9th Cir. 1986) (cleaned up and citation omitted), *overruled on other grounds by Townsend v. Holman Consulting Corp.*, 929 F.2d 1358 (9th Cir. 1990). Thus, in *In re Kunstler*, the Fourth Circuit affirmed sanctions against nationally-known civil rights attorney William Kunstler for signing a complaint that was baseless—if well-publicized—despite his reliance on another attorney "to prepare and file it." 914 F.2d 505, 514 (4th Cir. 1990), *cert. denied*, 111 S. Ct. 1607 (1991). Far from absolving Mr. Kunstler of responsibility, the court found his delegation of responsibility was itself improper. *Id.* The Court held: "Having failed in his responsibility, Mr. Kunstler may not now be heard to protest that he does not share in any violations of Rule 11 which are evident on the face of the complaint." *Id.*

Recently in *King v. Whitmer*, the Sixth Circuit considered a sanctions award against multiple attorneys with varying degrees of involvement in a largely baseless lawsuit to overturn the results of Michigan's 2020 presidential election. --- F.4th ----, 2023 WL 4145049 (6th Cir. June 23, 2023). Three attorneys had signed the operative complaint and five others were listed as "of counsel" but did not sign. *Id.* at *1. The district court sanctioned all of them. *Id.* at *2. On appeal, three of the attorneys listed as "of counsel" argued their involvement in the case was "too minimal to warrant sanctions." *Id.* at *3. The Sixth Circuit agreed as to two of those attorneys but not the third. *Id.* at *12. The district

court had sanctioned one of them merely because her name was listed on the complaint, which she had not signed. *Id*. The Sixth Circuit reversed, deeming this a finding of "responsib[ility] more as a matter of form than as a matter of real responsibility." *Id*.

However, the Sixth Circuit affirmed sanctions against the third attorney, Lin Wood, who was also listed as "of counsel" on the complaint, which he did not sign. *Id*. at *13. Mr. Wood had claimed "that someone placed his name on the complaint without his consent and that he knew nothing about this case until he 'saw something in the newspaper about being sanctioned.'" *Id*. The district court found him not credible. *Id*. The Sixth Circuit found no error in this conclusion, noting he had claimed elsewhere that he "represented plaintiffs" in a challenge to the 2020 election in Michigan; he tweeted about the case at the time it was filed; and a lead attorney in the case "'did specifically ask Mr. Wood for his permission' to put his name on the complaint," which another attorney stated was "spearheaded" by him. *Id*. The Sixth Circuit rejected Mr. Wood's argument that the district court was "required to undertake 'an individual analysis' of his conduct before it could sanction him." *Id*. (citing *NPF Franchising, LLC v. SY Dawgs, LLC*, 37 F.4th 369, 380–81 (6th Cir. 2022)). The court therefore affirmed sanctions against him, except to the extent he was taxed for the fees of a group of defendants who had never sought sanctions against him. *Id*. Evaluating the monetary sanctions imposed, the Sixth Circuit largely affirmed based on the frivolous allegations in the complaint, but reduced the amount based on its conclusion that several of the plaintiffs' claims were non-frivolous. *Id*. at *9–14.[3]

---

[3] Plaintiffs in this case made clear from the outset that, unlike the *King* plaintiffs, they were not seeking to overturn the 2020 presidential election. (FAC ¶ 8.) Still, there is at least one notable parallel between these lawsuits. In *King*, the Sixth Circuit found many of the plaintiffs' allegations about the Dominion voting machines used in Michigan to be sanctionable because they had no basis in fact. 2023 WL 4145049, at *4–5. The court noted many of the allegations "concerned different kinds of systems than the one Michigan used." *Id*. at 5. Like Arizona, Michigan "used a hand-marked ballot system—which one of the plaintiff's own exhibits, an article by Dr. Andrew Appel, said is 'the only practical technology for contestable, strongly defensible voting systems.'" *Id*. The court noted the plaintiffs' allegations regarding the undetectability of vote manipulation were undermined by the fact that "hand-marked ballots obviously can be recounted (and thus audited) by hand." *Id*. The same problems plagued many of Plaintiffs' allegations in this case.

- 19 -

In short, the text of Rule 11 and the weight of authority are against Mr. Dershowitz's position. The Court already concluded that Plaintiffs' FAC and MPI lacked an adequate basis in law and fact. Whether Mr. Dershowitz signed, or intended to sign, those filings as "counsel" or "attorney" or "of counsel," he signed them. And he effectively conceded that he authorized his signature on these filings without investigating whether they were legally and factually sound. If there was any doubt this brought him within the ambit of Rule 11, the evidence detailed above demonstrates that all parties involved understood the value of his signature. It was an agreed-upon part of his retention. It led opposing counsel and the public to believe he represented Plaintiffs in this matter—a notion furthered by Plaintiff Lake and Mr. Lindell themselves. Mr. Dershowitz did not do anything to dispel this notion until after the Maricopa County Defendants moved for sanctions. Further, he participated in at least one telephonic conference with opposing counsel; his telephonic presence was announced at the one hearing on the merits; and, according to Mr. Parker, he reviewed and provided feedback on at least the FAC.

Mr. Dershowitz also applied for, and was granted, permission to appear *pro hac vice* on Plaintiffs' behalf. This Court's Local Rules permit *pro hac vice* admission "to appear and participate in a particular case." LRCiv 83.1(b)(2). Once admitted, an attorney "is subject to the jurisdiction of the Court to the same extent as a member of the bar of this Court." *Id*. Mr. Dershowitz conceded he did not consult the rules. (Tr. at 34:22–35:5.) He claims he only applied for admission *pro hac vice* because the Clerk's office "demanded" it. (Doc. 128 at 3.) This is unpersuasive. The Complaint filed on April 22, 2022— necessarily before the Clerk's office contacted him—indicated he would apply for admission *pro hac vice*.[4] (Doc. 1 at 55.) More credibly, Mr. Parker stated he was the one who requested Mr. Dershowitz apply. He stated he did so for a straightforward reason:

> [I]t's my understanding, and I guess I could be mistaken but I don't believe
> I am, that whether you're counsel or of counsel, if you are on pleadings,

---

[4] The Court takes judicial notice of the fact that Mr. Dershowitz has applied for admission *pro hac vice* in cases in the District of Minnesota involving Mr. Lindell. *See* Doc. 10, *Lindell v. Pelosi*, No. CV-22-00028-ECT-DJF (D. Minn. Jan. 14, 2022); Doc. 15, *Lindell v. United States*, No. CV-22-02290-ECT-DLM (D. Minn. Sept. 22, 2022).

which Mr. Dershowitz was and which in writing we had confirmed he would be, whether counsel or of counsel, you need to be admitted to the jurisdiction because once you sign on to a pleading, I don't know of a quasi-Rule 11 or 1927 or any other obligation. I understand that if you are signed on to pleadings—and this was my understanding—you need to be admitted in the jurisdiction. *Pro hac vice* is the way to do that.

(Tr. at 52:10–20.) Mr. Dershowitz was obligated to apply for *pro hac vice* admission for the same reason he was subject to the requirements of Rule 11: He signed the filings. Because those filings were inadequate, he violated Rule 11.

The cases cited by Mr. Dershowitz are not to the contrary. In *McCarty v. Verizon New England, Inc.*, the district court considered which of three attorneys to sanction for the filing of an inadequate complaint. 772 F. Supp. 2d 362, 364–67 (D. Mass. 2011), *aff'd* 674 F.3d 119 (1st Cir. 2012). Most relevant here, the court declined to sanction an attorney who was "of counsel" to the firm of the lead attorney. *Id*. To the extent Mr. Dershowitz analogizes his use of the "of counsel" designation, he misses the mark. The attorney in *McCarty* used the designation to identify his relationship to a law firm, which is the widely accepted use of the term. The Arizona State Bar's Committee on the Rules of Professional Conduct has explained that while the term "is not precisely defined and encompasses a variety of situations," it connotes a "close, personal, continuous, and regular" relationship between an attorney and a law firm. Arizona Op. 16-01 (2016), available at https://perma.cc/S6LW-KKMP. The term does not cover "a relationship involving only an individual case . . . ; an outside consultant; or only occasional collaborative efforts between otherwise unrelated firms or lawyers." *Id*. (citing Am. Bar. Ass'n Formal Op. 90-357 and Arizona Op. 87-24). Here, Mr. Dershowitz used the term to identify his relationship with Plaintiffs. This may not be novel in the sense that he and others have used it in prior cases, but he has not identified any formal authority that condones it. In any event, the "of counsel" designation was not dispositive in *McCarty*. There, the attorney averred he "had no involvement, whatsoever, in th[e] action," which was "filed erroneously under [his] name." *McCarty*, 772 F. Supp. 2d at 366. Mr. Dershowitz cannot claim the same here.

In *Mars v. Anderman*, the district court determined sanctions were warranted for the filing of a meritless complaint. 136 F.R.D. 351, 353 (E.D.N.Y. 1989). The court decided to sanction only the plaintiff and not the attorney who filed his complaint or the attorney who tried his case. *Id*. The court concluded the former attorney had not violated Rule 11 because it was not sufficiently clear, prior to trial, that the plaintiff's claim was meritless. *Id*. at 354. The court declined to sanction the latter attorney "because violation of Rule 11 mandates sanctions against only 'the person who signed' the paper in question." *Id*. (citing *Oliveri v. Thompson*, 803 F.2d 1265, 1274 (2d Cir. 1986)). Neither scenario occurred here.

*Trout v. Garrett* is also unavailing. In *Garrett*, the district court affirmed that "[u]nder Rule 11 it is the signature of the attorney that certifies the legitimacy of the filing." 780 F. Supp. 1396, 1428 (D.D.C. 1991). The court concluded that a filing reversing a position long held by the defendant in protracted litigation was baseless and brought in bad faith. *Id*. at 1420–28. The filing bore the signatures of three attorneys. *Id*. at 1428. The signatures of two of those attorneys, however, were "apparently affixed" by the other. *Id*. at 1428. The court declined to sanction those two attorneys because there was "no evidence that [they] had enough knowledge of the history of this litigation to appreciate the frivolousness of the representations made in the [filing]." *Id*. By contrast here, recognizing the frivolousness of this lawsuit did not require a detailed understanding of its procedural history. In any event, the *Garrett* court expressly noted that its decision not to sanction the two attorneys was discretionary because it "could, under the law, proceed against [them] as well." *Id*. (citing *Robinson v. Chicago*, 868 F.2d 959 (7th Cir. 1989)).

Mr. Dershowitz maintains he did not intend to endorse Plaintiffs' claims and at most made an "honest mistake" about authorizing his signature as "of counsel." (*See, e.g.*, Doc. 113 at 2–3; Doc. 128 at 4.) As an initial matter, the Court observes that the effect of his signature on the filings was to create the impression that he did endorse the claims made therein. Further, to the extent he asserts he never reasonably expected to be subject to sanctions related to those claims, the Maricopa County Defendants followed the notice requirements under Rule 11(c). In any event, Mr. Dershowitz's subjective intent is not

controlling at this stage. As the Court previously noted, compliance with Rule 11 is largely measured by an objective standard. *See Smith v. Ricks,* 31 F.3d 1478, 1488 (9th Cir. 1994).

Lastly, Mr. Dershowitz and those who have written on his behalf raise policy reasons why Rule 11 should not apply, or should apply with lesser force, to govern attorneys who sign filings as "of counsel" with the intent of denoting their limited involvement in the issues raised therein. There is some merit to these points. The Court recognizes the contributions to be made by attorneys with specific expertise who lack the time or capacity to conduct the reasonable prefiling investigation Rule 11 requires. But an attorney in this situation may make his or her limited contributions without signing the pleadings. When an attorney makes the election to sign, his or her obligations under Rule 11 are not ambiguous and the Court must enforce them. *See Bus. Guides, Inc.*, 498 U.S. at 549 ("Once we conclude that Rule 11 speaks to the matter at issue, our inquiry is complete."). Moreover, these policy arguments only go so far. A contrary ruling here could diminish the significance of attorney signatures and cause courts to question whether they can be relied upon with confidence. It would offer safe harbor to attorneys who designate themselves "of counsel" no matter the inadequacy of the filings they sign. Taken to its conclusion, it could undermine the purposes of Rule 11 "to deter baseless filings," *Cooter & Gell v. Hartmarx Corp.*, 496 U.S. 384, 393 (1990), and "to bring home to the individual signer his personal, nondelegable responsibility." *Pavelic & LeFlore*, 493 U.S. at 460.

### 2.    28 U.S.C. § 1927

The same analysis does not hold under section 1927. There are important distinctions between these authorities. First, whereas Rule 11 applies to the presentation of a filing at any stage in the case, section 1927 focuses on "unnecessary filings and tactics once a lawsuit has begun." *Keegan Mgmt.*, 78 F.3d at 435. "The filing of a complaint may be sanctioned pursuant to Rule 11 or a court's inherent power, but it may not be sanctioned pursuant to § 1927." *Id*. Second, whereas the Rule 11 inquiry is largely objective, *Townsend*, 929 F.2d at 1362, "[s]anctions pursuant to section 1927 must be supported by a finding of subjective bad faith." *Blixseth v. Yellowstone Mtn. Club, LLC*, 796 F.3d 1004,

1008 (9th Cir. 2015). "[T]he conduct [must] be more severe than mere negligence, inadvertence, or incompetence." *Cruz v. Savage*, 896 F.2d 626, 632 (1st Cir. 1990).

Here, the Court imposed sanctions under section 1927 based on a finding that Plaintiffs' counsel acted at least recklessly by seeking an untimely and disruptive preliminary injunction based on Plaintiffs' inadequately supported claims. Central to this unnecessary multiplication of the proceedings was the MPI, which bore Mr. Dershowitz's signature, as did the subsequent briefing in support. As noted, his telephonic presence was also announced at the hearing on the MPI. These facts arguably could support a finding that he acted recklessly in lending his credibility to this unnecessary litigation. Thus, the Maricopa County Defendants maintain he is subject to sanctions under the statute.

Although this issue presents a closer call, the Court finds sanctions against Mr. Dershowitz are unwarranted under section 1927. First, because his involvement was limited, it is questionable whether he is responsible for "multipl[ying] the proceedings." 28 U.S.C. § 1927; *see FM Indus., Inc. v. Citicorp Credit Servs., Inc.*, 614 F.3d 335, 340 (7th Cir. 2010) ("[P]ersonal responsibility remains essential to an award of sanctions under § 1927."). Second, while Mr. Dershowitz's signature on the MPI and subsequent filings arguably toed the line of recklessness, the Court finds it fell closer to the side of negligence, which is insufficient for section 1927 liability. *See Cruz*, 896 F.2d at 632.

### 3.   Sanctions

The remaining issue is the appropriate sanction. The Court already concluded that payment of the Maricopa County Defendants' attorneys' fees is warranted in this matter and that the reasonable attorneys' fees total $122,200. The question is whether this sanction should apply equally to Mr. Dershowitz, or whether a different sanction is warranted.

As noted, Rule 11 sanctions "must be limited to what suffices to deter repetition of the conduct or comparable conduct by others similarly situated." Fed. R. Civ. P. 11(c)(4). The rule therefore serves the goals of both "specific and general deterrence." *Cooter & Gell*, 496 U.S. at 404. In determining the appropriate sanctions, the Advisory Committee suggested that a court consider:

Whether the improper conduct was willful, or negligent; whether it was part of a pattern of activity, or an isolated event; whether it infected the entire pleading, or only one particular count or defense; whether the person has engaged in similar conduct in other litigation; whether it was intended to injure; what effect it had on the litigation process in time or expense; whether the responsible person is trained in the law; what amount, given the financial resources of the responsible person, is needed to deter that person from repetition in the same case; [and] what amount is needed to deter similar activity by other litigants . . . .

Fed. R. Civ. P. 11, Advisory Comm.'s Note (1993). It made clear courts retain "significant discretion in determining what sanctions, if any, should be imposed for a violation." *Id*.

The Court has considered numerous factors weighing in favor of, and against, the imposition of monetary sanctions here. Several of those factors weigh heavily. On the one hand, Plaintiff Lake, Mr. Lindell, and, to a lesser extent, Mr. Parker, each highlighted Mr. Dershowitz's involvement in this case in an apparent effort to bolster their claims with his national profile. His involvement was cemented by the presence of his authorized signature on numerous filings, which he admittedly reviewed only briefly, if at all. Setting aside his effort to delimit his Rule 11 responsibilities by designating himself "of counsel," Mr. Dershowitz signed these documents and thereby certified they were adequately supported. In this sense, his conduct was both intentional and, ultimately, detrimental. Moreover, he disregarded not only his responsibilities under Rule 11, but also this Court's rules regarding *pro hac vice* admission, which he admittedly did not consult. Failing to impose meaningful sanctions here might very well encourage others to follow suit by lending their credibility to documents filed in court without facing any real consequence if their certifications prove hollow or incomplete. The need for general deterrence is therefore significant.

On the other hand, Mr. Dershowitz's involvement in this case was indeed limited and he made an effort—albeit a misguided one—to communicate his limited role. He did so apparently after discussing the issue with other attorneys and scholars. He therefore claims, with some credibility, to have committed nothing more than an "honest mistake." (*See, e.g.*, Tr. at 26:5–8.) If he did wrong, he has apologized and avows he will not do so

again. (*Id.* at 29:1–3.) The Court also finds some credibility in his claim that he was not contemporaneously aware that others held him out as having a substantial role in the case; his public participation appears largely to have been engineered by others. Thus, the specific deterrence concerns in this case are diminished and need not be vindicated by the imposition of joint and several liability for the full fee award. Further, any monetary sanction imposed should not be so significant as to dissuade other legal experts from providing advice or assistance in litigation out of fear of sanctions, provided they abide by the requirements of the rules in signing filings and entering appearances in those matters.

The general deterrence concerns posed by Mr. Dershowitz's conduct do require vindication, however. Attorneys must be reminded that their duties are not qualified in the way he suggests and that courts are entitled to rely on their signatures as certifications their filings are well-founded. The Court therefore will reduce Mr. Dershowitz's share of responsibility to ten percent of the total fee award, but not eliminate it entirely.

**IT IS THEREFORE ORDERED** granting in part and denying in part the Maricopa County Defendants' Application for Attorneys' Fees (Doc. 107). Plaintiffs' counsel Andrew D. Parker, the law firm of Parker Daniels Kibort LLC, Kurt B. Olsen, and the law firm of Olsen Law PC, are held jointly and severally liable for the Maricopa County Defendants' attorneys' fees in the amount of $122,200.00. Alan M. Dershowitz is held jointly and severally liable with the aforementioned parties up to the amount of $12,220.00. Payment shall be delivered to Maricopa County within thirty (30) days of this Order.

**IT IS FURTHER ORDERED** granting in part and denying in part the relief requested in the Application for Order to Show Cause (Doc. 108) filed by Mr. Dershowitz.

**IT IS FURTHER ORDERED** that if any party appeals this Order or the Court's Order of December 1, 2022 (Doc. 106), the obligation to pay the above-described attorneys' fees is stayed pending resolution of all appeals.

Dated this 14th day of July, 2023.

_____
Honorable John J. Tuchi
United States District Judge

- 26 -